**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action File No. 1:25-cv-** |
| **EDWIN BRANT FROST IV and FIRST LIBERTY BUILDING & LOAN, LLC** | |
| **Defendants, and** | |
| **FIRST LIBERTY CAPITAL PARTNERS LLC, FIRST NATIONAL INVESTMENTS LLC, MYHEALTHAI CAPITAL LLC, THE LEGACY ADVISORY GROUP INC., and THE LIBERTY GROUP LLC,** | |
| **Relief Defendants.** | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR ASSET FREEZE AND OTHER EQUITABLE RELIEF**

**I.  PRELIMINARY STATEMENT**

Between 2014 and June 2025, Defendants Edwin Brant Frost IV ("Frost"), and

First Liberty Building & Loan, LLC ("First Liberty") (together, "Defendants"),

raised at least $140 million from approximately 300 investors through the sale of

loan participation agreements and promissory notes which offered annual returns of

8% to 18%.  Defendants represented to investors that their funds would be used to

make short-term small business loans at relatively high interest rates ("Bridge Loans"). Defendants represented to investors that these Bridge Loans and interest thereon would be repaid by borrowers via Small Business Administration ("SBA") or other commercial loans, which Defendants claimed they would help broker.

Defendants, however, did not use investor funds as represented. Instead, of using investor funds to make Bridge Loans, Frost misappropriated investor funds for his personal use. For example, Frost used investor funds to make payments to himself and his family members in excess of $5 million. Frost further used investor funds to pay for the operations of affiliated companies that he controlled, First Liberty Capital Partners LLC ("FLCP"), First National Investments LLC, MyHealthAI Capital LLC, The Legacy Advisory Group Inc., and The Liberty Group LLC ("Relief Defendants"). The Relief Defendants received proceeds from this scheme without providing any value in return and were thus unjustly enriched thereby. As recently as May 24, 2025, Frost withdrew $100,000 investor funds for his personal use.

The Securities and Exchange Commission ("Commission") files this emergency action to preserve assets that have been procured though Defendants' fraudulent misappropriation of investor funds and are currently under the control of the Defendants and the Relief Defendants. In addition to an asset freeze, this motion seeks an order preventing the destruction of documents, an accounting and expedited

discovery.  The Commission also seeks the appointment of a receiver over First Liberty and the Relief Defendants.  The complaint ultimately seeks additional remedies of permanent injunctive relief against Defendants, disgorgement plus prejudgment interest against Defendants and Relief Defendants, and civil penalties against Defendants.

The sworn declaration of Tiffany Kunkle dated July 10, 2025 ("Kunkle Dec."), attached hereto as Exhibit 1, provides the basis for the facts set forth in this brief.

## II.  FACTS

### First Liberty's Investment Scheme

Starting in 2014, Defendants began raising capital via loan participation agreements offered to "friends and family."  "Friends and family" were later offered the opportunity to invest in promissory notes.  In 2024, Defendants expanded their capital raise by offering and selling promissory notes to the public via radio, internet program advertisements, and First Liberty's website.  [Kunkle Dec. ¶¶ 12-13.]

Defendants told investors in both investment programs that the invested funds were to be used to provide Bridge Loans to First Liberty customers who were trying to obtain long-term loans from the SBA.  [*Id*. ¶ 44.]  In total, Defendants raised at least $140 million from the sale of loan participation agreements and promissory notes to at least 300 investors.  [*Id*. ¶ 9.]

During the "friends and family" phase of Defendants' scheme, Defendants solicited investors to participate in specific Bridge Loans. For example, Frost would provide a potential investor with the total Bridge Loan amount, the anticipated closing date of the loan, and the date upon which the loan would mature. Additionally, Frost would provide the potential investor with information about the supposed borrower, the use of the funds, the existence of guarantees, and exit options for the loan. Investor funds were pooled together to reach the total amount purportedly needed to fund a specific Bridge Loan. [*Id.* ¶¶ 53-54 & Exs. A & B.]

The terms of the publicly advertised note program differed from the "friends and family" program. While the publicly advertised note program offered potential investors the opportunity to provide funding for Bridge Loans and pooled investor funds, investors did not participate in specific loans. First Liberty's website stated that the promissory notes allowed "First Liberty to provide small businesses with short term bridge loans and other commercial capital." As recently as May 2025, First Liberty's website stated that it had been providing commercial bridge lending since 2013 and that First Liberty had "funded over $100 million in bridge loans since 2013." [*Id.* ¶¶ 57-58.]

Both the "friends and family" and publicly advertised investments generally had a 12-month term (with rollover capability) and paid interest monthly. The "friends and family" agreements paid a rate of return between 14-18%, with investors

receiving the same interest rate regardless of investment size. The publicly offered notes paid between 8-13%, with the interest rate increasing based on the size of the investment, and investment tiers starting at $25,000. [*Id*. ¶¶ 10, 53-55 & Exs. C & D.]

Initially, in the "friends and family" program, First Liberty was to be compensated from the origination fee and other related fees that borrowers paid to obtain the Bridge Loans. [*Id*. ¶ 55 & Ex. C.] At that time, First Liberty charged 18% interest on the Bridge Loans and paid 18% interest on the loan participation agreements. Over time, Defendants began offering loan participation agreements at 16% interest but continued charging Bridge Loan borrowers 18% interest on their loans. [*Id*. ¶¶ 10, 55 & Exs. C & D.]

The loan participation agreements specifically state that all the fees paid on the loan belong to First Liberty and that First Liberty also would be compensated by the differential between the per annum interest rate paid by the Borrower to First Liberty and the per annum interest rate that First Liberty paid to the investors. [*Id*. ¶ 55 & Ex. C.] Some promissory notes contain a similar provision, while others are silent on the issue of Defendants' compensation. Frost, however, orally represented to promissory note investors that he and First Liberty did not take any fees out of the investor funds. [*Id*. ¶ 45.]

The difference (or spread) between the interest rates paid by the borrowers on the Bridge Loans and the interest rates First Liberty owed investors in the "friends and family" program was typically 2%. [*Id*. ¶ 15.] The promissory notes issued in the publicly advertised program do not identify the spread because those notes were not tied to specific borrowers. [*Id*. ¶ 16.] The spread and fees collected from borrowers did not generate enough revenue to pay the interest owed to investors. [*Id*. ¶¶ 26-27.]

**The Ponzi Scheme and Misrepresentations to Investors**

    A. ***First Liberty did not generate enough revenue from Bridge Loans to pay investors.***

Frost told investors that First Liberty used 100% of the proceeds from the sales of loan participation agreements and promissory notes to fund the Bridge Loans. [*Id*. ¶ 45.] Frost also told investors that they would be repaid from the repayment of the Bridge Loans and interest thereon. [*Id*. ¶ 46.] These representations were false.

An analysis of Defendants' bank records and a spreadsheet reflecting loans and investors shows that by no later than 2021, First Liberty began operating as a Ponzi scheme. [*Id*. ¶¶ 17-26.] At that time, even if all the outstanding Bridge Loans were fulfilling their interest obligations, First Liberty would not have had sufficient funds to pay investors and meet its payroll expense. [*Id*.] And by 2022, Defendants were not generating the maximum revenue from the Bridge Loans.

In August 2022, a Bridge Loan borrower with $6.2 million in loans filed bankruptcy and stopped making interest payments on its loans. Nevertheless, in December 2022, Defendants raised $6.5 million purportedly to make another loan to this borrower. [*Id*. ¶¶ 19-20.]

Defendants' potential revenue each year from 2019 to present calculated with the assumption that the Bridge Loans[1] were making full interest payments to First Liberty and deducting only payroll and credit card expenses[2] is set forth below:

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|---|
| Total interest payments First Liberty should have received from Bridge Loan borrowers | 1,201,188 | 3,450,675 | 5,228,188 | 8,164,425 | 12,156,963 | 18,727,147 | 8,695,014 | 57,623,599 |
| Total interest payments First Liberty owed to investors | (1,017,545) | (2,969,323) | (4,627,996) | (7,755,056) | (13,414,459) | (18,934,441) | (8,567,889) | (57,286,709) |
| **Subtotal** | **183,642** | **481,353** | **600,192** | **409,369** | **(1,257,496)** | **(207,294)** | **127,126** | **336,891** |
| Minus operating expenses | | | | | | | | |
| Payroll expenses | 0 | 0 | (795,849) | (963,808) | (1,029,108) | (1,304,216) | (756,983) | (4,849,963) |
| Credit Card expenses | (118,289) | (234,163) | (313,700) | (681,931) | (370,820) | (412,038) | (241,332) | (2,372,272) |
| | (118,289) | (234,163) | (1,109,548) | (1,645,739) | (1,399,928) | (1,716,254) | (998,314) | (7,222,235) |
| **Total Deficit** | **65,353** | **247,190** | **(509,357)** | **(1,236,371)** | **(2,657,424)** | **(1,923,547)** | **(871,189)** | **(6,885,344)** |

[*Id*. ¶¶ 26.] As reflected in the chart, Defendants did not generate sufficient revenues from the Bridge Loans to pay its operating expenses beginning in 2021. The only way that Defendants could continue making interest payments to new investors was to solicit new investors. By at least 2022, Frost knew that many Bridge Loans were

---

[1]     The analysis does not include any interest payments from the borrower who filed bankruptcy in August 2022 but does include the interest payments owed to investors for the Bridge Loans made to that borrower.

[2]     First Liberty incurred other expenses that are not included in this calculation.

in default, and that those Bridge Loans were not paying interest to First Liberty.  [*Id*. ¶ 56 & Ex. E.]  Nevertheless, First Liberty continued to make interest payments to all investors.  [*Id*. ¶ 51.]

### B.    Defendants misrepresented the success of the Bridge Loans

When soliciting new investors, Frost misrepresented the default rate of the Bridge Loans to investors.  Specifically, in connection with selling both the "friends and family" investments and the publicly advertised notes, Frost told some investors, including one in May 2025, that First Liberty had only ever had one Bridge Loan default.  [*Id*. ¶ 47.]  As recently as May 2025, when selling an investment, Frost told an investor that when the one Bridge Loan defaulted, First Liberty paid investors back with its own funds.  [*Id*. ¶ 48.]  When selling to other investors, Frost represented that only a few Bridge Loans had defaulted.  [*Id*. ¶ 49.]

At the time Frost made these representations he knew that at least five loans with principal balances totaling $12.7 million were no longer paying interest to First Liberty.  Frost also knew that First Liberty had not repaid investors the principal on any of these Bridge Loans and that First Liberty was continuing to pay investors interest on the Bridge Loans.  [*Id*. ¶¶ 19-20.]  Frost's representations regarding the success of First Liberty's Bridge Loan program were material to investors when deciding to invest with First Liberty.

Frost also misled investors about the security of the Bridge Loans. When selling investments, Frost told at least one investor that the borrowers to whom First Liberty made Bridge Loans had already received approval for SBA loans and that the Bridge Loan was only needed to provide funds while the SBA loan process was completed. [*Id.* ¶ 52.] In fact, few, if any, Bridge Loan borrowers had received preapproval for an SBA loan at the time the Bridge Loan was funded, and Frost knew that few Bridge Loans were ever converted to SBA loans. [*Id.* ¶ 59.]

Frost also misled investors about the security of their existing investments to obtain additional investments from those investors. For example, in 2019, an individual invested $500,000 in connection with a $3.4 million Bridge Loan to a borrower. The $3.4 million Bridge Loan closed in October 2019 and was to mature in May 2021 ("First Loan"). Subsequently, First Liberty made a second Bridge Loan to the same borrower in November 2019 for $900,000 that was to mature in June 2021 ("Second Loan"). In May 2021, after the First Loan matured but the investor was not repaid, First Liberty made a third loan to the same borrower for $1.5 million ("Third Loan"). In September 2021, First Liberty made a fourth loan to the same borrower for $400,000. ("Fourth Loan"). In August 2022, the Bridge Loan borrower filed for bankruptcy and ceased making interest payments on the Bridge Loans issued by First Liberty. [*Id.* ¶¶ 19-20 & 56.]

In May 2024, Frost solicited the investor in the First Loan for a new investment. Frost offered the investor the opportunity to participate with other investors in a loan that would be used to help fund a company that was developing a healthcare app. In response, the investor inquired about the status of repayment of his $500,000 investment in the First Loan. [*Id*. ¶ 53 & Ex. A.]

Frost told the investor that the First Loan was scheduled to pay off in June and that he was "very confident that it will." Frost also told the investor that the borrower was "up 20% YoY [year over year] in NOI [net operating income], and our lending partner who is refinancing this for us is very eager to get it done." Based on Frost's representations about the status of his $500,000 investment, the investor made an investment of $200,000 in a loan to First Liberty. [*Id*.]

Frost knew his statements to the investor about the First Loan were false when he made them. Frost knew by October 2022 that the borrower was in bankruptcy. On October 28, 2022, First Liberty filed a claim against the borrower in bankruptcy. The bankruptcy claim filed by First Liberty identified the Second and Third Loan. First Liberty did not make a claim for the $3.4 million First Loan or the Fourth Loan. The bankruptcy court ultimately approved an unsecured claim for First Liberty of $375,000. No payment has been made on First Liberty's claim. [*Id*. ¶ 56 & Exs. E & F.] Until First Liberty shuttered operations in June 2025, the investor received monthly interest payments on his $500,000 investment in the First Loan. [*Id*. ¶ 51.]

**<u>Defendants Fail to Disclose the Significant Default Rates</u>**

Each loan participation agreement contained a provision stating that First Liberty would provide notice to the investor if First Liberty obtained "actual notice or knowledge or any loss of Property or change in financial condition or any Obligor under the Loan which will have a material adverse effect upon continuation of payments under the Loan or its repayment on default." [*Id*. ¶ 55 & Ex. C.] Defendants failed to provide investors with notice of changes in borrowers' financial conditions despite knowing of at least five Bridge Loans that had defaulted and that the defaults would have a material adverse effect on the continuation of interest payments to investors and the repayment of the principal amount. [*Id*. ¶ 56 & Ex. E.] By at least 2023, Defendants issued loan participation agreements containing this notice provision, knowing that they did not intend to comply with it.

The loan participation agreements also contained a provision requiring the investor's consent before First Liberty could make additional loans to the borrower. Defendants failed to seek investor consent before making additional loans to existing borrowers. [*Id*. ¶ 55 & Ex. C.] By at least 2021, Defendants issued loan participation agreements containing the consent provision knowing that they did not intend to comply with it.

As recently as June 2025, Frost was soliciting investments in a $3.5 million loan and telling investors that First Liberty's cashflow and resources were sufficient

to repay investors if necessary.  [*Id.* ¶ 54 & Ex. B.]  This statement was false.  As of May 30, 2025, the balance in First Liberty's accounts was only $2,668,045.06.  [*Id.* ¶ 39.]

## Defendants Misappropriate Substantial Investor Funds

During Defendants' scheme, Frost misappropriated a significant amount of investor assets.  Between 2019 and 2024, Frost spent over $230,000 in investor funds to rent a vacation home for his family in Kennebunkport, Maine.  [*Id.* ¶ 33.]  Between 2019 and 2025, Frost used over $140,000 in investor funds to purchase jewelry.  [*Id.* ¶ 36.]  Additionally, Frost used investor funds to purchase a $20,800 Patek Philippe watch.  [*Id.* ¶ 38.]

Between 2022 and 2024, Frost paid over $335,000 in investor funds to a rare coin dealer.  [*Id.* ¶ 34.]  Frost also used investor funds to make over $2.4 million in payments to credit cards issued to him and his business entities.  [*Id.* ¶ 26.]  Frost has used investor funds to make more than $570,000 in political donations.  [*Id.* ¶ 29.]  Frost also has transferred more than $5 million of investor funds to himself and members of his family.  [*Id.* ¶ 30.]

Defendants directed investor funds to various entities related to First Liberty.  Specifically, Defendants directed over $630,000 to relief defendant FLCP.  Defendants directed over $1.1 million to relief defendant First National Investments LLC.  Defendants directed over $460,000 to relief defendant MyHealthAI Capital

LLC.  Defendants directed over $198,000 to relief defendant The Legacy Advisory Group Inc.  Defendants directed $8.3 million to relief defendant The Liberty Group LLC.  [*Id*. ¶¶ 60-64.]  None of these entities appear to have provided anything of value in return for these transfers.

In the last eight months, Frost has been dissipating assets at a rapid pace. From October 2024 through April 2025, Frost wrote checks from company accounts to himself for more than $1.3 million.  [*Id*. ¶ 32.]  Significantly, nine days after being interviewed by Commission staff, Frost withdrew $100,000 from company accounts containing investor funds.  [*Id*. ¶¶ 40-41.]  Very recently, Frost also has been making large purchases at companies that sell high value and easily concealable assets. Between December 2024 and May 2025, Frost wrote checks to a local jeweler totaling $40,570.  [*Id*. ¶ 37.]  In November and December 2024, Frost wrote checks from company accounts totaling $210,875 to a business that specializes in selling gold coins. [*Id*. ¶ 35.]

## III.   ARGUMENT

### A.   The Investments Are Securities

The loan participation agreements and promissory notes between Defendants and investors are investment contracts under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and the promissory notes also are securities under the "family resemblance" test adopted in *Reves v. Ernst & Young*, 494 U.S. 56 (1990).

Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include, among other things, an "investment contract." In *Howey*, the Supreme Court defined an investment contract to mean a contract, transaction, or scheme whereby a person makes (1) an investment of money, (2) in a common enterprise, (3) with the expectation of profits to be derived solely from the efforts of others. 328 U.S. at 298-99. Here, the first and third *Howey* factors are satisfied because at least 300 investors have provided principal investments totaling at least $140 million to First Liberty, were not involved in brokering the Bridge Loans or directing the use of the loan funds, and expected profits to be derived solely from the efforts of Defendants.

In the Eleventh Circuit, the second element, a "common enterprise," can be satisfied by a showing of "broad vertical commonality." *See SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 478-79 (5th Cir. 1974); *SEC v. Cont'l Commodities Corp.*, 497 F.2d 516, 520-523 (5th Cir. 1974). Broad vertical commonality requires only a finding that the fortunes of investors are linked to the efforts of the promoter or third parties. S*EC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199-1200 (11th Cir. 1999); *Koscot*, 497 F.2d at 479. Vertical commonality exists here because investors' returns were dependent upon the success of the Defendants, and the second requirement of *Howey* is met.

The promissory notes sold during the publicly advertised offering also qualify as securities under the Supreme Court's "family resemblance" test established in *Reves*. Under that test, a note is presumed to be a security unless it bears a strong resemblance to a judicially created list of non-security notes or the note is of a type that should be added to the list. *Reves*, 494 U.S. at 65-67. To determine whether a note is a security, the Supreme Court identified the following factors: (1) the motivation of the parties for entering the transaction; (2) the plan of distribution of the instrument; (3) the reasonable expectations of investors; and (4) whether some factor, such as the existence of another regulatory scheme, reduces the risk of the instrument, thereby rendering application of the securities laws unnecessary. *Id.* at 66-67.

Applying the *Reves* factors, the promissory notes are securities. Defendants sold the notes for investment purposes, and the purchasers of the notes were motivated to earn profits. The promissory notes do not fall within any of the types of instruments that *Reves* stated are not securities, they do not bear a family resemblance to the notes on the list, and they should not be added to the list due to factor four—there are no risk-reducing factors present here.

### B. The Defendants Violated the Antifraud Provisions of the Securities Act and the Exchange Act

Section 17(a) of the Securities Act of 1933 ("Securities Act") proscribes fraudulent conduct in the offer or sale of securities and Section 10(b) of the

Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder proscribe fraudulent conduct in connection with the purchase or sale of securities. *U.S. v. Naftalin*, 441 U.S. 768 (1979). Among other things, those statutes and the corresponding rule make it unlawful to make any untrue statement of material fact, or to omit any material fact necessary to make a statement not misleading, in the offer or sale of securities or in connection with the purchase or sale of securities. These provisions also reach beyond misrepresentations or omissions and encompass any wrongdoing by any person that rises to the level of a deceptive practice. *See Superintendent of Ins. v. Bankers Life and Cas. Co.*, 404 U.S. 6, 10 (1971).

Specifically, Section 17(a)(2) of the Securities Act makes it unlawful "in the offer or sale of any securities … to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." Rule 10b-5(b) prohibits the making of material misstatements and omissions to investors in connection with the purchase or sale of securities.

Defendants violated Section 17(a)(2) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5(b) thereunder by making material misrepresentations to investors concerning how the funds they invested would be used and obtained

money because of these material misrepresentations.  They led investors to believe the principal they invested was being used to make Bridge Loans to creditworthy individuals and entities and that few, if any, Bridge Loans actually defaulted. Defendants also led investors to believe that the interest payments investors received came from payments made by the Bridge Loan borrowers when Defendants actually were using new investor funds to pay interest to existing investors.

In addition, Rule 10b-5(a) prohibits "employ[ing] any device, scheme or artifice to defraud," and Rule 10b-5(c) bars "engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person," in connection with the purchase or sale of securities.  Section 17(a)(1) similarly prohibits "employ[ing] any device, scheme or artifice to defraud," and Section 17(a)(3) bars "engag[ing] in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon the purchaser," in the offer or sale of securities.

Here, Defendants engaged in a course of conduct designed to deceive investors and use the investment proceeds in a manner contrary to what they told investors, including by misappropriating investor funds.

Therefore, Defendants employed a "device, scheme, or artifice to defraud," in violation of Rule 10b-5(a) and Section 17(a)(1) and engaged in an "act" or "transaction, practice, or course of business" that "operated as a fraud or deceit" on

investors under Rule 10b-5(c) and Section 17(a)(3). *See Lorenzo v. SEC*, 139 S. Ct. 1094, 1101-02 (2019) (knowing dissemination of misrepresentations with an intent to deceive violates Rules 10b-5(a) and (c) and Section 17(a)(1)); *see also Malouf v. SEC*, 933 F.3d 1248, 1260 (10th Cir. 2019) (applying *Lorenzo* to Section 17(a)(3) because it "is virtually identical to Rule 10b-5(c)").

Scienter is required for Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and Section 17(a)(1) of the Securities Act, while a showing of negligence is required for Sections 17(a)(2) and (3) of the Securities Act. In this case, there is ample evidence to support, not just negligence or recklessness, but an actual specific intent to defraud by Defendants. The evidence to support this conclusion includes their misappropriation of funds and use of newly invested funds to make interest and principal payments to existing investors.

Because Frost controls First Liberty, his scienter is imputed to the entities. *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1096, n.16 (2d Cir. 1972). For these reasons, the Defendants have violated the anti-fraud provisions of the securities laws.

### C.     Liability of Relief Defendants

"A relief defendant is not accused of wrongdoing, but a federal court may order equitable relief against such a person where that person (1) has received ill-gotten funds, and (2) does not have a legitimate claim to those funds." *SEC v. Nat.*

*Diamonds Inv. Co.*, No. 9:19-CV-80633, 2019 WL 2583863, at *5 (S.D. Fla. June

11, 2019).  Here, the Relief Defendants received funds without providing anything of

value in return.  They are thus each liable to disgorge those funds with prejudgment

interest thereon.

## IV. <u>RELIEF REQUESTED</u>

### A. <u>Asset Freeze</u>

"A district court may exercise its full range of equitable powers, including

an asset freeze, to preserve sufficient funds for the payment of a disgorgement

award."  *SEC v. Torchia*, 183 F. Supp. 3d 1291, 1324 (N.D. Ga. 2016); *SEC v.

Lauer*, 478 F. App'x 550, 554 (11th Cir. 2012) (holding that "[t]he district court

may freeze assets in order to preserve funds while a party seeks an equitable

remedy such as disgorgement").  The purpose of an asset freeze is to "preserve the

status quo" and ensure that a defendant does not dissipate assets.  *SEC v. ETS

Payphones*, 408 F.3d 727, 734 (11th Cir. 2005); *Torchia*, 183 F. Supp. 3d at 1324.

Asset freezes are intended to protect the Commission's ability to collect

disgorgement and, because disgorgement is not limited to the specific assets illegally

obtained, asset freezes are not limited to those assets traceable to the fraud.  *See, e.g.*,

*SEC v. MCC Int'l. Corp.*, 2024 WL 1508281, at *3 (11th Cir. Apr. 8, 2024) (*citing

SEC v. Banner Fund Int'l, et al.,* 211 F.3d 602, 617 (D.C. Cir. 2000) and *FTC v.

Bronson Partners, LLC*, 654 F.3d 359, 373 (2d Cir. 2011)).

Defendants' decision to halt temporarily their efforts to solicit investors after learning of the Commission's investigation does not obviate the need for emergency relief. *ETS Payphones*, 408 F.3d at 733 (affirming preliminary injunction even though the defendant "has complied with the SEC since the inception of the SEC suit [because the court] . . . must weigh this compliance against the magnitude of the alleged fraud and examples of potential malfeasance, including a finding of scienter"); *Manor Nursing,* 458 F.2d at 1101 (noting that the "cessation of illegal activities in contemplation of an SEC suit does not preclude the issuance of an injunction enjoining violations"). "The reason is obvious: violators generally stop their illegal activities when under judicial scrutiny. But just because defendants may refrain from illegal activity during litigation does not mean they are unlikely to violate the securities laws again." *SEC v. Murphy*, 50 F.4th 832, 851 (9th Cir. 2022).

In *Starbucks Corp. v. McKinney*, 2024 WL 2964141, at *1 (2024), the Supreme Court established a four-part test to determine whether a party is entitled to emergency relief. Under that test, the Commission must show that: (1) it is likely to succeed on the merits of its claim; (2) irreparable harm will result in the absence of the emergency or preliminary relief; (3) the balance of equities tips in the Commission's favor; and (4) that the emergency relief is in the public interest. "The evidence presented for each of those criteria is balanced by the court on a sliding scale analysis: a much stronger showing on one or more of the necessary factors

lessens the amount of proof required for the remaining factors." *Collins & Co., Gen. Contractors v. Claytor*, 476 F. Supp. 407, 409 (N.D. Ga. 1979). The Commission can satisfy this standard.

First, the evidence shows that the Commission is likely to succeed on the merits of its claim. Defendants have made material misrepresentations when offering and selling securities and have engaged in a course of conduct intended to defraud investors. Defendants also have consented to permanent injunctions prohibiting them from future violations of the securities laws and an asset freeze.

Second, irreparable harm will result in the absence of an asset freeze. Since the very start of their scheme and continuing even after they learned of the Commission's investigation, Frost has been misappropriating a substantial portion of funds raised from investors. Although Defendants raised over $140 million from investors, the Commission has only been able to identify approximately $2.6 million remaining in bank accounts associated with Defendants. An asset freeze is necessary to ensure that Defendants do not further misappropriate or dissipate investor funds.

Third, the balance of equities also favors the Commission in this case, as the Defendants have defrauded more than 300 investors, and there is a pressing need to restrain Defendants from further misappropriating those investors' funds. *See, e.g., SEC v. Mizrahi*, CV-19-2284 PA, 2019 WL 3241185, at *4 (C.D. Cal. Apr. 10, 2019)

21

("The balance of the equities favor the SEC, which is safeguarding the public and client funds from further diversion.").  Fourth, an asset freeze is in the public interest, as it furthers the Commission's role to enforce the federal securities laws and safeguard the investing public.  *See, e.g., Mizrahi* at *6.  Finally, Defendants and Relief Defendants have consented to an asset freeze.

### B.    A Receiver is Necessary to Preserve Investor Funds

Pursuant to their general equity powers, courts may order ancillary relief to effectuate the purposes of the federal securities laws, to preserve defendants' assets, and to ensure that wrongdoers do not profit from their unlawful conduct. *SEC v. Blatt*, 583 F.2d 1325, 1335-36 (5th Cir. 1978).  In this regard, district courts have the power to appoint a receiver to marshal and preserve assets.  *SEC v. Materia*, 745 F.2d 197 (2d. Cir. 1984).

Courts consider multiple factors when determining whether to appoint a receiver.  These factors include:  (1)  whether the plaintiff has a valid claim; (2) whether the defendant committed or might commit fraud; (3) whether the property is in imminent danger of being lost, concealed, injured, diminished in value, or squandered; (4) whether adequate legal remedies are available; (5) whether any harm to the plaintiff by denying receivership would outweigh injury to the defendant; (6) whether the plaintiff has shown probable success in the action; and, (7) whether the plaintiff's interests will in fact be well-served by a receivership.  *Canada Life Assur.*

*Co. v. LaPeter,* 563 F.3d 837, 844 (9th Cir. 2009).  No single factor is dispositive.  *Id.*  An evidentiary hearing is not required on a plaintiff's request to appoint a receiver where the record discloses sufficient facts to warrant such an appointment.  *Bookout v. Atlas Fin. Corp.,* 395 F. Supp. 1338, 1342 (N.D. Ga. 1974), *aff'd*, 514 F.2d 757 (5th Cir. 1975).

Here, all of the factors weigh in favor of appointing a receiver.  The Commission has made a strong showing that the Defendants are committing securities fraud, and the Defendants have already dissipated substantial investor funds and assets.  Legal remedies will not suffice, as there are likely to be few assets against which investors could collect if First Liberty is allowed to continue operating as a Ponzi scheme.  Moreover, the harm to investors clearly outweighs any harm to Frost and First Liberty, which have already unjustly benefitted from the proceeds of their fraud.  Finally, Defendants and Relief Defendants have consented to the appointment of a receiver over First Liberty and the Relief Defendants.

### C. An Accounting, an Order Prohibiting Destruction or Concealment of Documents, and Expedited Discovery

The Commission requests that Defendants and Relief Defendants be ordered to provide an accounting of the use of investor funds in order to determine whether there are other entities or individuals who are in possession of investor funds or assets purchased using investor funds.  *Manor Nursing*, 458 F.2d at 1105; *SEC v. Lybrand*,

2000 WL 913894, at *12 (S.D.N.Y. July 6, 2000).  In addition, to preserve the Commission's ability to take effective discovery of the scope and magnitude of Defendants' fraud, the Commission requests an order prohibiting the Defendants from altering, concealing, or destroying relevant documents.  The Commission also requests expedited discovery to allow it to quickly identify additional assets.  The Defendants and Relief Defendants have consented to the requested to relief.

## V.  <u>CONCLUSION</u>

Based on the foregoing, the Commission respectfully requests that the Court issue an order imposing an asset freeze against Defendants and Relief Defendants and granting other relief as described above.

Respectfully submitted this 10th day of July, 2025,

*/s/ Kristin W. Murnahan*
M. Graham Loomis
Regional Trial Counsel
United States Securities & Exchange Commission
950 E. Paces Ferry Road NE, Suite 900
Atlanta, GA 30326
404-842-7622
Georgia Bar No. 457868
loomism@sec.gov

Kristin W. Murnahan
Senior Trial Counsel
United States Securities & Exchange Commission
950 E. Paces Ferry Road NE, Suite 900
404-842-7655
Atlanta, GA 30326
Georgia Bar No. 759054
murnahank@sec.gov

COUNSEL FOR PLAINTIFF

## CERTIFICATION OF COMPLIANCE

This is to certify that the foregoing was prepared using Times New Roman 14 point font in accordance with Local Rule 5.1 (B).

*/s/ Kristin W. Murnahan*
Kristin W. Murnahan