# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>      **Plaintiff,**<br><br>          v.<br><br><br>EDWIN BRANT FROST IV and FIRST LIBERTY BUILDING & LOAN, LLC<br><br>      **Defendants, and**<br><br>FIRST LIBERTY CAPITAL PARTNERS LLC, FIRST NATIONAL INVESTMENTS LLC, MYHEALTHAI CAPITAL LLC, THE LEGACY ADVISORY GROUP INC., and THE LIBERTY GROUP LLC,<br><br>      **Relief Defendants.** | Civil Action File No. 1:25-cv- |

## DECLARATION OF TIFFANY KUNKLE

Pursuant to 28 U.S.C. § 1746, the undersigned states as follows:

1.      I am a Senior Accountant in the Enforcement Division of the United States Securities and Exchange Commission (the "Commission").  I have been licensed by the State of Georgia as a CPA since 2003.  I am over eighteen years of age and am competent to make this declaration.

2.      I am the staff accountant who was part of the team assigned to the investigation of possible violations of the securities laws by the Defendants in the above-entitled cause of action, and I submit this declaration in support of the Commission's Emergency Motion for Asset Freeze and Other Equitable Relief.

3.      This Declaration is based upon my personal review of the following financial records, including monthly account statements, cancelled checks, deposit records, and wire details for the accounts listed below:

| Account Name | Financial Institution | Account Number | Start Date | End Date |
|---|---|---|---|---|
| First Liberty Building & Loan LLC | Truist | XXXXXXXXXXXX-2663 | May 31, 2018 | May 30, 2025 |
| First Liberty Capital Funding Acct | Truist | XXXXXXXXXXXX-2852 | May 31, 2018 | May 30, 2025 |
| First Liberty Capital Partners LLC | Truist | XXXXXXXXXXXX-5964 | May 31, 2018 | May 30, 2025 |
| First Liberty Capital Partners LLC, First Liberty Notes Acct | Truist | XXXXXXXXX-6642 | June 23, 2024 | May 30, 2025 |
| First National Investments LLC | Truist | XXXXXXXXXXXX-0003 | May 31, 2018 | May 30, 2025 |
| MyHealthAI Capital LLC | Truist | XXXXXXXXX-2742 | September 21, 2023 | May 30, 2025 |
| The Legacy Advisory Group Inc. | Truist | XXXXXXXXX-0746 | December 26, 2022 | May 30, 2025 |
| The Liberty Group LLC | Truist | XXXXXXXXXXXX-3854 | May 31, 2018 | May 30, 2025 |

4.      The Commission obtained the financial account information detailed in paragraph 3 above from Defendants' counsel.

5.      Based on my review of the accounts identified in paragraph 3, I have concluded that Defendants used funds they received from investors to pay interest and principal to other investors and to pay the personal expenses of Defendant Edwin Brant Frost IV ("Frost") and his family.

6.      The financial records show that Frost has raised investor funds through Defendant First Liberty Building & Loan LLC ("First Liberty") and

controls all the funds flowing in and out of the bank accounts of First Liberty, and Relief Defendants First Liberty Capital Partners LLC ("FLCP"), First National Investments LLC, MyHealthAI Capital LLC, The Legacy Advisory Group Inc., and The Liberty Group LLC (collectively the "First Liberty entities").

7.     Based on my review of the financial records, investor funds were pooled together in the bank accounts of the First Liberty entities.

8.     I also have reviewed a spreadsheet provided by Defendants' counsel that purports to reflect the Bridge Loans issued by Defendants.  This spreadsheet purports to contain information about the interest that borrowers owed to Defendants on the loans that First Liberty issued to borrowers.  The spreadsheet also contains some, but not all information about the interest owed to investors.

9.     Based on my review of this spreadsheet, it appears that Defendants solicited more than 300 investors to invest in loan participation agreements and promissory notes issued by FLCP and raised more than $140 million.

10.     Based on my review of this spreadsheet, it appears that the interest paid to investors varied from annual returns of 8% to 18%.  It appears that First Liberty generally charged borrowers 18% on the Bridge Loans.

11.     Based on my review of the spreadsheet, it appears that Defendants offered two different investment opportunities.

12.     One, which Mr. Frost said was offered to friends and family, offered investors the opportunity to make an investment that would be pooled with other investor funds and then lent to specific borrowers.

13.     The second, which Mr. Frost said was advertised via radio, the internet and First Liberty's website, offered investors the opportunity to enter into promissory notes with their funds being pooled with other investor funds and made available for Bridge Loans.

14.     The spreadsheet I reviewed contained a number of tabs.  One tab was identified as "Closed."  The "Closed" tab contained information about 22 loans.  Because Defendants identified those loans as "Closed", I assumed that those loans had been repaid.

15.     Another tab was identified as "FLCP" and contained information about 59 loans, including which investors had funded the loan as well as the maturity dates for many of the loans.  Most of those loans had maturity dates prior to 2025 but were not identified as closed.  For this reason, I assumed that those loans had not been repaid.  Based on the information in this tab, I determined that the difference (or spread) between the interest rates paid by the borrowers on the Bridge Loans and the interest rates First Liberty owed investors was typically 2%.

16.     Another tab was identified as "FLN" and contained investor information, including name, investment amount, and interest.  This tab did not

contain any information about any loans.  Based on the information that Defendants provided in the spreadsheet, I saw no evidence that the funds raised from the investors identified on the "FLN" tab were used to fund loans.  There is no information in the spreadsheet telling me what the spread between the interest paid to the investor and the interest paid on the Bridge Loan was.

17.    I used the spreadsheet provided by Defendants' counsel to analyze whether Defendants' business generated sufficient revenues to fulfill its obligations to investors.  In performing this analysis, I made certain assumptions.  All my assumptions favored the Defendants.

18.    First, I knew from the staff's investigation that it was likely that many of the Bridge Loans had defaulted and ceased making interests payments.  Nevertheless, for purposes of my analysis, I assumed that Defendants received interest payments from every borrower from the date the Bridge Loan was issued through May 30, 2025.[1]  If, as the staff believes, most of these loans had defaulted prior to their maturity date, my analysis overstates the amount of revenue generated by First Liberty.

19.    During our investigation, we did discover evidence that one borrower filed for bankruptcy in August 2022.  First Liberty made five loans totaling $12.7

---

[1]    My analysis also does not include three smaller loans, totaling $280,000, because I did not have sufficient information about the loan terms to include them.

million to this borrower. Four of those loans were made prior to the bankruptcy. In October 2019, Defendants made a $3.4 million Bridge Loan to the borrower, which matured in May 2021. In November 2019, Defendants made a $900,000 Bridge Loan to the borrower. In May 2021, Defendants made a $1.5 million Bridge Loan to the borrower. In September 2021, Defendants made a $400,000 Bridge Loan to the borrower. In my analysis, I excluded the interest payments from this borrower for these four loans starting in September 2022. Because the investors in these loans continued to receive interest payments on the loans, I included those interest payments in my analysis.

20.     The spreadsheet reflects a purported $6.5 million Bridge Loan to the borrower in December 2022, after the bankruptcy filing. While I included the interest payments owed to investors on this loan, I did not include any interest payments from the borrower on this loan.

21.     Second, I knew from the staff's investigation that several individuals who invested with First Liberty were not reflected on the spreadsheet. I did not include any investors who are not identified in the spreadsheet in my analysis. Had I included the additional investors the staff identified in my analysis, the amount that I determined First Liberty owed in interest payments would be higher.

22.     Third, while the spreadsheet identified some of the individuals who invested through the publicly advertised promissory note offering, the spreadsheet

did not identify the date upon which those individuals made their investment. Based on information obtained during the staff's investigation, the publicly advertised offering began in 2024. I assumed that all the investors identified on the spreadsheet invested as of June 2024 and were owed interest payments from June 2024 through May 30, 2025.

23. Fourth, the spreadsheet did not identify any loans made by First Liberty to Bridge Loan borrowers with funds invested through the publicly advertised promissory note offering. Nevertheless, I assumed that the total amount invested through that offering had been loaned out by First Liberty at an interest rate of 16% and that the interest was paid from June 2024 through May 30, 2025. If, as the staff believes, these investor funds were not used to fund Bridge Loans and were instead used to make Ponzi payments, my analysis overstates the amount of revenue that First Liberty was generating from June 2024 through May 2025.

24. Fifth, the spreadsheet did not include dates for some of the Bridge Loans issued by First Liberty. Because the spreadsheet identified each Bridge Loan with a chronological number, I assumed that the spreadsheet reflected the Bridge Loans in chronological order. Based on this assumption, if the origination date of the Bridge Loan was not identified, I used an origination date that fell between the origination dates of the loans before and after it on the spreadsheet.

25.     Finally, I assumed that all the credit card payments made using investor funds were for business expenses.  I did not obtain the credit card detail to determine if Frost used the credit cards for any personal expenses.

26.     My analysis is reflected below:

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|---|
| Total interest payments First Liberty should have received from Bridge Loan borrowers | 1,201,188 | 3,450,675 | 5,228,188 | 8,164,425 | 12,156,963 | 18,727,147 | 8,695,014 | 57,623,599 |
| Total interest payments First Liberty owed to investors | (1,017,545) | (2,969,323) | (4,627,996) | (7,755,056) | (13,414,459) | (18,934,441) | (8,567,889) | (57,286,709) |
| **Subtotal** | **183,642** | **481,353** | **600,192** | **409,369** | **(1,257,496)** | **(207,294)** | **127,126** | **336,891** |
| Minus operating expenses | | | | | | | | |
| Payroll expenses | 0 | 0 | (795,849) | (963,808) | (1,029,108) | (1,304,216) | (756,983) | (4,849,963) |
| Credit Card expenses | (118,289) | (234,163) | (313,700) | (681,931) | (370,820) | (412,038) | (241,332) | (2,372,272) |
| | (118,289) | (234,163) | (1,109,548) | (1,645,739) | (1,399,928) | (1,716,254) | (998,314) | (7,222,235) |
| **Total Deficit** | **65,353** | **247,190** | **(509,357)** | **(1,236,371)** | **(2,657,424)** | **(1,923,547)** | **(871,189)** | **(6,885,344)** |

27.     If First Liberty had received all the interest payments from Bridge Loan borrowers, it would not have made enough money to pay investor interest and cover First Liberty's basic operating expenses such as payroll and credit card expenses.

28.     Additionally, notwithstanding the fact that revenues were insufficient to cover Defendants' obligation to investors, my review of Defendants' bank records showed that from May 31, 2018 through May 30, 2025, Frost misappropriated more than $6.3 million of the investor funds for personal use.  The following provide some examples.

29.     Frost used investor funds to make $572,800 in political donations.

30.     In total, Frost has transferred $5,024,997 million of investor funds to himself and members of his family.

31.     Of that $5 million, from June 2018 through May 2025, Frost wrote checks made out to cash or made cash withdrawals totaling $355,166.

32.     Of that $5 million, from October 2024 through April 2025, Frost wrote checks from company accounts to himself totaling $1,324,000.

33.     Between 2019 and 2024, Frost spent $233,442 of investor funds to rent a vacation home for his family in Kennebunkport, Maine.

34.     Bank records show that between 2022 and 2024, Frost wrote checks totaling $337,195 of investor funds to a rare coin dealer. The memo line referenced "gold eagles" in most instances.

35.     Of that $337,195, between November and December 2024, Frost wrote checks from company accounts totaling $210,875 to the rare coin dealer.

36.     Bank records show that between 2019 and 2025, Frost paid $140,619 of investor funds to a jewelry store to purchase jewelry.

37.     Of that $140,619, between December 2024 and May 2025, Frost wrote checks to the jewelry store totaling $40,570.

38.     Additionally, Frost used investor funds to purchase a $20,800 Patek Philippe watch.

39.     As of May 30, 2025, the balance in First Liberty's accounts was $2,668,045.06.

40.     On May 15, 2025, the staff of the Commission conducted an investigative interview of Frost.  During that interview, Frost made similar misrepresentations to the staff that he made to investors.

41.     Nine days later, on May 24, 2025, Frost withdrew $100,000 from company accounts containing investor funds.

42.     During our investigation, we spoke with various individuals who invested with Defendants.  Additionally, we received documents from some of those individuals.

43.     Investors said that Frost told them that their funds would be used to make short short-term small business loans at relatively high interest rates.

44.     Defendants represented to investors that these Bridge Loans and interest thereon would be repaid by borrowers via Small Business Administration ("SBA") or other commercial loans, which Defendants claimed they would help broker.

45.     Frost told investors that First Liberty used 100% of the proceeds from the sales of loan participation agreements and promissory notes to fund Bridge Loans.

46.     Frost also told investors that they would be repaid from the repayment of the Bridge Loans and interest thereon.

47.     Several investors said that Frost had told them that First Liberty had only experienced one Bridge Loan default.

48.     One investor said that Frost told him in May 2025, that First Liberty had used its own funds to repay the investors in the one Bridge Loan that had defaulted.

49.     Other investors said that Frost told them that very few Bridge Loans had defaulted.

50.     Investors told the staff that the fact that very few Bridge Loans had defaulted was important to them when they decided to invest.

51.     Investors told us that they received interest payments on their investments until First Liberty ceased operations as of June 30, 2025.

52.     One investor told us that Frost represented that the borrowers to whom First Liberty made Bridge Loans had already received approval for SBA loans and that the Bridge Loan was only needed to provide funds while the SBA loan process was completed.

53.     One investor provided us with a copy of his email communications with Frost concerning when a Bridge Loan in which he had invested would be repaid.  A true and correct copy of that document is attached hereto as Exhibit A.

54.     Another investor provided us with a copy of an email solicitation that he received from Defendants in June 2025.  A true and correct copy of that document is attached hereto as Exhibit B.

55.     Several investors provided us with copies of their investment agreements with Defendants.  An example of a loan participation agreement is attached as hereto as Exhibit C.  An example of promissory note issued to an investor in the publicly advertised program is attached hereto as Exhibit D.

56.     During our investigation, we reviewed the bankruptcy filings of CurePoint, LLC, one of First Liberty's borrowers.  CurePoint filed bankruptcy in August 2022.  The Consent Motion to Approve the Compromise of First Liberty's claim, the Order granting that motion, and the Trustee's most recent post-confirmation report are attached hereto as Exhibits E, F & G.

57.     During our investigation, I reviewed the First Liberty website.  On the website, I found information about the publicly advertised promissory note offering.  The website stated that the notes offered to investors paid between 8 and 13%, with the interest rate increasing based on the size of the investment, and investment tiers starting at $25,000.

58.     First Liberty's website also stated that the promissory notes allowed "First Liberty to provide small businesses with short term bridge loans and other commercial capital."  As recently as May 2025, First Liberty's website stated that it

had been providing commercial bridge lending since 2013 and that First Liberty had "funded over $100 million in bridge loans since 2013."

59.     During our investigation, we found no evidence that the any Bridge Loan borrower received preapproval from the SBA for a loan.

60.     Defendants directed over $630,000 to relief defendant FLCP.

61.     Defendants directed over $1.1 million to relief defendant First National Investments LLC.

62.     Defendants directed over $460,000 to relief defendant MyHealthAI Capital LLC.

63.     Defendants directed over $198,000 to relief defendant The Legacy Advisory Group Inc.

64.     Defendants directed $8.3 million to relief defendant The Liberty Group LLC.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


Dated:  July 10, 2025

*Tiffany Kunkle*
_____
Tiffany Kunkle

# EXHIBIT A

**CAUTION:** This email originated from outside of the organization. DO NOT click links or open attachments unless you recognize the sender and know the content is safe. If you are unsure about an attachment or have questions, please contact IT Support.

Yes it will.  CurePoint is one of our strongest credits, the BK Trustee has just been dragging out the process for 2 yrs now at $1700 hr.

I am fully confident of you being paid, the only question is when.

If you need to exit some or part of one of your participations, just let me know and I will try to accommodate your needs.

Always want to serve you well Doug.

Regards,

BFIV

**Brant Frost,**
**IV**

***First Liberty Building & Loan***
Newnan, GA
770-253-4300-office
404-664-9086-cell



> **Caution:** This is an external email and has a suspicious subject or content. Please take care when clicking links or opening attachments. When in doubt, contact your IT Department

Brant
Thanks for the update.
I am concerned with the continued push back dates with the CurePoint loan.
I participated in the last 2 leases based on the payout dates of the CurePoint loan.
I know it is out of your hands and I have asked you this same question a couple times, since it was supposed to pay off in July2024 will CurePoint payoff in June 2025?
Thanks for your help

████████████

> **CAUTION:** This email originated from outside of the organization. DO NOT click links or open attachments unless you recognize the sender and know the content is safe. If you are unsure about an attachment or have questions, please contact IT Support.

█████ ,

Good afternoon.  Please see attached updated payoff dates for your participations with us.

Glad to add any additional color if you'd like.  Otherwise expect for all payments to continue until payoffs as noted.

Regards,

BFIV

**Brant Frost,**
**IV**
***First Liberty Building & Loan***
Newnan, GA
770-253-4300-office
404-664-9086-cell



---

**From:** ████████████████████
**Sent:** Monday, December 2, 2024 9:42 AM
**To:** Brant Frost IV <bf4@firstlibertyga.com>
**Cc:** Jayme Sickert <jsickert@firstlibertyga.com>
**Subject:** RE: CurePoint

> **Caution:** This is an external email and has a suspicious subject or content. Please take care when clicking links or opening attachments. When in doubt, contact your IT Department

Can I get an updated payoff for the attached?
Thanks

████████████

---

**From:** Brant Frost IV <bf4@firstlibertyga.com>
**Sent:** Tuesday, September 24, 2024 12:37 PM
**To:** ████████████████
**Cc:** Jayme Sickert <jsickert@firstlibertyga.com>
**Subject:** Re: CurePoint

**CAUTION:** This email originated from outside of the organization. DO NOT click links or open attachments unless you recognize the sender and know the content is safe. If you are unsure about an attachment or have questions, please contact IT Support.

Paying off Q4

Brant Frost, IV
*First Liberty Building & Loan*
Newnan, GA
770-253-4300-office
404-664-9086-cell

> On Sep 24, 2024, at 11:47 AM, Shook, Doug <doug@oslcares.com> wrote:

> Any update on CurePoint?

> **From:** ███████
> **Sent:** Monday, July 1, 2024 11:42 AM
> **To:** Brant Frost IV <bf4@firstlibertyga.com>
> **Cc:** Jayme Sickert <jsickert@firstlibertyga.com>
> **Subject:** RE: CurePoint

> OK
> Thanks

> **From:** Brant Frost IV <bf4@firstlibertyga.com>
> **Sent:** Monday, July 1, 2024 11:37 AM
> **To:** ███████
> **Cc:** Jayme Sickert <jsickert@firstlibertyga.com>
> **Subject:** RE: CurePoint

**CAUTION:** This email originated from outside of the organization. DO NOT click links or open attachments unless you recognize the sender and know the content is safe. If you are unsure about an attachment or have questions, please contact IT Support.

███████

Good morning. It is in u/w now with our large institutional lender for a closing in July, we have buy-in from the top two guys
there and it looks good.

We have our SBA loan as a back-up, but it looks like we will not need it.

Will keep you posted.

Regards,

BFIV

Brant Frost,
IV

***First Liberty Building & Loan***
Newnan, GA
770-253-4300-office
404-664-9086-cell

<image001.png>

**From:** ███████████████████ >
**Sent:** Monday, July 1, 2024 10:45 AM
**To:** Brant Frost IV <bf4@firstlibertyga.com>
**Cc:** Jayme Sickert <jsickert@firstlibertyga.com>
**Subject:** RE: CurePoint

Brant
Please advise the CurePoint payoff since it didn't pay off in June?
Thanks



<image002.png>

<image003.png>

***Committed to serving with faith, knowledge, compassion and love.***
***CONFIDENTIALITY NOTICE:*** *This message and accompanying documents are covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521, and contain information intended for the specified individual(s) only. This e-mail transmission, any electronic attachments or other inclusions herein may contain information that is confidential, proprietary, privileged, or otherwise exempt from disclosure. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, printing, distribution, or use of any information contained in or attached to this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately notify us by telephone at 770-888-4683. Please delete or otherwise destroy this e-mail with any inclusions and attachments. Your cooperation is appreciated. Thank You.*

**From:** Brant Frost IV <bf4@firstlibertyga.com>
**Sent:** Tuesday, June 11, 2024, 2:43 PM
**To:** ████████████████████

**CAUTION:** This email originated from outside of the organization. DO NOT click links or open attachments unless you recognize the sender and know the content is safe. If you are unsure about an attachment or have questions, please contact IT Support.

Tentatively yes, will confirm once we get a hard date.

Brant Frost, IV
***First Liberty Building & Loan***
Newnan, GA
770-253-4300-office
404-664-9086-cell

> On Jun 11, 2024, at 2:40 PM, Shook, Doug <doug@oslcares.com> wrote:
>
> Is CurePoint still scheduled to payoff this month?



<image002.png>

<image003.png>

***Committed to serving with faith, knowledge, compassion and love.***
***CONFIDENTIALITY NOTICE:*** *This message and accompanying documents are covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521, and contain information intended for the specified individual(s) only. This e-mail transmission, any electronic attachments or other inclusions herein may contain information that is confidential, proprietary, privileged, or otherwise exempt from disclosure. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, printing, distribution, or use of any information contained in or attached to this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately notify us by telephone at 770-888-4683. Please delete or otherwise destroy this e-mail with any inclusions and attachments. Your cooperation is appreciated. Thank You.*

---

**From:** Brant Frost IV <bf4@firstlibertyga.com>
**Sent:** Tuesday, May 7, 2024 10:53 AM
**To:**
**Cc:** Jayme Sickert <jsickert@firstlibertyga.com>
**Subject:** Re: New 16% opportunity with 3 to 1+ warrants

**CAUTION:** This email originated from outside of the organization. DO NOT click links or open attachments unless recognize the sender and know the content is safe. If you are unsure about an attachment or have questions, pl contact IT Support.

Will do.  At what level are you considering participating?

We have est $400K left.

Brant Frost, IV
*First Liberty Building & Loan*
Newnan, GA
770-253-4300-office
404-664-9086-cell

> On May 7, 2024, at 9:46 AM, ██████████████████████ wrote:
>
> Please send me the paperwork for this
> Douglas Shook

>> On May 3, 2024, at 5:09 PM, Brant Frost IV
>> <bf4@firstlibertyga.com> wrote:

>> **CAUTION:** This email originated from outside of the organization. DO NOT click links or open att recognize the sender and know the content is safe. If you are unsure about an attachment or ha contact IT Support.

>> Yes it is still scheduled to pay off in June, and yes I
>> am very confident that it will, they are up 20% YoY in
>> NOI, and
>> our lending partner who is refinancing this for us is
>> very eager to get it done.
>>
>> Let me know if you are still interested and if yes, at
>> what level.
>>
>> Regards,
>>
>> BFIV
>>
>> Brant Frost,
>> IV

*First Liberty Building & Loan*
Newnan, GA
770-253-4300-office
404-664-9086-cell

<image004.png>

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Friday, May 3, 2024 4:43 PM
**To:** Brant Frost IV <bf4@firstlibertyga.com>
**Subject:** RE: New 16% opportunity with 3 to 1+ warrants

I am interested.
Is Curepoint still scheduled to payoff in June? If so, how confident are you because every payoff date has been extended for the last 2 years?

**From:** Brant Frost IV <bf4@firstlibertyga.com>
**Sent:** Friday, May 3, 2024 2:04 PM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** New 16% opportunity with 3 to 1+ warrants

**CAUTION:** This email originated from outside of the organization. DO NOT click links or open att... recognize the sender and know the content is safe. If you are unsure about an attachment or ha... contact IT Support.

Dear ▮▮▮,

Good afternoon. We have a new high yield loan opportunity for your review.

The summary details are:
$3.5M loan amount
Medical Healthcare AI powered app
MyHealthAI.org
16% pay rate, int only paid monthly
Warrants that pay 100-300% or more of your participation if and when the company is sold for a minimum of $100M+
12 mo term w one 12 mo extension option
6 mo min interest earn
Secured by $15M in First Liberty controlled stock in MHAI
Less than 49% LTV
First Liberty is the borrower/guarantor
Provides liquidity for First Liberty as the primary capital source/partner for this new AI medical app.

Underlying company is so potentially profitable, and funding is time sensitive, hence the bonus warrant offer.
Exit is new capital coming into MyHealthAI over next 9-12 mos
Back up exit is new institutional financing available to MHAI in 12-18 mos
Expect to sell the company for $250-300M+ in 36 months.
$100K min.
$2.0M committed
$1.5M available
Funds on or before next Thursday 05/09

The warrant bonus is pro rata, so if the company sells for $250-500M, then the participant will receive 2.5-5 times their participation in bonus. i.e. $100K in = 2.5 or 5 to 1, $250-500K bonus
if the company sells for $250-500M.

MyHealthAI is a new market ready healthcare app powered by artificial intelligence which works thru your phone or thru a Bluetooth powered wearable.  It significantly lowers health care costs
and improves overall health and patient outcomes by focusing on well care vs sick care.

See company website here, scroll down 3-4 pages and watch 3 min summary video:  www.myhealthai.org

See short video on the flagship product RPM - Remote Patient Monitoring –
here:  https://tinyurl.com/mhai-vid1

Patients are valued at $1,000 each in companies like MHAI, so with 15K patients signed up to date, we have created $15M in enterprise value in 8 months.  We believe it is very conservative to have 250-300K patients signed up in 24-36 months, giving the company a value of $250-300M.

We just signed a rural hospital CFO as our latest BDO – Business Development Officer.  He has a clear line of sight to sign up 20K patients within his existing hospital relationships in the next
12 months without prospecting any new rural hospitals, medical practices or ACOs.  WE may well get to a million patients if things go well.

The development team spent 3 yrs writing code for this app, and it was launched in October 2023.  They have

signed up 15,000 patients to date, with 250K more in the queue. The architect and visionary
of the app is a 4 yr trusted friend and client; he has built and sold one $300M company and is a brilliant code writer and software developer.

MHAI is a B2B play, with rural hospitals, non-hospital linked medical practices and ACOs – Accountable Care organizations - as the primary customers. All three of these potential customers are typically
starved for revenue and are looking for new ways to deliver better patient outcomes and increase cash flow to boot; MHAI helps them do both with zero up-front capital outlay.

This is the most compelling opportunity we have sponsored to date.

Please let me know if you are interested in this opportunity and if yes, at what level.

Regards,

BFIV

 Brant Frost, IV

**First Liberty Building & Loan**
Newnan, GA
770-253-4300-office
404-664-9086-cell

<image004.png>

<image004.png>

# EXHIBIT B

From:               Brant Frost IV <bf4@firstlibertyga.com>
Sent:             Monday, June 16, 2025 5:00 PM
To:
Subject:        18-20% loan opportunity - AI Loan Underwriter

Dear ███,

Good afternoon.  We have a direct participation First Liberty loan opportunity for your review.

The summary details are:

$3.500M loan amount
18-20% rate depending on participation amount
Funds the development of AI driven commercial loan underwriting software
Secured by First Liberty's corporate guarantee
Secured also by assignment of our interest in this $30M est value company once built – est time to do so 18-30 months
24 mo term
One 12 mo extension options
Exit is the sale of the underwriting software company in 18-30 mo for est $30-100M
Back up exit is payoff from loan fees generated by the nationwide lender network that this software creates
2nd back up exit is from cash flow and resources of First Liberty, which are sufficient to repay this loan if necessary
$100K min
$500K max
$100K+ pays 12% annual pay rate with a 6% per annum bonus at exit – 18% total annual yield
$250K+ pays 13% annual pay rate with a 7% per annum bonus at exit – 20% total annual yield
Funding by cob next Tuesday 06/24

Our partner is AGYL AI, a boutique software development firm that builds custom software for B2B clients like ours.  Over the last two months
they have built a working model of "DuePoint", our new AI driven software system.  DuePoint will allow our underwriting team to increase
productivity from preparing one loan credit memo every 1-2 days, to preparing 5-10 loan credit memos per day.

We will use these funds to finish the initial version of the software for ourselves and, to market it to other community banks and credit unions
across the country.  Our partners at AGYL AI already have half a dozen lenders who are interested in buying a subscription to DuePoint.  Their
initial research indicates that the banking market will pay a $5k mo subscription fee or $60k yr, which is less than half of the $150K avg salary
of a commercial loan underwriter.

With just 50 bank customers at $60k apiece per yr in subscription fee income, DuePoint will have $3M in ARR, annual recurring revenue.  Fast
growing B2B software firms like this one trade at 10 x or more of ARR – annual recurring revenue.  At $5M or more of ARR, a fast-growing B2B
software company can trade at 15-20 x ARR.

So, with just 50 bank customers, we could sell DuePoint for $30M; with 100 customers we could sell it for $100M+.  We believe that either of
these goals is achievable in 18-30 months.

Another compelling feature that we are building into DuePoint is a loan referral system, where our customer community banks can refer back to
First Liberty, pre-screened "A" credit loan requests that are doable by some lender, but just not by them.  We will pay a 20% referral fee to our
DuePoint partner banks, and earn  80% of the loan fees generated by these referred loans.

At just one loan referral per month from each of 50 community bank partners, at a low avg loan amount of $1M, we will earn $7-10M in additional
net annual loan fee income.  Under competitive pressure from the mega banks, community banks are starved for income.  This loan referral system
allows community banks to earn much needed fee income from loans they otherwise could not do.

Our entire focus at First Liberty is helping the Main Street business owner, entrepreneur and investor; DuePoint allows us to help Main Street community
banks and credit unions as well by offering them Wall Street level technology and, a loan referral system that generates much needed new fee income.

This project generates profits three ways:

1) It 5-10 folds our loan underwriting productivity, thus allowing us to increase our profitability accordingly.
2) It creates a loan referral network among our new partner banks that should conservatively earn for us $7-10M in additional ann fee income
3) And it builds a B2B software company that, with just 50-100 bank customers, allows us to sell the company for $30-100M in est 18-30 mo.

We are delighted to share some of this potential upside with you, hence the handsome return offered.

We will need your funds for this opportunity by cob 06/24, Tuesday of next week.

Please let me know if you are interested and if yes, at what level.

Gratefully,

Brant

*Brant Frost, IV*
*First Liberty Building & Loan*
Newnan, GA

770-253-4300-office
404-664-9086-cell



# EXHIBIT C

# LOAN PARTICIPATION AGREEMENT

**DATE AND PARTIES.** The date of this Loan Participation Agreement (Agreement) is February 15, 2023. The parties and their addresses are:

**ORIGINATING LENDER (Seller):**

> FIRST LIBERTY CAPITAL PARTNERS, LLC
> P. O. Box 2567
> Newnan, GA 30264

**PARTICIPANT (Purchaser):**



**1. LOAN BACKGROUND INFORMATION.** A Promissory Note evidencing a Loan from Originating Lender to Borrower was executed in favor of Seller as follows:

| | |
|---|---|
| **A. Borrower Name and Address:** | **Tie and Timber Technologies, 301 South Cypress Street, Mullins, SC 29574** |
| **B. Date of Loan:** | **February 15, 2023** |
| **D. Loan Amount:** | **Two Million Five Hundred Thousand and 00/100 Dollars** |
| **E. Outstanding Principal Balance:** | **Two Million Five Hundred Thousand and 00/100 Dollars** |
| **F. Due Date:** | **February 29, 2024.** |

## 2. SALE OF PARTICIPATION.

**A. Purchase of Participation.** Purchaser agrees to purchase a **$100,000.00** participation in the Loan from Seller on the terms and conditions hereinafter stated. This sale is made without recourse to Seller.

**B. Purchaser's Share of Borrower Principal Payments.** Purchaser's percentage of all Principal Payments is **4%**.

**C. Purchaser's Interest Rate.** Purchaser's Interest Rate shall be **16.0%** per annum.

**D. Purchaser's Interest in Loan Documents.** This Agreement includes the sale to Purchaser of a Share in all notes and other instruments evidencing indebtedness of Borrower in the Loan, together with all security interests in the Property securing such indebtedness. Purchaser and Seller agree that Purchaser will be considered for all purposes the legal and equitable owner of the above Share in the Loan, related documents, and Property and will possess all applicable rights, privileges and remedies, subject to other provisions of this Agreement.

## 3. PAYMENTS.

### A. PAYMENTS IN GERNERAL.

Seller will receive all Payments and apply them to Borrower's account. Payments received by Seller under the Loan will be held for the benefit of Seller and Purchaser until the payments are actually paid to and received by Purchaser. Seller's contribution to the Loan is "first in, last out" and, in the event of a shortfall in Borrower's payment of any amounts owing under the Note, Seller shall not receive any payment under the Note until the shortage owed to Purchaser is paid. If Seller must refund any part of a Payment that was remitted to Purchaser to Borrower or any other person, Purchaser shall remit to Seller immediately the amount received by Purchaser relating to such refunded Payment.

**4. EXPENSES.** Seller may at its discretion make additional advances for taxes, insurance premiums and other items deemed necessary by Seller to collect, enforce, or protect the Loan and any Property securing the Loan including, but not limited to, attorneys' fees, court costs and disbursements. Purchaser's share of such expenses is **4%.**

**5. BORROWER FEES.** Borrower Fees shall belong to Seller. All Borrower Fees have been or shall be paid to Seller as collected from Borrower.

**6. ADMINISTRATIVE FEES.** Seller will bear all costs of administering and servicing the Loan and shall be compensated by the **2%** differential between the **18%** per annum interest rate paid by Borrower to Seller and the **16%** per annum interest rate paid to by Seller to Purchaser.

**7. SECURITY.** The Loan is secured by one or more guaranty agreements and the following Property, all of which is evidenced by executed security agreements, assignments, mortgages, deeds of trust or other instruments in favor of Seller. A security interest in the Property is assigned and sold to Purchaser, subject to other provisions within this Agreement, in proportion to Purchaser's Investment and is held by Seller for the benefit of Purchaser. Upon full payment of Purchaser's Investment plus interest thereon the security interest given to Purchaser will be null and void.

Property description: Lien on furniture, fixtures, equipment, inventory, accounts receivables, and other personal property of Borrower.

**8. UNRELATED CREDIT OF BORROWER.** If Borrower requests or continues other credit unrelated to the Loan, Seller and Purchaser agree that they will not provide this credit without first obtaining the consent of the other.

**9. DEFINITIONS.** In this Agreement, pertinent terms and their definitions are as follows.

**A. Borrower Fees.** Borrower Fees include, but are not limited to, commitment fees, servicing fees, late charges, prepayment penalties and other similar fees received from Borrower and not defined as a Payment.

**B. Default.** Default includes all definitions of the term used in any Loan Documents and other related instruments evidencing the Borrower's indebtedness.

**C. Loan.** Loan means Borrower's obligation as described in this Agreement and includes, but is not limited to, all extensions, renewals, modifications and re-financings of Borrower's obligation as well as all collateral and assurances of repayment taken in connection with the Loan.

**D. Loan Documents.** Loan Documents refer to all the documents executed as a part of or in connection with the Loan.

**E. Obligor.** Obligor includes all borrowers, co-makers, guarantors and endorsers of the Loan.

**F. Payments.** Payments includes principal, interest, and other charges received by Seller with respect to the Loan from whatever source derived including, but not limited to, all sums realized from any endorser, guarantor, or other person liable with respect to the Loan; all sums realized from the exercise by Seller of any rights pursuant to a lien or right of set-off with respect to any deposit balance or other property of the Borrower; any insurance proceeds or casualty awards; and any proceeds from the sale, liquidation, exchange, or substitution of the Property.

**G. Purchaser's Interest Rate.** Purchaser's Interest Rate means the rate specified in this Agreement.

**10. DOCUMENTATION OF LOAN.** Except as required for recording, Seller will hold all writings concerning the Loan, including all security instruments and guaranties, and will maintain records pertaining to the Loan. Purchaser acknowledges receipt of all copies of Loan Documents which Purchaser specifically requested and deemed reasonably necessary to fully evaluate the quality of the Loan before consenting to this Agreement. All Loan Documents are available at Seller's office for Purchaser's inspection and copying at normal lobby hours upon reasonable advance notice and at such other times as Seller may permit. Unless otherwise agreed, Seller will from time to time provide Purchaser with complete and current credit information regarding the following: Loan accrual status; status of principal and interest payments; financial statements, Property values and lien status; and any factual information bearing on the Borrower's continuing credit worthiness.

**11. INTENTIONALLY OMITTED.**

**12. ADMINISTRATION.**

**A. Loan Servicing.** Seller may administer the Loan and any related security and guaranties as though it were the sole owner and holder thereof. Except as provided below, Seller will make all decisions concerning the servicing of the Loan and any related security and guaranties, acceleration, foreclosure, acquisition of other security or guaranties, deficiency judgments, purchase at foreclosure sales, and administration and disposition of acquired security. Seller will not, without Purchaser's written consent, reduce principal or interest with respect to the Loan or release or allow for the substitution of any Property, outside the normal course of dealing with Borrower so as to substantially reduce the possibility of repayment of the Loan. Seller will not, without Purchaser's written consent, renew, extend or consent to the revision of the provisions of any note or security documents covered or waive any claim against Obligor.

**B. Seller's Duty to Purchaser.** Seller will use the same degree of care in servicing and collecting the Loan as it would for its own accounts. Seller will not be liable to Purchaser for any action taken or omitted or for any error in judgment, except for bad faith or willful misconduct.

**C. Participation Payments.** Seller will remit Purchaser's percentage of the Payments and any shared Borrower Fees not later than the close of the tenth business day following receipt of any Payments or

Borrower Fees. If shared, Expenses and Administrative Fees will be charged to and payable by Purchaser from time to time as they are incurred or as otherwise agreed. Unless otherwise agreed, such charges will be deducted from the amount of any Payments or Borrower Fees to be remitted to Purchaser from time to time, but will not exceed the total amount to be remitted to Purchaser at any one time. At Seller's option, and upon reasonable notice to Purchaser, Seller may demand full payment of any outstanding Expenses or Administrative Fees due Seller. If Seller must refund any part of a Payment that was remitted to Purchaser to Borrower or any other person, Purchaser shall remit to Seller immediately the amount received by Purchaser.

**13. FAILURE TO REMIT PAYMENTS.** If Seller fails to remit amounts received from Borrower that are due and payable to Purchaser as specified in this Agreement then all of the following applies.

**A. Purchaser's Duty.** Purchaser will not be responsible for any Expenses or Administrative Fees incurred by Seller until all amounts owing Purchaser are paid in full with applicable interest.

**B. Seller's Penalty.** Seller will pay to Purchaser, in addition to the full amount of any late amounts due and payable to Purchaser, a penalty on the late amounts equal to any penalty specified on the Promissory Note or, if none is specified, the Promissory Note rate.

**14. FUNDING OF THE PARTICIPATION.** Purchaser will pay to Seller on demand (in immediately available funds as agreed to herein) the amount agreed to in this Agreement.

**15. SELLER'S REPRESENTATIONS.** Seller represents that the Borrower is not in default on principal or interest payments; and that the terms of the Loan have not been renegotiated or compromised due to the deteriorating financial condition of Borrower.

**16. PURCHASER'S WARRANTIES.** Purchaser hereby represents and warrants to Seller that at the time Purchaser executes this Agreement, Purchaser has received all authorizations of its manager, members, board of directors, shareholders, stockholders and such other bodies or persons as are necessary to authorize Purchaser's purchase of the agreed upon Share, that such authorization was reflected in the appropriate minutes thereof and continues to be an official record of Purchaser, and that Purchaser has the financial ability to perform its obligations under this Agreement.

**17. LIABILITY AND DISCLAIMER OF WARRANTIES.** Purchaser acknowledges that it has made an independent investigation of the Loan, and has satisfied itself with respect to the credit standing of any Obligor of the Loan, the value of any security for the Loan, the validity and enforceability of the Loan agreement, the Promissory Note and any guaranty and security and all other matters in connection with the Loan. Purchaser acknowledges that it is not relying upon Seller's judgment, and that Seller has made no warranty of any kind, express or implied, in connection with the Loan or any of the foregoing. Unless otherwise agreed, Seller makes no warranties or representations regarding the legality, perfection, enforceability, or priority of any security interests, mortgages, guaranties, or similar documents issued in connection with the Loan. Purchaser agrees to share the risks of collection of the Loan and of the adequacy of the Property in proportion to Purchaser's Share. Purchaser releases Seller from any liability under state or federal securities laws arising from the failure of Seller to register the Purchaser's Share in the Loan. Purchaser and Seller acknowledge that based on their independent evaluations, Purchaser's Share in the Loan is either not a security under a federal or state law or, if a security, is exempt from registration or qualification.

**18. NOTIFICATION.** Seller and Purchaser will promptly notify each other should either receive actual notice or knowledge of any loss of Property or change in financial condition of any Obligor under the Loan,

which will have a material adverse effect upon continuation of payments under the Loan or its repayment on default. All notices will be sent by first-class mail and sent to the address shown in this Agreement.

**19. DEFAULT AND LIQUIDATION OF LOAN.** Subject to **Paragraph 3 PAYMENTS**, and the "first in, last out" nature of Seller's interest in the Loan, in the event of Default, or if Seller in its sole discretion should otherwise accelerate and liquidate the Loan, all Payments collected and received by Seller will be applied ratably as follows: first, to Expenses; second, to the unpaid principal amount of the Loan in proportion to the respective unpaid investments of Seller and Purchaser in the Loan at the time of Default; and third, to the respective accrued interest and other charges of Seller and Purchaser. Upon Borrower's Default, all Payments and Borrower Fees received from Borrower, whether designated for repayment of the Loan or undesignated, will be deemed intended for the repayment of the Loan in accordance with this Agreement.

**20. REMOVAL OF SELLER AS ADMINISTRATOR.** The Seller may be removed as the Loan's administrator under the following terms and conditions.

    **A. Qualifying Events.** Upon the occurrence of any of the following events, Purchaser may notify Seller and assume the administration of the Loan and related guarantees and security agreements as well as demand any documentation or writings reasonably necessary to evidence proof of Purchaser's security interest and perfection.

        **(1)** Seller fails to comply with Seller's fiduciary, contractual or legal obligations as provided under this Agreement or by state or federal law.

        **(2)** Seller petitions for or becomes subject to bankruptcy.

        **(3)** Seller commits any act of insolvency.

        **(4)** Seller is declared insolvent, is taken over, or otherwise closed by a governmental regulatory agency which has jurisdiction over Seller.

    **B. Multiple Participants.** In the event of multiple participants in the Loan, the participating lender with the then largest share will have the option to assume administration. If any participant possessing this option does not exercise its right upon the demand of the other participants, the option will then pass to the participant with the next largest share. Unless otherwise agreed, participants possessing equal shares in the Loan will share equally in administration.

    **C. Purchaser Rights.** Purchaser will have the right to notify and communicate with all Obligors of the Loan, and to direct them to pay any amounts due under the Loan directly to Purchaser or such other participant assuming administration of the Loan. Seller will join in this notice to Obligor upon request by Purchaser. Unless otherwise agreed, all remaining terms of this Agreement will survive Seller's removal as administrator until Purchaser's Investment is satisfied in full or the Loan is repurchased by Seller as provided in this Agreement.

    **D. Loan Repayment.** Upon the occurrence of any of the events in this section, all Payments received from Borrower, whether designated for repayment of the Loan or undesignated, will be deemed intended for the repayment of the Loan in accordance with this Agreement.

**21. ASSIGNMENT.** Neither Purchaser nor Seller may sell, pledge, assign, sub-participate, or otherwise transfer its interest in the Loan, Loan security, Loan guaranty or rights or obligations under this Agreement without the prior written consent of the other party which will not be unreasonably withheld, except that Seller may sell other participations in the Loan without Purchaser's consent. The duties and benefits of this Agreement will bind and benefit the permitted successors and assigns of Seller and Purchaser. Upon receipt by Purchaser of a bona fide offer from a third party to purchase, sub-participate or otherwise acquire Purchaser's interest in the Loan, Purchaser will notify Seller of the offer and provide Seller with the right of

first refusal. Seller will respond to Purchaser's offer in a timely manner. If Seller elects not to obtain Purchaser's interest, with Seller's consent Purchaser may transfer its interest to such third party.

**22. ATTORNEYS' FEES AND COSTS.** If any lawsuit or proceeding is brought by Seller or Purchaser to enforce the terms of this Agreement, the unsuccessful party will pay the prevailing party all its court costs and reasonable attorneys' fees incurred in bringing or defending such action.

**23. GENERAL PROVISIONS.**

**A. Partnership, Joint Venture, Agency, Trust.** Purchaser and Seller agree that this Agreement is not intended and is not to be construed to create a partnership, joint venture, agency, or trust relationship.

**B. Sale of Percentage.** This Agreement constitutes a sale of a percentage ownership interest in the Loan and is not and shall not be construed as an extension of credit by Purchaser to Seller. If federal or state laws or regulations, or a judicial decision, now or later provides that the purchase of a participation interest is an extension of credit, Purchaser and Seller agree that this Agreement shall constitute a security agreement under the Uniform Commercial Code and hereby grants to Purchaser a security interest in the Loan. Purchaser shall have all the rights and remedies of a secured party under the Uniform Commercial Code, including but not limited to rights upon default. Seller authorizes Purchaser to file one or more financing statements against Seller with respect to the Loan from time to time.

**C. Applicable Law.** This Agreement is governed by the laws of Georgia, the United States of America, and to the extent required, by the laws of the jurisdiction where the Property is located, except to the extent such state laws are preempted by federal law.

**D. Amendment, Integration And Severability.** This Agreement may not be amended or modified by oral agreement. No amendment or modification of this Agreement is effective unless made in writing and executed by Purchaser and Seller. This Agreement is the complete and final expression of the agreement. If any provision of this Agreement is unenforceable, then the unenforceable provision will be severed and the remaining provisions will still be enforceable.

**E. Remedies.** Nothing in this Agreement will be construed to limit Purchaser's or Seller's remedies to those described in this Agreement. Purchaser and Seller are allowed all Remedies at law or in equity.

**F. Interpretation.** Whenever used, the singular includes the plural and the plural includes the singular. The section headings are for convenience only and are not to be used to interpret or define the terms of this Agreement.

**G. Confidentiality.** Purchaser acknowledges that all information relating to the Loan is confidential and solely for Purchaser's use. Purchaser agrees not to share it with any other party.

**SIGNATURES.** By signing, Purchaser and Seller agree to the terms contained in this Agreement. Purchaser also acknowledges receipt of a copy of this Agreement.

**PURCHASER:**



By: _____ (SEAL)

SELLER:

FIRST LIBERTY CAPITAL PARTNERS, LLC, a Georgia limited liability company

By: _____ (SEAL)
    Brant Frost IV, its Manager

# EXHIBIT D



## FIRST LIBERTY NOTE

**DATE:** March 14, 2025

**MAKER:** FIRST LIBERTY CAPITAL PARTNERS, LLC
      14 Greenville Street
      Newnan, GA 30263

**PAYEE:**



**SIGNED:**

**AMOUNT:** $50,000.00

**ANNUAL RATE OF INTEREST:** 10% (paid monthly)

**TERM:** 12 MONTHS (FLCP may extend for one additional 12 month term)
Payee may request an early withdrawal of some or all of their funds with a sixty day written notice. A penalty of six months interest will be imposed on the amount withdrawn. This early withdrawal request option is made solely on a best-efforts basis using all reasonable diligence.

IN WITNESS WHEREOF, Maker has executed, signed, sealed, and delivered this Promissory Note as of the date appearing above.

MAKER: FIRST LIBERTY CAPITAL PARTNERS, LLC

BY: *Brant Frost IV/Manager*
Brant Frost IV/Manager

**THE DIRECT OR INDIRECT OWNERSHIP OF THIS NOTE BY NON-ACCREDITED INVESTORS IS PROHIBITED.**

# EXHIBIT E

IN THE UNITED STATES BANKRUPTCY
COURT FOR THE NORTHERN DISTRICT OF
GEORGIA ATLANTA DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Curepoint, LLC, | Case No. 22-56501-PMB |
| Debtor. | |

**CONSENT MOTION TO APPROVE COMPROMISE AND
SETTLEMENT OF CLAIM OF FIRST LIBERTY CAPITAL
PARTNERS, LLC (CLAIM NO. 21) PURSUANT TO RULE 9019
OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

COMES NOW, David A. Wender, solely in his capacity as the Liquidating
Trustee of the Curepoint Liquidation Trust (the "**Trustee**") for the above-captioned debtor (the
"**Debtor**") in the above-styled case (the "**Case**"), by and through counsel, and files this consent
motion (the "**Motion**") requesting entry of an order approving the compromise and settlement of
the claim asserted against the Debtor by First Liberty Capital Partners, LLC ("**First Liberty**",
together with the Trustee, the "**Parties**"), and respectfully represents to the Court the following:

**Jurisdiction, Venue and Statutory Predicates**

1.     The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and
1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is
core within the meaning of 28 U.S.C. § 157(b)(2).

2.     The statutory predicates for the relief sought herein are sections 105, 502, and 506
of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rule
9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and BLR 9019-
1.

## **Background**

3. On August 19, 2022 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

4. The Court approved the appointment of the Trustee on October 19, 2022. (D.I. 108).

5. On October 28, 2022, First Liberty filed Claim No. 21 (the "**Claim**") asserting an unsecured claim against the Debtor totaling $2,667,000. (*See* Claim).  The Claim is purportedly based upon a *Promissory Note* (the "**2019 Note**") in the principal amount of $900,000 dated November 22, 2019 (the "**2019 Loan**") and a *Promissory Note* (the "**2021 Note**," together with the 2019 Note, the "**Notes**") in the principal amount of $1,500,000 dated May 20, 2021 (the "**2021 Loan**," together with the 2019 Loan, the "**Loans**").  (*Id.*).  The Claim alleges that it includes: (i) $900,000 of principal and $198,000 of interest on account of the 2019 Loan and (ii) $1,500,000 of principal and $69,000 of interest on account of the 2021 Loan.  (*Id.*).  The maturity date for the 2019 Loan was May 31, 2021.  (*Id.* at 11).  The 2021 Loan was executed on May 20, 2021, approximately eleven (11) days prior to maturity of the 2019 Loan.  (*Id.* at 5).

## **Relief Requested**

6. By this Motion, the Trustee seeks entry of an order substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**") approving the compromise and settlement of the Claim.

7. After negotiations and in the interest of avoiding the uncertainties associated with litigation and its attendant costs, including collection risks, the Parties have agreed to a

compromise and settlement of the Claim on the following terms (the "**Settlement**"): the Claim

shall be an allowed unsecured claim in the total amount of $375,000.00.

## **Grounds for Relief**

8.      The Trustee requests that the Court approve the Settlement as outlined herein.  The

Settlement is the result of good faith, arm's length negotiations between the Parties.

9.      The Settlement meets all applicable legal standards and is well within the range

of reasonableness.

10.     The approval of a compromise and settlement in a bankruptcy case is within the

sound discretion of the court and will not be disturbed or modified on appeal unless approval or

disapproval of the settlement is an abuse of discretion.  *Rivercity v. Herpel (In re Jackson Brewing

Co.),* 624 F.2d 599, 602-03 (5th Cir. 1980).  In order to exercise its discretion properly, the court

must consider whether the compromise suggested "'falls below the lowest point in the range of

reasonableness.'" *Anaconda-Ericsson. Inc. v. Hessen (In re Teltronics Servs. Inc.),* 762 F.2d 185,

189 (2d Cir. 1985) (internal citation omitted).

11.     The Eleventh Circuit has held that the Court must consider and evaluate the

following factors:

  (a)      the probability of success in the litigation,

  (b)      the difficulties, if any, to be encountered in the matter of collection,

  (c)      the complexity of the litigation involved, and the expense, inconvenience
  and delay necessarily attending it, and

  (d)      the paramount interest of the creditors and a proper deference to their
  reasonable views in the premises.

*Wallis v. Justice Oaks II Ltd. (In re Justice Oaks II. Ltd.),* 898 F.2d 1544, 1549 (11th Cir. 1990).
In making its evaluation, a court must not rest its approval of the settlement on a resolution of the
ultimate factual and legal issues underlying the compromised disputes. *Teltronics, supra,* 762
F.2d at 189.  Rather, the court should consider the probable outcome of the litigation, including
its advantages and disadvantages, and make a pragmatic decision based on all equitable factors.
*Florida Trailer and Equip. Co. v. Deal,* 284 F.2d 567, 571 (5th Cir. 1960).

12.    Bankruptcy Rule 9019 provides that after conducting a hearing on notice to
creditors, the Bankruptcy Court may approve a compromise or settlement. To assure that
compromise is proper in a given case, the court must apprise itself of the necessary facts for an
intelligent, objective and educated evaluation and compare the "terms of the compromise with the
likely rewards of litigation." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry. Inc.
v. Anderson*, 390 U.S. 414, 424-25 (1968).

13.    The Settlement proposed herein clearly meets the standard for approval under
Bankruptcy Rule 9019 and is in the best interests of the bankruptcy estate and the Debtor's
creditors. The Settlement was reached after thorough analysis of the merits of the Claims.
Importantly, the Settlement will resolve costly disputes, expensive litigation and will free up
material sums for distribution to unsecured creditors.

14.    The Settlement is, therefore, in the best interests of the Debtor's estate because it
enables the estate to reduce the amount of outstanding claims in the Case and avoid lengthy and
costly litigation, the ultimate result of which is uncertain to the estate.

**Notice**

15.      Notice of this Motion will be given to: (a) the Parties; (b) the United States Trustee; (c) all parties requesting notices in the Case pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Trustee submits that no further notice need be given.

16.      No prior application for the relief requested herein has been made to this Court or any other court.

**Conclusion**

WHEREFORE, the Trustee respectfully requests that this Court approve the proposed Settlement detailed herein and grant such other and further relief as this Court may deem just and proper.


Dated:  September 4, 2024


Respectfully submitted,
/s/ *David A. Wender*
David A. Wender (Ga. Bar No. 748117)
Nathaniel T. DeLoatch (Ga. Bar No. 216330)
Eversheds Sutherland (US) LLP
999 Peachtree Street, NE, Suite 2300
Atlanta, GA 30309-3996
Telephone: 404.853.8175
Facsimile: 404.853.8806
Davidwender@eversheds-sutherland.com
Nathanieldeloatch@eversheds-sutherland.com

*Counsel for the Liquidating Trustee of the
Curepoint Liquidation Trust*

Consented to by,
/s/ *Fred B. Wachter (signed w/ express
permission)*
Fred B. Wachter, Esq. (Ga. Bar No. 729215)
The Wachter Law Firm
106 Hammond Drive NE
Atlanta, GA 30328
Telephone: 770.973.1100
Facsimile: 770.565.6666
fbwachter@wachterlaw.com

*Counsel for First Liberty Capital Partners,
LLC*

**EXHIBIT A**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| In re:<br><br>CUREPOINT, LLC,<br><br>               Debtor. | Chapter 11<br><br>Case No. 22-56501- PMB |

**ORDER APPROVING CONSENT MOTION TO APPROVE COMPROMISE AND SETTLEMENT OF CLAIM OF FIRST LIBERTY CAPITAL PARTNERS, LLC (CLAIM NO. 21), SUBJECT TO OBJECTION**

On September [•], 2024, David A. Wender, in his capacity as the Liquidating Trustee of the Curepoint Liquidation Trust (the "**Trustee**") for the above-captioned debtor (the "**Debtor**") in the above-styled case (the "**Case**"), filed the *Consent Motion to Approve Compromise and Settlement of Claim of First Liberty Capital Partners, LLC (Claim No. 21)* (D.I. [•]) (the "**Consent Motion**"), seeking the Court's approval of the Parties'[1] Settlement, as set forth in the Consent

---

[1] Terms used but not defined herein shall have the meaning ascribed to them in the Consent Motion.

Motion.  No hearing is necessary on the Consent Motion absent the filing of an objection to it. The Consent Motion demonstrates preliminarily that sufficient grounds exist to grant the Consent Motion and approve the Settlement. Accordingly, it is hereby

ORDERED that the Consent Motion is GRANTED, subject to objection as provided for herein; and it is further

ORDERED the Settlement between the Parties, as set forth in the Consent Motion, is hereby APPROVED; and it is further

ORDERED that any party in interest shall have twenty-one (21) days from the service of this Order to file an objection to the Consent Motion, the Settlement, and/or the relief provided in this Order; and it is further

ORDERED that if an objection is timely filed, counsel for the Trustee will set the Consent Motion and all such objections for hearing pursuant to the Court's Open Calendar Procedures; and it is further

ORDERED that if no objection to this Order is timely filed, this Order shall be a final Order approving the Consent Motion and the Settlement; and it is further

ORDERED that the Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order; and it is further

ORDERED that the Trustee shall, within three (3) days of the entry of this Order, cause a copy of this Order and the Consent Motion to be served by first class mail, postage prepaid,[2] on (i) the Parties; (ii) the United States Trustee, (iii) all parties requesting notices in the Case pursuant

---

[2] First class mail service is not required if the recipient is a registered ECF user who has agreed to waive all other service in favor of ECF service pursuant to Bankruptcy Local Rule 5005-8, in which case ECF notification shall serve as the required service.  The party certifying service should certify ECF service on such recipients.

to Bankruptcy Rule 2002, and (iv) and the Debtor's twenty (20) largest unsecured creditors, and

shall file promptly thereafter a certificate of service confirming such service.

**END OF ORDER**

Prepared and submitted by,

/s/_____

David A. Wender (Ga. Bar No. 748117)

Nathaniel T. DeLoatch (Ga. Bar No. 216330)

EVERSHEDS SUTHERLAND (US) LLP

999 Peachtree Street, NE, Suite 2300

Atlanta, GA 30309-3996

Telephone: 404.853.8175

Facsimile: 404.853.8806

Davidwender@eversheds-sutherland.com

Nathanieldeloatch@eversheds-sutherland.com

*Counsel for the Liquidating Trustee of the*
*Curepoint Liquidation Trust*

Consented to by,

/s/_____

Fred B. Wachter, Esq. (Ga. Bar No. 729215)

The Wachter Law Firm

106 Hammond Drive NE

Atlanta, GA 30328

Telephone: 770.973.1100

Facsimile: 770.565.6666

fbwachter@wachterlaw.com

*Counsel for First Liberty Capital Partners,*
*LLC*

## **DISTRIBUTION LIST**

Lindsay P. S. Kolba
Office of the U.S. Trustee
Suite 362
75 Ted Turner Drive, S.W.
Atlanta, GA 30303

David Wender
Eversheds Sutherland (US) LLP
Suite 2300
999 Peachtree St., NE
Atlanta, GA 30309-3996

Fred B. Wachter
The Wachter Law Firm
106 Hammond Drive NE
Atlanta, GA 30328

Will B. Geer
Rountree Leitman Klein & Geer LLC
Century Plaza I
2987 Clairmont Road, Suite 350
Atlanta, GA 30329

First Liberty Capital Partners, LLC
P.O. Box 2567
Newnan, GA 30264

Keith Logue
3423 Weymouth Court
Marietta, GA 30062

# EXHIBIT F



**IT IS ORDERED as set forth below:**

**Date: September 6, 2024**

_____
**Paul Baisier**
**U.S. Bankruptcy Court Judge**

_____

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| CUREPOINT, LLC, | Case No. 22-56501- PMB |
| Debtor. | |

**ORDER APPROVING CONSENT MOTION TO APPROVE COMPROMISE AND
SETTLEMENT OF CLAIM OF FIRST LIBERTY CAPITAL PARTNERS, LLC (CLAIM
NO. 21), SUBJECT TO OBJECTION**

On September 5, 2024, David A. Wender, in his capacity as the Liquidating Trustee of the

Curepoint Liquidation Trust (the "**Trustee**") for the above-captioned debtor (the "**Debtor**") in the

above-styled case (the "**Case**"), filed the *Consent Motion to Approve Compromise and Settlement*

*of Claim of First Liberty Capital Partners, LLC (Claim No. 21)* (D.I. 424) (the "**Consent**

**Motion**"), seeking the Court's approval of the Parties'[1] Settlement, as set forth in the Consent

_____
[1] Terms used but not defined herein shall have the meaning ascribed to them in the Consent Motion.

Motion.  No hearing is necessary on the Consent Motion absent the filing of an objection to it. The Consent Motion demonstrates preliminarily that sufficient grounds exist to grant the Consent Motion and approve the Settlement. Accordingly, it is hereby

ORDERED that the Consent Motion is GRANTED, subject to objection as provided for herein; and it is further

ORDERED the Settlement between the Parties, as set forth in the Consent Motion, is hereby APPROVED; and it is further

ORDERED that any party in interest shall have twenty-one (21) days from the service of this Order to file an objection to the Consent Motion, the Settlement, and/or the relief provided in this Order; and it is further

ORDERED that if an objection is timely filed, counsel for the Trustee will set the Consent Motion and all such objections for hearing pursuant to the Court's Open Calendar Procedures; and it is further

ORDERED that if no objection to this Order is timely filed, this Order shall be a final Order approving the Consent Motion and the Settlement; and it is further

ORDERED that the Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order; and it is further

ORDERED that the Trustee shall, within three (3) days of the entry of this Order, cause a copy of this Order and the Consent Motion to be served by first class mail, postage prepaid,[2] on (i) the Parties; (ii) the United States Trustee, and (iii) all parties requesting notices in the Case

---

[2] First class mail service is not required if the recipient is a registered ECF user who has agreed to waive all other service in favor of ECF service pursuant to Bankruptcy Local Rule 5005-8, in which case ECF notification shall serve as the required service.  The party certifying service should certify ECF service on such recipients.

pursuant to Bankruptcy Rule 2002, and shall file promptly thereafter a certificate of service confirming such service.

**END OF ORDER**

Prepared and presented by,

/s/ *David A. Wender*

David A. Wender (Ga. Bar No. 748117)
Nathaniel T. DeLoatch (Ga. Bar No. 216330)
EVERSHEDS SUTHERLAND (US) LLP
999 Peachtree Street, NE, Suite 2300
Atlanta, GA 30309-3996
Telephone: 404.853.8175
Facsimile: 404.853.8806
Davidwender@eversheds-sutherland.com
Nathanieldeloatch@eversheds-sutherland.com

*Counsel for the Liquidating Trustee of the Curepoint Liquidation Trust*

Consented to by,

*/s/ Fred B. Wachter (signed w/ express permission)*

Fred B. Wachter, Esq. (Ga. Bar No. 729215)
The Wachter Law Firm
106 Hammond Drive NE
Atlanta, GA 30328
Telephone: 770.973.1100
Facsimile: 770.565.6666
fbwachter@wachterlaw.com

*Counsel for First Liberty Capital Partners, LLC*

# EXHIBIT G

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF GEORGIA

### Atlanta Division

In re: Curepoint, LLC

§
§
§
§

_____
Debtor(s)

Case No.   22-56501 _____

☐ Jointly Administered

---

## Post-confirmation Report

Chapter 11

Quarter Ending Date: 03/31/2025 _____

Petition Date: 08/19/2022 _____

Plan Confirmed Date: 12/22/2023 _____

Plan Effective Date: 12/29/2023 _____

This Post-confirmation Report relates to:  ◯ Reorganized Debtor

◉ Other Authorized Party or Entity: Curepoint Liquidation Trust _____

Name of Authorized Party or Entity

/s/ Nathaniel T. DeLoatch _____
Signature of Responsible Party

04/30/2025 _____
Date

Nathaniel T. DeLoatch _____
Printed Name of Responsible Party

999 Peachtree St. NE, Suite 2300, Atlanta, GA 30309 _____
Address

STATEMENT: This Periodic Report is associated with an open bankruptcy case; therefore, Paperwork Reduction Act exemption 5 C.F.R. § 1320.4(a)(2) applies.

Debtor's Name Curepoint, LLC                                                Case No.  22-56501

## Part 1: Summary of Post-confirmation Transfers

|  | Current  Quarter | Total Since Effective  Date |
|---|---|---|
| a. Total cash disbursements | $75,018 | $1,826,745 |
| b. Non-cash securities transferred | $0 | $0 |
| c. Other non-cash property transferred | $0 | $0 |
| d. Total transferred (a+b+c) | $75,018 | $1,826,745 |

## Part 2: Preconfirmation Professional Fees and Expenses

| a. | | | | Approved Current Quarter | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|---|
| | Professional fees & expenses (bankruptcy) incurred by or on behalf of the debtor | | *Aggregate Total* | $75,018 | $1,475,618 | $75,018 | $1,475,618 |
| | *Itemized Breakdown by Firm* | | | | | | |
| | | Firm Name | Role | | | | |
| i | | Eversheds Sutherland | Lead Counsel | $75,018 | $1,226,684 | $75,018 | $1,226,684 |
| ii | | Chapter 11 Trustee | Other | $0 | $169,161 | $0 | $169,161 |
| iii | | RLKG | Other | $0 | $79,773 | $0 | $79,773 |
| iv | | | | | | | |
| v | | | | | | | |
| vi | | | | | | | |
| vii | | | | | | | |
| viii | | | | | | | |
| ix | | | | | | | |
| x | | | | | | | |
| xi | | | | | | | |
| xii | | | | | | | |
| xiii | | | | | | | |
| xiv | | | | | | | |
| xv | | | | | | | |
| xvi | | | | | | | |
| xvii | | | | | | | |
| xviii | | | | | | | |
| xix | | | | | | | |
| xx | | | | | | | |
| xxi | | | | | | | |
| xxii | | | | | | | |
| xxiii | | | | | | | |
| xxiv | | | | | | | |
| xxv | | | | | | | |
| xxvi | | | | | | | |
| xxvii | | | | | | | |
| xxviii | | | | | | | |
| xxix | | | | | | | |

Debtor's Name Curepoint, LLC                                    Case No.  22-56501

| | | | | | |
|---|---|---|---|---|---|
| xxx | | | | | |
| xxxi | | | | | |
| xxxii | | | | | |
| xxxiii | | | | | |
| xxxiv | | | | | |
| xxxv | | | | | |
| xxxvi | | | | | |
| xxxvii | | | | | |
| xxxvii | | | | | |
| xxxix | | | | | |
| xl | | | | | |
| xli | | | | | |
| xlii | | | | | |
| xliii | | | | | |
| xliv | | | | | |
| xlv | | | | | |
| xlvi | | | | | |
| xlvii | | | | | |
| xlviii | | | | | |
| xlix | | | | | |
| l | | | | | |
| li | | | | | |
| lii | | | | | |
| liii | | | | | |
| liv | | | | | |
| lv | | | | | |
| lvi | | | | | |
| lvii | | | | | |
| lviii | | | | | |
| lix | | | | | |
| lx | | | | | |
| lxi | | | | | |
| lxii | | | | | |
| lxiii | | | | | |
| lxiv | | | | | |
| lxv | | | | | |
| lxvi | | | | | |
| lxvii | | | | | |
| lxviii | | | | | |
| lxix | | | | | |
| lxx | | | | | |
| lxxi | | | | | |

UST Form 11-PCR (12/01/2021)                    3

Debtor's Name Curepoint, LLC                                              Case No.  22-56501

| | | | | | | |
|---|---|---|---|---|---|---|
| lxxii | | | | | | |
| lxxiii | | | | | | |
| lxxiv | | | | | | |
| lxxv | | | | | | |
| lxxvi | | | | | | |
| lxxvii | | | | | | |
| lxxviii | | | | | | |
| lxxix | | | | | | |
| lxxx | | | | | | |
| lxxxi | | | | | | |
| lxxxii | | | | | | |
| lxxxiii | | | | | | |
| lxxxiv | | | | | | |
| lxxxv | | | | | | |
| lxxxvi | | | | | | |
| lxxxvi | | | | | | |
| lxxxvi | | | | | | |
| lxxxix | | | | | | |
| xc | | | | | | |
| xci | | | | | | |
| xcii | | | | | | |
| xciii | | | | | | |
| xciv | | | | | | |
| xcv | | | | | | |
| xcvi | | | | | | |
| xcvii | | | | | | |
| xcviii | | | | | | |
| xcix | | | | | | |
| c | | | | | | |
| ci | | | | | | |

| | | | Approved Current Quarter | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|
| b. | Professional fees & expenses (nonbankruptcy) incurred by or on behalf of the debtor        *Aggregate Total* | | $0 | $245,130 | $0 | $245,130 |
| | *Itemized Breakdown by Firm* | | | | | |
| | Firm Name | Role | | | | |
| i | SOLIC | Financial Professional | $0 | $241,330 | $0 | $241,330 |
| ii | Radiology Oncology Systems | Other | $0 | $3,800 | $0 | $3,800 |
| iii | | | | | | |
| iv | | | | | | |
| v | | | | | | |
| vi | | | | | | |

Debtor's Name Curepoint, LLC                                          Case No.  22-56501

| | | | | | |
|---|---|---|---|---|---|
| vii | | | | | |
| viii | | | | | |
| ix | | | | | |
| x | | | | | |
| xi | | | | | |
| xii | | | | | |
| xiii | | | | | |
| xiv | | | | | |
| xv | | | | | |
| xvi | | | | | |
| xvii | | | | | |
| xviii | | | | | |
| xix | | | | | |
| xx | | | | | |
| xxi | | | | | |
| xxii | | | | | |
| xxiii | | | | | |
| xxiv | | | | | |
| xxv | | | | | |
| xxvi | | | | | |
| xxvii | | | | | |
| xxviii | | | | | |
| xxix | | | | | |
| xxx | | | | | |
| xxxi | | | | | |
| xxxii | | | | | |
| xxxiii | | | | | |
| xxxiv | | | | | |
| xxxv | | | | | |
| xxxvi | | | | | |
| xxxvii | | | | | |
| xxxvii | | | | | |
| xxxix | | | | | |
| xl | | | | | |
| xli | | | | | |
| xlii | | | | | |
| xliii | | | | | |
| xliv | | | | | |
| xlv | | | | | |
| xlvi | | | | | |
| xlvii | | | | | |
| xlviii | | | | | |

Debtor's Name Curepoint, LLC                                    Case No.  22-56501

| xlix | | | | | |
|---|---|---|---|---|---|
| l | | | | | |
| li | | | | | |
| lii | | | | | |
| liii | | | | | |
| liv | | | | | |
| lv | | | | | |
| lvi | | | | | |
| lvii | | | | | |
| lviii | | | | | |
| lix | | | | | |
| lx | | | | | |
| lxi | | | | | |
| lxii | | | | | |
| lxiii | | | | | |
| lxiv | | | | | |
| lxv | | | | | |
| lxvi | | | | | |
| lxvii | | | | | |
| lxviii | | | | | |
| lxix | | | | | |
| lxx | | | | | |
| lxxi | | | | | |
| lxxii | | | | | |
| lxxiii | | | | | |
| lxxiv | | | | | |
| lxxv | | | | | |
| lxxvi | | | | | |
| lxxvii | | | | | |
| lxxviii | | | | | |
| lxxix | | | | | |
| lxxx | | | | | |
| lxxxi | | | | | |
| lxxxii | | | | | |
| lxxxiii | | | | | |
| lxxxiv | | | | | |
| lxxxv | | | | | |
| lxxxvi | | | | | |
| lxxxvi | | | | | |
| lxxxvi | | | | | |
| lxxxix | | | | | |
| xc | | | | | |

Debtor's Name Curepoint, LLC

Case No.  22-56501

| | | | | | |
|---|---|---|---|---|---|
| xci | | | | | |
| xcii | | | | | |
| xciii | | | | | |
| xciv | | | | | |
| xcv | | | | | |
| xcvi | | | | | |
| xcvii | | | | | |
| xcviii | | | | | |
| xcix | | | | | |
| c | | | | | |
| ci | | | | | |
| c. | All professional fees and expenses (debtor & committees) | | $0 | $0 | $0 | $0 |

### Part 3: Recoveries of the Holders of Claims and Interests under Confirmed Plan

| | Total Anticipated Payments Under Plan | Paid Current Quarter | Paid Cumulative | Allowed Claims | % Paid of Allowed Claims |
|---|---|---|---|---|---|
| a. Administrative claims | $0 | $0 | $0 | $0 | 0% |
| b. Secured claims | $1,344,757 | $0 | $1,344,757 | $1,344,757 | 100% |
| c. Priority claims | $514 | $0 | $514 | $514 | 100% |
| d. General unsecured claims | $1,300,000 | $0 | $0 | $3,762,116 | 34% |
| e. Equity interests | $0 | $0 | $0 | | |

### Part 4: Questionnaire

a. Is this a final report?                                                                     Yes ◯    No ◉

    If yes, give date Final Decree was entered: _____

    If no, give date when the application for Final Decree is anticipated:  06/01/2025

b. Are you current with quarterly U.S. Trustee fees as set forth under 28 U.S.C. § 1930?         Yes ◉    No ◯

Debtor's Name Curepoint, LLC                                                    Case No.  22-56501

### Privacy Act Statement

28 U.S.C. § 589b authorizes the collection of this information and provision of this information is mandatory.  The United States Trustee will use this information to calculate statutory fee assessments under 28 U.S.C. § 1930(a)(6) and to otherwise evaluate whether a reorganized chapter 11 debtor is performing as anticipated under a confirmed plan. Disclosure of this information may be to a bankruptcy trustee when the information is needed to perform the trustee's duties, or to the appropriate federal, state, local, regulatory, tribal, or foreign law enforcement agency when the information indicates a violation or potential violation of law.  Other disclosures may be made for routine purposes.  For a discussion of the types of routine disclosures that may be made, you may consult the Executive Office for United States Trustee's systems of records notice, UST-001, "Bankruptcy Case Files and Associated Records."  *See* 71 Fed. Reg. 59,818 et seq. (Oct. 11, 2006).  A copy of the notice may be obtained at the following link: http://www.justice.gov/ust/eo/ rules_regulations/index.htm.  Failure to provide this information could result in the dismissal or conversion of your bankruptcy case, or other action by the United States Trustee.  11 U.S.C. § 1112(b)(4)(F).

**I declare under penalty of perjury that the foregoing Post-confirmation Report and its attachments, if any, are true and correct and that I have been authorized to sign this report.**

/s/ David A. Wender                                         David A. Wender
Signature of Responsible Party                              Printed Name of Responsible Party

Trustee of the Curepoint Liquidation Trust                  04/30/2025
Title                                                       Date

Debtor's Name Curepoint, LLC                                            Case No.  22-56501

Page 1

Other Page 1

Page 2 Minus Tables

Bankruptcy Table 1-50

Debtor's Name Curepoint, LLC

Case No.  22-56501



Bankruptcy Table 51-100

Non-Bankruptcy Table 1-50

Non-Bankruptcy Table 51-100

Part 3, Part 4, Last Page