**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE** | : | |
| **COMMISSION,** | : | **Civil Action File No.** |
| **Plaintiff,** | : | **1:25-cv-3826-MLB** |
| **v.** | : | |
| **EDWIN BRANT FROST IV and** | : | |
| **FIRST LIBERTY BUILDING & LOAN, LLC,** | : | |
| **Defendants, and** | : | |
| **FIRST LIBERTY CAPITAL PARTNERS** | : | |
| **LLC, et. al.,** | : | |
| **Relief Defendants.** | : | |

**MEMORANDUM IN OPPOSITION BY RECEIVER TO BAY POINT
CAPITAL PARTNERS II, LP'S MOTION TO INTERVENE**

S. Gregory Hays, not individually, but as Court-Appointed Receiver
("**Receiver**") pursuant to the *Order Appointing Receiver* dated July 11, 2025 [Doc.
No. 6] ("**Appointment Order**") that was entered in the above-captioned case (the
"**Receivership**"), by and through counsel, hereby files this *Memorandum in
Opposition by Receiver to Bay Point Capital Partners II, LP's Motion to Intervene*
(the "**Objection**") to object to *Bay Point Capital Partners II, LP's Motion to
Intervene* [Doc. No. 18] (the "**Motion**") that was filed by Bay Point Capital Partners
II, LP ("**Bay Point**"), respectfully showing as follows:

## I.    INTRODUCTION

1.    Bay Point invested in a portion of three Bridge Loans (as defined below)
made incident to the alleged Ponzi scheme involving First Liberty Capital Partners
LLC ("**FLC**") that led to appointment of the Receiver at the request of the United

States Securities and Exchange Commission ("**SEC**") to protect the assets subject to the Receivership. Bay Point seeks to intervene in this case for the purpose of removing parts of the Bridge Loans from the Receivership and assuming the administration and enforcement (and presumably collection) of minority shares of those Bridge Loans. It should be noted Bay Point is itself a hedge fund and private funds advisor with assets under management of over $800 million as of March 28, 2025, and has deployed capital of over $1.6 billion since 2012[1] and appears to be one of the more sophisticated investors in this Receivership. However, Bay Point does not make any showing as to why it should be treated differently than other investors in this case and fails to establish a basis to intervene. For the reasons set for the herein and in his Affidavit (the "**Affidavit**") filed contemporaneously herewith, the Receiver opposes the Motion and recommends to the Court that it be denied.

2.    It is not disputed that the Receiver is charged with acting in the best interests of all of the investors and maximizing the value of the assets of the Receivership for the investors. Bay Point, on the other hand, is seeking to protect its own interests in three loans that are not completely owned by Bay Point and are subject to claims of other investors. Notably absent from the Motion is any indication that Bay Point would: a) protect the interests of the many other investors in these loans; b) act to protect interests that are not already protected by the Receiver; or c)

---

[1] According to Form D filed with the SEC in 2023, Bay Point has issued securities valued at over $366 million. *See* form D.

serve a purpose other than to disrupt the orderly and efficient administration of the Receivership. Moreover, the Motion fails to provide any basis as to why Bay Point should not simply participate in the claims process just like every other similarly situated investor.

3.      In addition to the foregoing, the Motion fails to demonstrate: a) a default by FLC under the BP Agreements (as defined below); b) the occurrence of a Qualifying Event (as defined below) to justify the removal of FLC as administrator; c) any failure by FLC to remit a payment to Bay Point that was actually due; or d) a right to intervene in this Receivership. The Motion should be denied.

## II.   FACTUAL BACKGROUND

### a.   Bridge Loans.

4.      FLC used loan participation agreements and promissory notes to obtain over $100 million to fund short-term loans to various borrowers (the "**Bridge Loans**"). Bay Point was an investor with First Liberty and executed documents pursuant to which it purported to invest in three Bridge Loans to be made by FLC. However, based on the information currently available to the Receiver, investor funds were routinely comingled such that it is impossible for the Receiver to determine, as of this date, precisely where or how Bay Point's funds were used or whether they were actually invested in the three Bridge Loans identified in the Motion. *See* Affidavit ¶¶ 7-10. Indeed, there is no indication in the Motion that Bay

Point knows or attempted to verify how its funds were being used or ever sought to segregate its investments prior to June, 2025.

5.    Although the majority of the Bridge Loans ultimately defaulted and certain borrowers ceased making payments on such loans, it appears to the Receiver that FLC continued to make payments to investors with proceeds from the comingled pool of funds from other investors. Investors in the Bridge Loans are similarly situated in having potentially received proceeds from the commingled pool to which they may not have been entitled. Such circumstance is one reason that it is vital to have the Bridge Loans administered by court-appointed fiduciary in a single proceeding. The Receiver submits that dividing the Bridge Loans into separate fiefdoms with no overlying reconciliation structure would produce inequitable results and severely prejudice certain investors. The Receiver is in the early stages of preparing a detailed reconciliation to account for the sources and uses of funds by the Receivership Entities (as defined in the Appointment Order). *See* Affidavit ¶¶ 4-7. The situation would be far more complicated and difficult to unwind if an investor who owned only a portion of a certain Bridge Loans was able to divert and control parts of Bridge Loans for their own benefit.

6.    Bay Point invested in minority positions of three of the Bridge Loans in 2022 and after FLC began operating as a Ponzi scheme as alleged by the SEC. *See* Doc. No. 1. First, Bay Point asserts an interest in a loan made on or about December

19, 2022 to 2406  Cancer Care, LLC ("**Cancer Care**") in the original principal amount of $6,500,000 that had an original maturity date of December 18, 2023 (the "**CC1 Loan**"). Records available to the Receiver indicate that Cancer Care also entered into two other loans that matured on December 20, 2024 (collectively, the "**Other CC Loans**"). Bay Point does not have any interest in the Other CC Loans. However, the CC1 Loan and Other CC Loans were treated as a combined unit and the guarantors are substantially the same and distinguishing between the loans in which Bay Point has an interest (the CC1 Loan) and the loans in which it does not have an interest (the Other CC Loans) is difficult at best.

7.     The Receiver is actively investigating the CC1 Loan and the other CC Loans and has met with the principal of borrower for all three loans. *See* Affidavit ¶ 6. The Receiver has demanded documents and information from this borrower and the borrower has provided certain information and, to date, has agreed to work with the Receiver to resolve all of the loans.

8.     On or about February 10, 2023, FLC made a loan to Full Circle, LLC ("**Full Circle**") in the original principal amount of $2,750,000 (the "**Full Circle Loan**") that had an original maturity date of February 9, 2024 (there is a dispute as to whether the maturity date was actually extended). This loan is secured by a Security Agreement held in the name of First Liberty in certain real estate located in Walton County. Bay Point purportedly invested in a portion of the Full Circle Loan.

The last payment received on the Full Circle Loan was on May 28, 2024.

9.     Full Circle has retained counsel and has disputed liability to the Receiver, alleging that First Liberty and its principal, Defendant Frost, defrauded it. The Receiver is actively working on pursuing a recovery of this loan, investigating the collateral securing the loan, and evaluating the claims of Full Circle. The Receiver regards this loan as being in a work out status prior to seeking to enforce remedies under the applicable agreements. *See* Affidavit ¶ 6.

10.     On or about March 31, 2023, FLC made a loan to Stone Capital Group, LLC ("**Stone Capital**") in the original principal amount of $3,750,000 that matured on March 30, 2024 (the "**SC1 Loan**"). Bay Point purportedly invested in a portion of the SC1 Loan. Records available to the Receiver indicate that Stone Capital also entered two other loans with the more recent loan maturing on November 22, 2024 (collectively, the "**Other SC Loans**"). The SC1 Loan and Other SC Loans were treated as a combined unit and the guarantors and other security for SC1 Loan and Other SC Loans is substantially the same. As with the CC1 Loan, Bay Point does not have any interest in the Other SC Loans. The Receiver has been unable to locate any payments made on account of the SC1 Loan. *See* Affidavit ¶ 6.

11.     Moreover, even before the Receivership was filed, First Liberty was involved in extensive litigation regarding the Stone Capital loans. To the best of the knowledge information and belief of the Receiver, Bay Point was not in any way

involved in this litigation and may not have even known about it. As of the appointment of the Receiver, the collateral for such loans, which was all held in the name of First Liberty is currently tied up in litigation previously managed by counsel for FLC.

12.    Included in this litigation are disputes regarding certain collateral located in Metarie, Louisiana wherein FLC engaged Graham, Arceneaux & Allen, LLC on or about March 6, 2024, to pursue a foreclosure action and on or about March 20, 2024, to pursue a replevin action With regard to certain collateral in Florida, FLC engaged Thompson, Crawford, Brown & Smiley on or about January 31, 2024. The Receiver is communicating with these two law firms and plans to coordinate with them in handling this long pending litigation.

### b.  Bay Point Loan Participation Agreements

13.    The Receiver does not dispute that Bay Point and FLC entered into separate loan participation agreements incident to which Bay Point purchased minority shares of the CC1 Loan (but not the Other CC Loans), Full Circle Loan and SC1 Loan (but not the Other SC Loans) in exchange for a "percentage of all Principal Payments" received by FLC on account of the respective loans as well as interest payments (collectively, the "**BP Agreements**"). However, the funds paid by Bay Point pursuant to the BP Agreements were paid into a common fund maintained by FLC and commingled with other proceeds from investors entering loan participation

agreements and related to promissory notes. *See* Affidavit ¶¶7-10. No separate fund was established for this investment by Bay Point and Bay Point apparently did not insist that its funds be segregated. The BP Agreements are similar to the participation agreements entered into by other investors to invest in portions of the Bridge Loans.

14.    Indeed, as set forth in the Affidavit, there are a total of sixty five other investors across the three loans who hold participation interests in those loans. *See* Affidavit ¶¶ 8-9. The Bay Point Motion is silent with respect to these other investors and it seems apparent that the Bay Point is seeking to collect these loans for its own benefit and in complete disregard for the interests of these other investors.

15.    The obligation of FLC to remit a percentage of Principle Payments to Bay Point under the BP Agreements is premised on FLC first receiving payments from Cancer Care, Full Circle or Stone Capital on those loans in which Bay Point held an interest. Indeed, Paragraph 3 of the BP Agreements provides that "Payments received by Seller [FLC] under the Loan will be held for the benefit of Seller and Purchaser [Bay Point] until the payments are actually paid to and received by Purchaser." Paragraph 12(C) further provides that "Seller will remit Purchaser's percentage of the Payments and any shared Borrower Fees [as defined in the BP Agreements] not later than the close of the tenth business day following receipt of any Payments or Borrower Fees."

16.    The Receiver has attempted to determine, first, whether any payments

were made to Bay Point and, second, whether those payments could be matched to payments received from the three borrowers at issue. With respect to the first issue, and as set forth in Exhibit A to the Affidavit, while Bay Point did invest $5,400,00 with First Liberty, it received at least $ 2,077,288.53 in payments from First Liberty through 2024. Thus, Bay Point has already received a return of forty percent (40%) its principal invested with First Liberty. Moreover, as detailed in the Affidavit, the Receiver was unable to correlate any of these payments to Bay Point to payments received from the borrowers. *See* Affidavit ¶¶ 5-6.

17.    The BP Agreements provide that the administrator of the CC1 Loan, Full Circle Loan and SC1 Loan may be removed if a "**Qualifying Event**" occurs. The BP Agreements specifically define a Qualifying Event as one of the following:

> (1)    First Liberty Capital fails to comply with its fiduciary, contractual or legal obligations under the Participation Agreements or under state or federal law.
> (2)    First Liberty Capital petitions for or becomes subject to bankruptcy.
> (3)    First Liberty Capital commits any act of insolvency.
> (4)    First Liberty Capital is declared insolvent, is taken over, or otherwise closed by a governmental regulatory agency which has jurisdiction over First Liberty Capital.

18.    The BP Agreements do not provide for any other events to constitute a Qualifying Event.

19.    Even if FLC actually failed to remit the percentage due from payments received by FLC, Paragraph 13 of the BP Agreements expressly provides the

outcomes of a failure to remit to Bay Point the percentage due from payments received by FLC. Such outcomes do not include removal as administrator.

20.     Further, although the Participation Agreements make reference or partial assignments of the security interests held by First Liberty for each of the loans, none of those security interests or liens were actually transferred to Bay Point and each remains recorded in the solely in the name of First Liberty and are assets of the Receivership Estate. It is worth noting that if the Bay Point Motion were granted, this Court would also need to issue an order to the Receiver compelling him to transfer partial liens and security interests securing the three Bridge Loans at issue to Bay Point. The Bay Point Motion does not address the very practical issue of how foreclosure or enforcement actions would take place if Bay Point held a partial interest in those liens with First Liberty retaining its interests or whether those interests should be assigned to the sixty-five other investors holding participation interests. The potential for conflict between Bay Point and First Liberty and/or Bay Point and the other investors in the enforcement of these loans is readily apparent.

### c.  **Appointment of Receiver and Review of loans.**

21.     FLC was not taken over or otherwise closed by a governmental regulatory agency and instead voluntarily ceased its business operations in advance of the appointment of the Receiver.

22.     On July 11, 2025, after First Liberty ceased operations, the: a) SEC

filed a complaint (the "**Complaint**") against Defendants Edwin Brant Frost IV ("**Frost**") and First Liberty Building & Loan, LLC (together, "**Defendants**") and the Relief Defendants (as defined in the Appointment Order); and b) the District Court entered the Appointment Order to appoint the Receiver for the purposes of marshaling and preserving all assets of the Receivership Entities and the assets of Defendant Frost that: i) are attributable to funds derived from investors or clients of the Defendants; ii) are held in constructive trust for the Defendants; and/or iii) may otherwise be includable as assets of the estates of the Defendants.

23.    The Appointment Order includes essential provisions to empower the Receiver to analyze and investigate assets, administer assets for the benefit of the Receivership and harmed investors and creditors, and develop a fair and reasonable liquidation plan for all investors

24.    To provide the Receiver with the ability to fulfill the duties of the Receiver without being hindered or obstructed by litigation against property of the Receivership, the Court entered an injunction against interference with the Receiver (the "**Injunction**") and stay of all civil legal proceedings involving any Receivership Property [as defined in the Appointment Order] or the Receivership Entities until further order of this Court. *See* Appointment Order ¶¶ 32-34. The Injunction protects against action that would "[d]issipate or otherwise diminish the value of any Receivership Property." *See* Appointment Order ¶ 32(C).

25.    Since being appointed, the Receiver has endeavored to marshal and preserve the assets of the Receivership Entities. Incident thereto, the Receiver investigated the loans made by FLC, including the CC1 Loan, Full Circle Loan, and SC1 Loan, which were all past their respective original maturity dates and in default as of the appointment of the Receiver.

26.    While the Receiver is still investigating the Bridge Loans, the Receiver has already expended significant efforts related to the Bridge Loans, including the CC1 Loan, Full Circle Loan and SC1 Loan.

## ARGUMENT AND CITATION OF AUTHORITY

27.    "The district court has broad powers and wide discretion to determine relief in an equity receivership." *SEC v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992) (citations omitted) (noting that to "'allow any individual to elevate his position over that of other investors similarly 'victimized' by asserting claims for restitution and/or reclamation of specific assets . . . would create inequitable results, in that certain investors would recoup 100% of their investment while others would receive substantially less . . .'"). Indeed, "'a court sitting in equity has the discretionary authority to deny state law remedies as inimical to the receivership' . . . It is well-established that 'equitable principles may supersede rights an investor would have under other law to recover its assets.'" *Sec. & Exch. Comm'n v. Torchia*, No. 1:15-CV-3904-WSD, 2016 WL 2996902, at *4 (N.D. Ga. May 25, 2016) (citation

omitted). Here, the contract claims sought to be pursued by Bay Point are inimical to the Receivership.

28.    This Receivership involves more than 70 individual Bridge Loans involving: a) various borrowers and parties who entered loan participation agreements and investor notes; b) proceeds commingled into and out of a common pool including funds of other investors; and c) certain parties who received transfers from the common pool containing funds of investors to which such parties may not have been entitled. Rather than focusing on untangling and administering the Bridge Loans, the Receiver is being distracted by having to address the Motion that seeks to divert portions of three of the Bridge Loans who may have received transfers of funds of other investors and by a party which asserts an interest in only portions of such loans. Bay Point requests this without any apparent regard for the sixty-five other investors holding interests in these loans. The Receiver submits that granting the Motion would cause even further disruption, result in an inequitable administration of the Bridge Loans, cause conflict, confusion and unnecessary expense in the enforcement of loans, harm the Receivership and otherwise cause injustice. Under the circumstances, the Motion fails to assert a legitimate basis for the relief sought by Bay Point for at least nine reasons.

29.    First, Bay Point fails to demonstrate a default or Qualifying Event under the BP Agreements.

30.     Second, the Receivership provides a third-party fiduciary and a court-monitored creditor claims process that adequately represents any interests that Bay Point may have in any Bridge Loans. There is no evidence that the Receiver would inadequately represent such interests in the Receivership.

31.     Third, Section 21(g) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78u(g) prohibits intervention in SEC Enforcement Actions without the consent of the SEC. This threshold issue is not addressed in the Motion even though the SEC has not consented, but is discussed in the opposition to the Motion filed by the SEC. The Receiver hereby adopts such discussion and joins in the objection by the SEC.

32.     Fourth, Bay Point does not have standing to intervene.

33.     Fifth, the Motion fails to assert a legitimate basis for Bay Point to intervene in the Receivership as a matter of right.

34.     Sixth, the Motion fails to assert a legitimate basis for Bay Point to intervene in the Receivership with court permission.

35.     Seventh, Bay Point has already received over $2 million in payments constituting a 40% return on its principal investment. There is no evidence that Bay Point was entitled receive these funds pursuant to the BP Agreements and the Receiver does not know how this return compares to amounts received by other investors. Further, the money received by Bay Point may actually represent monies

invested by other investors, not returns on the Bridge Loans in which Bay Point invested. Indeed, the Receiver may find it appropriate to have certain pre-receivership transfers returned or credited against future distributions to Bay Point.

36.    Eighth, the relief requested in the Motion would delay resolution for investors as it would result in the three Bridge Loans in which Bay Point has an interest being subject to new state court actions (but only on parts of the loans held by Bay Point) rather than the entire loans remaining before this Court. The Receiver submits that federal Law in Ponzi Scheme cases is more established and provides a more efficient option to recover funds for defrauded victims.

37.    Ninth, the requested relief would result in competition between the Receivership and Bay Point. For example, a personal guarantee in the CC1 Loan is from an individual who guaranteed a significant amount of other Bridge Loans.

### A. Bay Point Fails to Demonstrate a Default or Qualifying Event Under the Bay Point Participation Agreements.

38.    The Motion fails to demonstrate that FLC actually failed to remit the percentage due from any Principal Payments received by FLC from Cancer Care, Full Circle and Stone Capital. Instead, Bay Point alleges that the "intent to cease making payments to Bay Point" constitutes a Qualifying Event. Such allegation does not constitute a default and is not supported by the BP Agreements that: a) specifically identify the four events that constitute a Qualifying Event; and b) do not include the failure to remit payment as a Qualifying Event. Not only does the Motion fail to

demonstrate that a failure to remit a payment is a Qualifying Event, but the Motion does not even demonstrate that FLC actually failed to remit the percentage due from payments received by FLC. Bay Point ignores entirely, and fails to disclose to this Court, the substantial payments actually made to it by First Liberty or to explain the circumstances under which such payments were made. Even if Bay Point could identify any such failure, the penalties for such conduct do not include removal as administrator. *See* BP Agreements ¶ 13.

39.    Bay Point also alleges that Qualifying Event occurred due to the alleged "closure of First Liberty's business as a result of a federal investigation." FLC was not; however, taken over or otherwise closed by a governmental regulatory agency as would be required to constitute a Qualifying Event under the BP Agreements. First Liberty voluntarily ceased operations prior to this lawsuit being filed.

40.    Under the circumstances, the Motion fails to demonstrate a default or Qualifying Event under the BP Agreements to remove FLC as administrator.

**B. Allowing Bay Point to Intervene Would Disrupt the Receivership.**

41.    This Court has already established an efficient process for the administration of the Receivership Assets. Indeed, the Receiver is a third-party fiduciary acting in the best interests of the Receivership and there will be a claims process in which Bay Point can assert whatever claim that Bay Point believes that it may have against any Bridge Loans prior to any distribution to creditors that may

ordered by the Court. Allowing Bay Point to intervene, carve up the Bridge Loans into parts and short-circuit the established process by stripping away potential assets to which Bay Point may not be entitled would be counter-productive and disruptive to the orderly and efficient administration of the Receivership. Moreover, not only would such relief hinder reconciliation efforts and benefit Bay Point to the detriment of other investors, but it may also lead other similarly situated investors to seek the same relief in a spiral that would further prejudice and leave certain investors without relief. Under the circumstances, the Motion should be denied on this basis alone

### C. Bay Point Does Not Have Standing to Intervene.

42.      An "intervenor of right must have Article III standing in order to pursue relief that is different from that which is sought by a party with standing. *See Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 440, 137 S. Ct. 1645, 1651, 198 L. Ed. 2d 64 (2017); *see also United States v. RaPower-3, LLC*, 341 F.R.D. 311, 316 (D. Utah 2022) (extending holding in *Town of Chester* to permissive intervenors). Here, the SEC initiated this proceeding to obtain relief arising from three claims for violations of securities laws and sought an asset freeze and the appointment of the Receiver. Notwithstanding that the asset freeze and appointment of the Receiver were granted incident to the Appointment Order almost two months prior to the filing of the Motion, such relief is different than the relief sought by Bay Point to administer three of the Bridge Loans predicated on contract law.

43.    "The well-settled test for establishing Article III standing includes three basic requirements." *Salvors, Inc. v. Unidentified Wrecked & Abandoned Vessel*, 861 F.3d 1278, 1290 (11th Cir. 2017). First, the party "must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (quotations, citations, and footnote omitted). Second, the party "must establish a causal connection between its injury and the defendant's conduct. Third, the [party] . . . must show that it is likely—and not merely speculative—that a favorable decision by the court will redress the injury." *Duty Free Americas, Inc. v. Estée Lauder Cos.*, 797 F.3d 1248, 1271 (11th Cir. 2015) (citation omitted).

44.    Here, the Motion fails to identify an invasion of legally protected interest by FLC or even identify any payment actually due to Bay Point that was not already remitted by FLC. Instead, the Motion alleges a hypothetical injury based on the Receivership Order without disclosing the substantial payments made to Bay Point. Incident thereto, Bay Point improperly asserts a right in any payments made on account of the CC1 Loan, Full Circle Loan and SC1 Loan even though Bay Point would only be entitled to a portion of such payments under the BP Agreements. While this matter is speculative as there is not fund of payments made on account of the CC1 Loan, Full Circle Loan and SC1 Loan currently available and there is no

pending distribution by the Receivership before the Court, the amount that would actually be due to Bay Point has yet to be determined. Since Bay Point is unable to demonstrate any concrete and actual injury by FLC, Bay Point is unable to establish any causation or redressability at this juncture.

45.    Under the circumstances, Bay Point does not have standing to intervene in the Receivership and should utilize the claims process like every other similarly situated investor.

### D. Bay Point Cannot Intervene as a Matter of Right

46.    Bay Point is not entitled to intervene as a matter of right under Fed. R. Civ. P. 24(a)(2).

47.    Intervention as of right under Rule 24(a)(2) is only available where the party seeking to intervene demonstrates "that: (1) his application to intervene is timely; (2) he has an interest relating to the property or transaction which is the subject of the action; (3) he is so situated that disposition of the action, as a practical matter, may impede or impair his ability to protect that interest; and (4) his interest is represented inadequately by the existing parties to the suit." *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989) (citation omitted). Bay Point is unable to demonstrate any of the required elements.

48.    First, "[t]imeliness is determined by the Court in the exercise of its sound discretion, and is to be determined from all the circumstances and not solely

by reference to how far the suit has progressed." *Sec. & Exch. Comm'n v. Marin*, No. 1:19-MC-20493-UU, 2019 WL 3428551, at *3 (S.D. Fla. May 31, 2019), *report and recommendation adopted*, No. 1:19-MC-20493-UU/JJO, 2019 WL 13240985 (S.D. Fla. Sept. 30, 2019) (finding that the timeliness requirement was not satisfied where the movant knew of the SEC case from the beginning and did not seek to intervene until approximately 2 months later). Here, the Motion is untimely as it was filed almost two months after the entry of the Appointment Order even though Bay Point was aware of the action by the SEC from the beginning. The statement by Bay Point that "there is nothing for the Court to unwind" completely misses the point that FLC maintained proceeds from a pooled fund and the Receivership will need to reconcile transactions as part of the proper administration of the Bridge Loans. In fact, there are approximately seventy loans, including the Bridge Loans, to unwind as well as the interests of the respective investors and creditors in any proceeds. Notwithstanding the foregoing, the Receiver and the SEC have already expended significant time and resources in the Receivership and would be greatly prejudiced from the intervention of a new party is raising contract issues that would not otherwise need to be addressed. Moreover, other investors remaining in the Receivership would be greatly prejudiced if assets of the Receivership are diverted without adequate administration. Such prejudice greatly outweighs any minimal inconvenience that Bay Point may encounter if intervention is denied and Bay Point

is treated the same as other investors, especially in light of the fact that any interest of Bay Point can be addressed during the claims process in the Receivership.

49.     Second, Bay Point does not actually own any property of the Receivership, does not directly hold any liens in the collateral securing the loans and only holds an interest in a portion of three Bridge Loans and no specific fund to pay such Bridge Loans currently exists. Under the circumstances, Bay Point does not have a significant interest relating to property of the Receivership as Bay Point only has an economic interest that may be relevant in the event that collection efforts are successful. Indeed, in order to fully enforce any foreclosure or turn over matters, Bay Point would require the assistance of the Receiver, if not the outright conveyance of security interests currently held in the Receivership.

50.     Third, the disposition of this matter will not impede or impair the ability to protect any interest of Bay Point as: a) the claims process in the Receivership will provide sufficient protection by allowing Bay Point an opportunity to demonstrate its asserted claims as well as providing transparency with respect to amounts collected; and b) Bay Point will have an opportunity to present argument related to any proposed distribution from the Receivership, which can only occur upon notice and application to this Court. Indeed, Bay Point will not be prejudiced by being treated the same as other investors or creditors in the claims process. It is well recognized that the receivership claims process is the appropriate forum for

considering interests of creditors and shareholders. *See SEC v. Elliott*, 953 F.2d 1560 (11th Cir. 1992). Even in receiverships involving secured creditors, "Courts have repeatedly held that a receivership claims process is the appropriate forum for considering interests of secured creditors and allowing secured creditors to protect their interest." *Sec. & Exch. Comm'n v. JCS Enters., Inc.*, No. 14-CV-80468, 2015 WL 13950381, at *1 (S.D. Fla. Nov. 3, 2015) (citation omitted). The attempt by Bay Point to obtain preferential treatment by avoiding the claims process and divert property of the Receivership to which Bay Point may not be entitled should be rejected.

51.    The Receiver has not yet presented a claims process to the Court as the Receiver has focused on recovering assets of the Receivership; however, a plan of liquidation, as required by the Appointment Order, will be filed and a claims process will be represented in the near future. Bay Point will have an opportunity to respond to the proposed process that will treat all similarly situated investors the same.

52.    Finally, the interest of Bay Point is adequately represented by the existing parties to the Receivership as both the Receiver and the SEC seek to protect the interests of the defrauded investors through the proper administration of the Bridge Loans. Once "a receiver has been appointed, and the parties seeking relief or intervention have the same goal, i.e., protection of investors, there is a presumption that the receiver will adequately represent all parties." *Commodity Futures Trading*

*Comm'n v. Eustace*, No. CIV.A. 05-2973, 2005 WL 2862945, at *2 (E.D. Pa. Oct. 31, 2005). Likewise, "government entities, like the SEC, that bring enforcement proceedings are mandated to act in the interest of maximizing the recovery to all defrauded individuals and therefore, are often presumed to be adequately representing the interests of non-party investors." *Sec. & Exch. Comm'n v. Callahan*, 193 F. Supp. 3d 177, 206 (E.D.N.Y. 2016). Bay Point failed to rebut such presumption or that Receiver and the SEC will serve the interests of investors like Bay Point by seeking to have the Bridge Loans properly administered. Furthermore, Bay Point fails to demonstrate why the claims procedure in the Receivership is insufficient to protect any legitimate interests Bay Point may have in any property of the Receivership. Bay Point fails to satisfy the prerequisites to intervene as a matter of right, and the Motion should be denied.

### E. Bay Point Should Not Be Granted Permission to Intervene

53.    It would not be appropriate for the Court to exercise it discretion to allow Bay Point to intervene permissively under Fed. R. Civ. Proc. 24(b).

54.    Permissive intervention under Rule 24(b) is based on: a) timeliness; b) whether the party seeking to intervene "shares with the main action a common question of law or fact[; and c)] . . . whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." *See* Fed. R. Civ. Proc. 24(b). "Even when the requirements of Rule 24(b) are satisfied, it is in the court's

sole discretion whether to allow intervention." *Am. Fed'n of State, Cnty. & Mun. Emps. (AFSCME) Council 79 v. Scott*, 278 F.R.D. 664, 668 (S.D. Fla. 2011). Indeed, whether "to allow permissive intervention rests in the discretion of this Court." *Orlowski v. Bates*, No. 211CV01396JPMCGC, 2014 WL 12771522, at *5 (W.D. Tenn. Feb. 11, 2014) (citation omitted). Here, Bay Point is unable to satisfy the elements for permissive intervention.

55.    First, as discussed above, the Motion is untimely. Second, the contract claims that Bay Point seeks to pursue regarding the administration of the three Bridge Loans in which Bay Point invested are separate and distinct from the questions of law and fact currently addressed in the Receivership.

56.    Third, intervention will unduly delay or prejudice the adjudication of the Receivership and lead to possible conflicts for the reasons set forth in the Affidavit. Such significant harm greatly outweighs any minimal impact the denial of the Motion may have on Bay Point, which has an available remedy in the form of participating in the claims process. Furthermore, Bay Point fails to demonstrate that the Receiver cannot adequately represent the interests of investors in the three Bridge Loans in which Bay Point invested. Indeed, it makes far more sense for the Receiver, who holds the entirety of the collateral securing those loans to enforce them. Under the circumstances, a "more equitable creditor claims process, overseen by this Court and in which [Bay Point] . . . will participate, is required to ensure that no deserving

creditor is left remediless." *Orlowski v. Bates*, No. 211CV01396JPMCGC, 2014 WL 12771522, at *6 (W.D. Tenn. Feb. 11, 2014). The instant Receivership allows for the most efficient enforcement of the loans and administration of claims and allowing intervention by one party would inevitably cause delay, confusion, conflict and additional cost to that process.

WHEREFORE, for the foregoing reasons, and for the reasons stated in Paragraph 11 of the Affidavit, the Receiver respectfully requests that the Court deny the Motion and the request to intervene, maintain the Injunction and the stay, deny the request for Bay Point to bring a declaratory judgment action against FLC, and award the Receiver such other and further relief as this Court deems just and proper.

Respectfully submitted this 30th day of September, 2025.

LAW OFFICES OF HENRY F. SEWELL, JR., LLC

*/s/ Henry F. Sewell, Jr.*
Henry F. Sewell, Jr., Esq.
Georgia Bar No. 636265
hsewell@sewellfirm.com; Phone: (404) 926-0053
Buckhead Centre
2964 Peachtree Road NW, Suite 55
Atlanta, GA 30305
*Counsel for Receiver*

## CERTIFICATE OF COUNSEL REGARDING FONT SIZE AND
## <u>CERTIFICATE OF SERVICE</u>

Counsel certifies that the foregoing has been prepared using Times New Roman font size 14 in accordance with Local Rules 5.1(C) and 7.1(D), and the attachments are consistent with Local Rule 5.1(B).

Counsel further certifies certify that I have this day electronically filed the foregoing *Memorandum in Opposition by Receiver to Bay Point Capital Partners II, LP's Motion to Intervene* with the Clerk of Court via the CM/ECF system, and further certify that a true and correct copy of the same has been served by U.S. Mail, properly addressed and postage pre-paid, upon the following:

THOMPSON HINE LLP
Alexandra C. Nelson
Austin B. Alexander
Two Alliance Center, Suite 1600
3560 Lenox Road
Atlanta, Georgia 30326
    Sent electronically to alexandra.nelson@thompsonhine.com
    Sent electronically to austin.alexander@thompsonhine.com

This 30th day of September, 2025.

    LAW OFFICES OF HENRY F. SEWELL, JR., LLC

    */s/ Henry F. Sewell, Jr.*
    Henry F. Sewell, Jr., Esq.
    Georgia Bar No. 636265
    hsewell@sewellfirm.com
    Phone: (404) 926-0053
    Buckhead Centre
    2964 Peachtree Road NW, Suite 55
    Atlanta, GA 30305
    *Counsel for Receiver*