**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | Civil Action File No. |
| | : | 1:25-cv-3826-MLB |
| v. | : | |
| | : | |
| EDWIN BRANT FROST IV and FIRST LIBERTY BUILDING & LOAN, LLC, | : | |
| | : | |
| Defendants, and | : | |
| | : | |
| FIRST LIBERTY CAPITAL PARTNERS LLC, FIRST NATIONAL INVESTMENTS LLC, MYHEALTHAI CAPITAL LLC, THE LEGACY ADVISORY GROUP INC., and THE LIBERTY GROUP LLC, | : | |
| | : | |
| Relief Defendants. | : | |

## FIRST QUARTERLY REPORT OF RECEIVER

S. Gregory Hays, as Court-Appointed Receiver ("**Receiver**") pursuant to the *Order Appointing Receiver* dated July 11, 2025 [Doc. No. 6] ("**Appointment Order**") that was entered in the above-captioned case (the **"Case"** or "**Receivership**"), by and through counsel, hereby files this *First Quarterly Report of Receiver* (the "**Repor**t") and respectfully shows as follows:[1]

---

[1] The Receiver previously filed on July 21, 2025, an initial status report regarding the Receivership [Doc. No. 14].

## I.  INTRODUCTION

1.      Since Receiver was appointed on July 11, 2025, significant progress has been made in identifying, securing, and recovering assets for the benefit of the estate arising from the Receivership (the "**Receivership Estate**"). To date, the Receiver has taken control of more than $1.6 million in bank accounts of the Receivership Entities, seized and sought the liquidation of certain Receivership Assets, analyzed, evaluated, and initiated collection efforts with regard to the loans made by the Receivership Entities.

2.      At the conclusion of the Reporting Period of July 11, 2025, through September 30, 2025 (the "**Reporting Period**"), the Receivership Estate held $1,460,895.91 in cash on hand in these fiduciary accounts

3.      Moreover, the Receiver has marshaled control of certain real property in Georgia and secured the turnover of ownership and control of two vehicles with an estimated market value of approximately $80,000. The Receiver has also selected an experienced and reputable auctioneer to market certain property of the Receivership and began marketing efforts for the sale of such property.

4.      With respect to insurance, the Receiver contacted the insurance company of the Receivership Entities and requested that the Receiver be named as an additional insured to ensure that any insurance proceeds are recovered by the

Receiver. The Receiver also investigated the status of insurance for Receivership Assets and attempted to obtain reasonable insurance for any uninsured properties to the extent possible. The Receiver has insured two properties and has not been able to purchase insurance on a third property.

5.     The primary asset of the Receivership consists of approximately sixty (60) individual, defaulted loans.  In some cases, individual borrowers hold several loans in their or affiliate names. The Receiver has spent most of his efforts to date on working to untangle and administer the loans. First of all, it is important to note that despite First Liberty stating to investors they never had a defaulted loan, not a single loan held by the Receiver is current on payments and loans themselves are either matured or in default. Such loans involve: a) various borrowers and parties who entered loan participation agreements and investor notes; b) proceeds commingled into and out of a common pool including funds of other investors; and c) certain parties who received transfers from the common pool containing funds of investors to which such parties may not have been entitled. A substantial amount of time was invested in efforts to understand the loans, communicate with borrowers, demand past due payments, engage in collection efforts, and address issues related to the loans. Certain loans are secured by real and/or personal property. As such, the Receiver and the professionals of the Receiver took strategic steps to protect the interests of the

Receivership in the collateral related to such loans by, among other things, reviewing all available loan files and making an effort to inspect and otherwise document collateral related to such loans. Moreover, the Receiver worked on confirming whether the properties and businesses were insured and, if not, inquired about appropriate insurance coverage.

6.      The primary activity of the Receiver over the next several months will be the enforcement and collection of these loans. The Receiver anticipates that collecting these loans will be an expensive and protracted process which will take many months and may require protracted litigation. All of the loan agreements reviewed to date by the Receiver provide for the collection of attorney's fees and litigation expenses and the Receiver will seek to recover those expenses to the fullest extent possible along with default interest. The Receiver cannot predict, at this point, the amounts which may be recovered on these loans.

7.      This Report contains a listing and description of all assets known to the Receiver and the Receiver continues to search for additional assets and will report such assets to the Court as they are discovered.

8.      During the Application Period, the Receiver also discovered that significant transfers of funds and other assets were made to third parties, insiders, and affiliates of the Receivership Entities who did not appear to have provided

equivalent value to the Receivership Entities and/or who may have facilitated the misconduct and contributed to the investor losses that are the subject of this enforcement action. The Receiver has started investigating the claims that the Receivership Estate may have against those parties, gathering relevant information and documents among records of the Receivership Entities and obtaining additional information from other parties.

9.      Based on the review of the computers of the Receivership Entities, and interviews of its administrator and other employees, the Receiver confirmed that the Receivership Entities did not properly manage their finances or business operations or maintain in financial records in a readily usable manner. The Receiver is organizing these records as well as obtaining information from third parties, such as banks, lawyers and public records to understand the operations and transactions of the Receivership Entities with various third parties, insiders and affiliates.  The Receiver is diligently working to identify claims the Receivership Estate may have against such parties, to discover additional assets of the Receivership Estate, and to confirm transfers between investors and the Receivership Entities.

10.     The Receiver is actively attempting to reconstruct information from records from financial institutions and various third parties and to import this information into a database (the "**Funds Tracing Database**") . The Receiver is still

waiting for the production of certain ACH information from Truist that is necessary to complete the reconstruction. The Funds Tracing Database currently has data from 19 bank accounts including approximately 29,000 separate transactions.

11.     To obtain the information and documents from investors needed to complete the reconstruction of accounts and determine the amounts that investors transferred to, received back from, and lost as a result of their investments with the Receivership Entities, the Receiver, with Court-approval, engaged the technology company and noticing and claims agent Stretto, Inc. ("**Stretto**") to set up a secure online portal through which investors could upload their information and documents, to send investors notice of and a link to the portal, and to provide technical support to investors.  This collection of investor information and documents will assist the Receiver in preparing an account reconstruction and otherwise fulfill the Receiver's duties and will significantly streamline any claims process that the Court may approve in this Receivership.

12.     **THE RECEIVER HAS NOT FINALIZED PLANS FOR A CLAIM ADMINISTRATION PROCESS AND HAS BEEN PRIMARLY FOCUSED ON RECOVERIES. IT IS ANTICIPATED THE CLAIMS PORTAL WILL BE ESTABLISHED BEFORE THE END OF THE YEAR.  ALL INVESTORS WILL BE PROVIDED NOTICE AND AMPLE TIME TO COMPLETE THE**

**CLAIM FORM. INVESTORS ARE ENCOURAGED TO SUBSCRIBE TO THE RECEIVER WEBSITE TO ENSURE THEY RECEIVE NOTICES.**

13.     Finally, the Receiver set up, with the assistance of Stretto, a website that can be accessed at www.firstlibertyreceivership.com (the "**Website**"). The Website provides free access to all pleadings in the Case and allows interested parties to subscribe to receive recurring notifications of pleadings filed on the docket in the Case. In order to limit costs and the administrative burden on the Receivership, all parties are encouraged to search the Website first before attempting to contact the Receiver directly. The website address is www.firstlibertyreceiveership.com.

14.     The Receiver has established an email and phone number incident to which investors and other parties can communicate with the Receiver: FirstLibertyInquiries@stretto.com and 404-926-0060. All inquiries are responded to on a daily basis.

15.     The Receiver sent out correspondence to all investors notifying them of the enforcement action and Receivership and providing pertinent information, including the website address, the telephone number, and the email address.  Since the first week of the Receivership, attorneys and staff at the office of the Receiver have been communicating with investors and other parties and interest.

16.     The Receiver will continue to work diligently with the team of professionals of the Receiver to fulfill the duties of the Receiver under the Appointment Order and report efforts and activities in status reports and other court filings until such time as the Court may discharge the Receiver of his duties.

## II. INJUNCTION, STAY, AND APPOINTMENT OF RECEIVER

17.     On July 11, 2025, Securities and Exchange Commission (the "**SEC**") filed a complaint (the "**Complaint**") against Defendants Edwin Brant Frost IV ("**Frost**") and First Liberty Building & Loan, LLC ("**First Liberty**") (together, "**Defendants**") and Relief Defendants First Liberty Capital Partners LLC, First National Investments LLC, MyHealthAI Capital LLC, The Legacy Advisory Group Inc., and The Liberty Group LLC (collectively, the "**Relief Defendants**"). In the Complaint, the SEC alleges that Frost engaged in investment fraud through First Liberty to the detriment of potentially hundreds of investors and other parties and further alleges that the Receivership Entities raised funds through the publicly advertised offerings and either misappropriated such funds or used such funds to make Ponzi-style payments to existing investors in conjunction with making short-term bridge loans. *See* Doc. No. 1.

### A. Preliminary Injunction

18.     The SEC also filed *Plaintiff's Emergency Motion for Asset Freeze and*

8

*Other Equitable Relief* seeking an asset freeze, the appointment of a receiver over the Receivership Entities, and a preliminary injunction to prevent the dissipation of assets and the continued defrauding of investors [Doc. No. 2] (the "**Freeze Motion**"). Such pleading alleges that "Defendants represented to investors that their funds would be used to make short-term small business loans at relatively high interest rates . . . [and that since at least 2021,] Defendants have had to use funds raised from new investors to make . . . interest payments." *See* Freeze Motion ¶¶ 2-13. Indeed, the SEC alleges that Defendants "did not use investor funds as represented." *See* Freeze Motion ¶ 8. The Defendants and Relief Defendants consented to a certain a Consent Judgement [Doc. No. 5] incident to which the assets of the Receivership Entities were frozen and each defendant and the Relief Defendant were ordered to present a sworn accounting within 20 business days of July 11, 2025. The Defendants have not filed this accounting.

### B. Appointment of Receiver

19.    On July 11, 2025, the Court entered the Appointment Order to appoint the Receiver. The Court found that the appointment of a Receiver was necessary to marshal, preserve, and recover assets of the Receivership Entities. *See* Appointment Order, at p. 1. Based on the record in the Case, the Court determined that the appointment of a receiver in this action was necessary and appropriate for the

purposes of marshaling and preserving all assets of First Liberty, First Liberty Capital Partners LLC, First National Investments LLC, MyHealthAI Capital LLC, The Legacy Advisory Group Inc., and The Liberty Group LLC ("**Receivership Entities**") and the assets of Defendant Frost that: (a) are attributable to funds derived from investors or clients of the Defendants; (b) are held in constructive trust for the Defendants; and/or (c) may otherwise be includable as assets of the estates of the Defendants (collectively, the "**Recoverable Assets**"). *See* Appointment Order, p. 1.

20.    The Appointment Order provides that the District Court takes exclusive jurisdiction and possession of the assets, of whatever kind and wherever situated of the Receivership Entities, including the Defendant in this case. *See* Appointment Order, p. 2. The Appointment Order further defines "Receivership Property" as all "property interests of the Receivership Entities, including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind." *See* Appointment Order ¶ 6(A).

21.    The Appointment Order includes essential provisions to empower the Receiver to analyze and investigate assets, administer assets for the benefit of the Receivership and harmed investors and creditors, and develop a fair and reasonable liquidation plan for all investors. Incident thereto, the Receiver is tasked with

securing assets all property interests of the Receivership Entities, managing the estate, and liquidating assets of the Receivership Estate. *Id*. at ¶¶ 4-7.

22.    To provide the Receiver with the ability to fulfill the duties of the Receiver without being hindered or obstructed by litigation against property of the Receivership, in addition to freezing the Receivership Property, the District Court entered an injunction against interference with the Receiver (the "**Injunction**") and stay (the "**Stay**") of all civil legal proceedings involving any Receivership Property or the Receivership Entities until further order of the District Court. *See* Appointment Order ¶¶ 32-34. The Injunction protects against action that would "[d]issipate or otherwise diminish the value of any Receivership Property." See Appointment Order ¶ 32(C). Furthermore, the Stay under Section VII of the Appointment Order stays all litigation matters other than the litigation subject to the Receivership and clearly provides that no further actions should be taken against any assets or entities subject to the Appointment Order until further order of the District Court.

23.    The Receiver also has the power to engage professionals, issue subpoenas, and take any legal actions necessary to recover assets and protect the estate. *Id*. at ¶ 7(F). The Appointment Order also requires the Receiver provide the Court with quarterly written reports detailing the efforts of the Receiver to marshal,

collect, and preserve assets and otherwise fulfill the duties of the Receiver. *See id.* at ¶ 54.

### C. Stay of Litigation Involving the United States

24.     On October 1, 2025, Administrative Order No. ORDER 25-01 was filed [Doc. No. 27] to stay this litigation in light of the lapse of appropriations. The Receiver's activities are not otherwise affected by this stay and the Receiver has continued his investigative and collection activities during the stay.

### III.     EFFORTS TO FULFILL DUTIES OF THE RECEIVER

25.     Promptly after the entry of the Appointment Order, the Receiver began the process of discharging the duties of the Receiver under the Appointment Order by working to gather as much information as possible to gain a clear understanding of pertinent matters.

### A. Termination of Employees

26.     Immediately upon his appointment, the Receiver discovered that the Receivership Entities had several highly compensation employees on its payroll. Payroll costs were approximately $120,000 per month and the entire staff of nine (9) employees had been terminated prior to his appointment. After taking control of the records and of the Newnan office, the Receiver elected to not re-employ any of these individuals.

### B. Retention of Professionals

27.    The Receiver sought and obtained approval to retain the counsel, a forensic accountant, and an administrative and claims agent for the Receiver. Specifically, the Receiver prepared and filed a motion [Doc. No. 20] (the "**Employment Motion**") seeking to employ the Law Offices of Henry F. Sewell, Jr., LLC as counsel ("**HFS**" or "**Counsel**"), Hays Financial Consulting, LLC ("**HFC** or "**Forensic Accountant**") as forensic accountant, and Stretto as administrative and claims agent for the Receiver (collectively, the "**Receiver's Professionals**"). Such motion was granted incident to the entry of a certain ORDER GRANTING MOTION BY RECEIVER FOR AUTHORIZATION TO EMPLOY THE LAW OFFICES OF HENRY F. SEWELL, JR., LLC AS COUNSEL, HAYS FINANCIAL CONSULTING, LLC AS FORENSIC ACCOUNTANT, AND STRETTO, INC. AS ADMINISTRATIVE AND CLAIMS AGENT FOR THE RECEIVER [Doc. No. 10]. The Receiver's Professionals are Retained Personnel as such term is defined in the Appointment Order.

28.    The Receiver has also sought, on September 15, 2025, approval to retain professionals in the ordinary course of business [Doc. No. 20]. The Court has not yet entered an order with regard to such pleading. This motion was to continue the services of certain law firms that First Liberty employed before the receivership to

continue certain litigation efforts on behalf of the receivership.

### C. Securing Books and Records of Receivership Entities

29.     During the Reporting Period, the Receiver began investigating the assets of the Receivership and obtained and secured the books, computers, and records of the Receivership Entities in compliance with the Appointment Order. The Receiver immediately shut off outside access to server and email system of the Receivership Entities.

30.     During the Reporting Period, the professionals of the Receiver visited the offices of First Liberty located at 14 Greenville St, Newnan, GA 30263 (the "**Newnan Office**") to inspect its contents. The Receiver discovered a notable absence of current paper documents at the Newnan Office, but did find stacks of unopened mail from financial institutions and desks and filing cabinets with dated records. After collecting the books, records, and computers of the Receivership Entities and removing all important documents from the Newnan Office, the Newnan Office was closed.

31.     The Receiver retained IT professionals to assist in imaging devices and downloading electronic records and had the data on the computers located at the Newnan office forensically analyzed and preserved by TransPerfect Legal in addition to obtaining data services from Valid8 to import and analyzed bank account

records.

32.    During the Reporting Period, the Receiver and the professionals of the Receiver also interviewed and communicated with parties with knowledge of Receivership Assets. In particular, the Receiver and his team also met with and/or spoke to:

a) SEC, Georgia Secretary of State and other governmental agencies;

b) Former professionals of the Receivership Entities;

c) Various investors of the Receivership Entities to provide details of the Receivership and assistance with gathering and submitting information and documents through the secure online portal for purposes of the reconstruction by the Forensic Accountant the accounts of the Receivership Entities and any claims process the Court may approve;

d) Counsel for various investors of the Receivership Entities to discuss the Receivership, the assets and records of the Receivership Estate, the investors and potential claims against various third parties, insiders, and affiliates of the Receivership Entities; and

e) Borrowers and/or counsel for borrowers regarding the status of outstanding obligations due to the Receivership Entities and/or the status of any available collateral.

**D. Claims Process**

33.     At an appropriate time in the near future, the Receiver will establish claim procedures in this Receivership and will provide investors with a claim form with instructions as to how to file a claim and set a bar date for filing claims. Information about the claims procedure will be posted on the Website.

34.     While there is no need for investors to contact the Receiver about obtaining a proof of claim form at this time, investors are encouraged to collect and compile all documentation related to their claim so that such documentation is available when the claim form is posted to the Website and distributed by the Receiver to investors. Because of the significant amounts of investor money paid to the Receivership Entities, the number of investors, and the period of time during which the offering was conducted, this will be a complicated Receivership that will require the cooperation of investors and the Receiver hopes that the investors will fully cooperate with in the administration of this Receivership.

**E. Property of the Receivership**

35.    The Receiver and the Receiver's Professionals are in the process of marshalling assets and have filed the Appointment Order with federal district courts in the States of Florida, Georgia, North Carolina, South Carolina, Tennessee, Alabama, Mississippi and Texas to aid the potential recovery of assets as directed in 28 U.S.C. 754.

### i.    Real Property

### a) Winder Property

36.    The Receivership Assets includes certain real property located at 169 W. Athens St., Winder, Georgia (the "**Winder Property**"). The property was acquired by First Liberty Capital pursuant to a deed in lieu of foreclosure in connection with a defaulted loan made on this property.

37.    The Receiver's claim to the Winder Property is contested by Haven Real Estate Holdings of Winder, LLC ("**Haven Winder**") which filed on July 9, 2025, just prior to the appointment of the Receiver, a certain *Verified Complaint for Specific Performance* (the "**Winder Complaint**") against First Liberty Capital, LLC to initiate Case No. 2025000831 in the Superior Court of Coweta County (the "**Winder Action**"). Haven Winder also filed a Notice of Lis Pendens (the "**Lis Pendens**") related to the Winder Property just prior to the Appointment Order being entered. The Winder Action has been stayed.

38.     Pursuant to paragraph 18 of the Winder Complaint, the Winder Complaint and Lis Pendens were purportedly filed to protect an unidentified interest in the Winder Property. The Winder Complaint itself seeks to compel the transfer of the Winder Property to the Haven Winder without: a) identifying a written purchase agreement to acquire the property or even a specific purchase price to be paid by Haven Winder to acquire the Winder Property; or b) indicating that Haven Winder is able to promptly pay the purchase price in full. Instead of including pertinent purchase information such as a written purchase agreement signed by First Liberty Capital Partners, LLC, the Winder Complaint further includes an outstanding promissory note by Haven Winder for a construction loan in the amount of $2 million (the "**HW Construction Loan**"). The Receiver has determined that no amount of the HW Construction Loan was allocated for the purchase of the Winder Property. Upon information and belief, Haven Winder intended to obtain a subsequent loan in addition to the HW Construction Loan in order to obtain the funds to acquire the Winder Property, but Haven Winder never obtained such loan and does not presently have sufficient funds to purchase the Haven Property. Although Haven Winder did not have any ownership interest in the Winder Property or authority to sell the Winder Property for First Liberty Capital, paragraph 13 of the Winder Complaint indicates that Haven Winder entered a contract to sell the Winder

Property to North Georgia Recovery Center, LLC ("**NSRC**") for $3,955,000.00. The Receiver submits that such sales contract, the Winder Complaint, and the Lis Pendens are invalid and are causing the Receivership to incur damages.

39.    To help limit the damages caused by the conduct of Haven Winder, the Receiver has made a formal demand that the Lis pendens be withdrawn and intends to seek authority to sell the Winder Property free and clear of all liens, claims, interests, and encumbrances.

40.    The Receiver has inspected the exterior and interior of the Winder Property on multiple occasions to ensure no code enforcement issues and ensure that the Winder Property is secure and landscaping is maintained. The Receiver was advised that the Winder Property was undergoing renovations and that the project was 90% complete. Upon inspection, it was determined that significant work remains to be done to complete the renovation. A representative of the Receiver also visited the City of Winder Fire and Police Departments to notify the authorities of the Receivership and provide contact information in the event of an emergency. The Receiver intends to continue monthly inspections.

41.    The Winder Property was not insured when the Receiver was appointed. The Receiver researched insurance coverage options and obtained property and liability insurance coverage for the Winder Property. In order to insure

that the Winder Property was not cited for county code enforcement issues or vagrant vandalism, the Receiver hired a landscaping company to maintain the landscape on site. The Receiver continues to monitor the property on a routine basis. The entrance to the Winder Property is guarded with lock and cable to prevent access without notice to the Receiver.

42.     At the time the Receiver was appointed a re-zoning application was pending for the Winder Property the effect of which would, according to information provided to the Receiver, make the property more valuable. The Receiver continued pursuit of that application which was granted on October 6, 2025.

43.     The Receiver has received notice from Barrow County Property Tax of an amount due of $11,631.98 due December 5, 2025. The Receiver plans to pay this tax bill.

44.     The Receiver has received calls from parties interested in purchasing the property. The names of these parties have been recorded and such parties will be contacted when the procedure for a sale is established.

45.     The Receiver has attempted to reach a negotiated resolution of the issues relating to the Winder Property which have now failed and the Receiver will now seek to protect the interests of the Receivership in the Winder Property and to sell it.

**b) Newnan Office**

46.     The Receivership Assets also includes the Newnan Office, which is located a block off the square in Newnan, Georgia and currently has two rental tenants on the first floor.

47.     The Newnan Office served as the main office building of the Receivership Entities. The commercial building is approximately 2,400 square feet of office space located the central downtown district of Newnan, Georgia. The two tenants collectively pay $2,500 per month in rent to the Receiver. Upon review and inspection of the location, the Receiver met with Jayme Sickert (a former officer of First Liberty) and retrieved the relevant business records, including loan documents, security surveillance system, and business financial records. The Receiver is actively clearing the space in preparation of a sale of the location through auction. Dwaine Butler, of the Receiver's office, visits the vacant property weekly to ensure the property is secure, and tenant maintenance issues are addressed.

48.     The Receiver continues to pay the monthly utility bills to maintain water and electrical service in the property. The Receiver has received the Coweta County property tax bill with an amount of $2,079.37 due on December 1, 2025. The Receiver intends to pay the property tax prior to its due date.

49.     The Newnan Office is insured with property and general liability

coverage. The Receiver has confirmed the policy is active and in good standing.

50.     The Receiver has communicated with a party who offered to purchase the Newnan Office prior to the entry of the Appointment Order. After evaluating potential options, the Receiver determined that an auction sale was in the best interests of the Receivership. The Receiver prepared and filed a motion on September 25, 2025, seeking authority to sell the Newnan Office [Doc. Nos. 23 and 24]. The Court has not yet entered an order on such motion. The Receiver has selected Bullseye Auction to sell the Newnan Office via an auction sale. Bullseye has inspected the property and is in communication with the Receiver should the auction be approved.

51.     The Receiver has concluded that an auction of this building is the most efficient method to sell this building.

### ii.    Interests in Loans

52.     The Receivership Entities used loan participation agreements and promissory notes to obtain over $100 million to fund short-term loans to various borrowers (the "**Bridge Loans**"). As noted above, the Receivership Estate includes a number of individual Bridge Loans by the Receivership Entities. The Receiver has advised borrowers, **and reiterates this demand in this Report, that all borrowers must continue to pay loans in accordance with their applicable loan documents**.

Persons and entities that borrowed money and still owe money to the Receivership Entities should continue to make required payments on their loans and should expect the Receiver to fully enforce and collect all loans to the fullest extent possible. All payments should be sent directly to the Receiver at Suite 555, 2964 Peachtree Road NW, Atlanta, Georgia 30305. Wire instructions are also available upon request.

53.    To date, only one borrower has made payments totaling $45,000 to the Receiver. While most of the loans have been in default for a long time, the Receiver's impression is, frankly, that many of the borrowers are using the Receivership as a basis to contest their loans and to avoid their responsibilities to repay those loan. Investors should be assured that the Receiver intends to enforce each loan to the fullest extent possible and default interest is accruing.

54.    The Receiver has not yet located a clear list of borrowers and amounts payable and certain reports reviewed by the Receiver do not appear to be accurate. For example, records of the Receivership Entities indicate that the Receivership Entities raised more funds for certain loans than were actually loaned and paid interest on certain loans even if such loans were in default. Furthermore, loan schedules indicate that certain loans have been paid off even though the principal balance was not repaid and certain reports appear to have incorrect loan payoff figures. The Receiver does believe, however, based on a review of the public filings

and bank records, that he has sufficient evidence to prove up the amounts of the loans, confirm amounts advanced to borrowers, confirm amounts received from borrowers and to enforce and recover upon the existing loans.

55.    The Receiver understands that individual investors who executed Participation Agreements with the Receivership Entities were informed and believed that their investments were to be directed to particular loans. The Receiver's investigation to date, however, indicates that all funds received were pooled and comingled with other investor funds and that loans were made from a common fund.

56.    The progress of the Receiver has been hindered by attempts by certain investors to interfere with the administration of the Bridge Loans. For example, Bay Point Capital Partners II, LP ("**Bay Point**"), an investor in a portion of three of the loans, filed *Bay Point Capital Partners II, LP's Motion to Intervene* [Doc. No. 18] (the "**Intervention Motion**") seeking to intervene in this case for the purpose of removing three Bridge Loans from the Receivership and assuming the administration and enforcement of minority shares of those loans. The Receiver prepared an objection and response to the Invention Motion and the matter is currently pending before the Court. Another investor has demanded same type of takeover of a participant loan and the Receiver has responded to counsel for that investor.

57.    Although the majority of the Bridge Loans ultimately defaulted and certain borrowers ceased making payments on such loans, the Receivership Entities continued to make payments to investors with proceeds from the comingled pool of funds from other investors. Investors in the Bridge Loans are similarly situated in having potentially received proceeds from the commingled pool to which they may not have been entitled. Such circumstance is one reason that it is vital to have the Bridge Loans administered by court-appointed fiduciary in a single proceeding. The Receiver submits that dividing the Bridge Loans into separate fiefdoms with no overlying reconciliation structure would produce inequitable results and severely prejudice certain investors. The Receiver is in the early stages of preparing a detailed reconciliation to account for the sources and uses of funds by the Receivership Entities. The situation would be far more complicated and difficult to unwind if an investor who owned only a portion of a certain Bridge Loans was able to divert and control parts of Bridge Loans for their own benefit.

58.    The progress of the Receiver has also been hindered by attempts by borrowers to avoid payment of the Bridge Loans. As noted above, many of the borrowers are seeking to use the Receivership to attempt to avoid their obligations to the Receivership Entities.

59.    Certain Bridge Loans are detailed below. The Receiver does note that he

has focused his early efforts on larger loans which appear to be collectible. There are a number of loans that the Receiver is still evaluating and for which he is collecting information. Certain loans have received far more attention than other loans for this reason and the Receiver will continue to manage his enforcement activities (and related expenses) based on likelihoods of recovery.

**a) Curepoint LLC (CP 1), Daniel Dooley, Philip Miles, Mark Miles, and Physician Financial Partners, LLC**

60.     Curepoint LLC ("**Curepoint**") entered loans dated: a) November 1, 2019, in the amount of $3,650,000; b) November 22, 2019 in the amount of $900,000; c) May 20, 2021 in the amount of $1,500,000; and d) September 30, 2021 in the amount of $400,000. The security for such loans includes guarantees.

61.     Curepoint is the debtor in Chapter 11 Case No. 22-56501-PMB pending in the United States Bankruptcy Court for the Northern District of Georgia (the "**Curepoint Bankruptcy Case**"). Prior to the appointment of the Receiver, the Receivership Entities filed a claim in the Curepoint Bankruptcy Case. After the liquidating trustee in the Curepoint Bankruptcy Case objected to the claim, the amount of the claim was reduced to $300,000.

62.     The Receiver reviewed the claim, determined that the Receivership Entities held obligations due by Curepoint that should be considered in calculating the claim, and determined that there was a basis for the claim to be allowed at greater

amount. The Receiver filed in the Curepoint Bankruptcy Case a *Motion by Receiver to Reconsider Claim* [Doc. No. 450]. An evidentiary hearing on this Motion is scheduled for November 13, 2025.

**b) 2406 Cancer Care LLC, Erich G. Randolph, and Philip Miles (CP 2)**

63.     Erich G. Randolph is the Manager of 2406 Cancer Care LLC ("**Cancer Care**"), which entered a loan dated December 19, 2022 in the amount of $6,500,000.00 that had an original maturity date of December 18, 2023 and was secured by furniture, fixtures, equipment, inventory, accounts receivable, and other assets and guarantees by Eric Randolph, Aaron Williams, and Philip Miles (the "**CC1 Loan**"). Records available to the Receiver indicate that Cancer Care also entered into a loans dated December 20, 2023, in the amounts of:

a) $475,000.00 that matured on December 20, 2024 and is secured by medical equipment and drawings, bonds, for or affecting the existing or proposed construction and equipping of the improvements located or to be located on certain property and guarantees by Eric Randolph and Philip Miles; and

b) $750,000.00 that matured on December 20, 2024 and is secured by medical equipment and guarantees by Eric Randolph and Philip Miles.

64. The amount due by Cancer Care includes an obligation involving Moneyline Ventures, LLC dated May 31, 2024 in the original principal amount of $2,000,000.

65. Philip Miles has requested that the Receiver provide a payoff for the amount due by Cancer Care. The Receiver has calculated that the amount due on this loan is $5,584,777.32 as of October 27, 2025, although the Receiver is advised that this amount is disputed by Mr. Miles. The Receiver does believe that Mr. Miles, who has made interest payments to the Receiver, has a sincere interest in resolving this loan the Receiver is currently awaiting a detailed response from Mr. Miles.

**c) Urohealth, LLC and Philip Miles**

66. Philip Miles is the Manager of UroHealth, LLC ("**Uro**"), which entered a loan (the "**W. Robbins Loan**") date October 12, 2023, in the amount of $3,500,000 that had a maturity date of October 11, 2024 that is secured by all assets of Uro, furniture, equipment, and accounts receivable. The Promissory Note related thereto has a cross default and collateralization provision.

67. Uro entered another loan (the "**Dublin Loan**") dated February 8, 2024, in the amount of $3,500,000 that had a maturity date of February 7, 2025, and is secured by all assets of Uro furniture, equipment, accounts receivable, and a guaranty by Philip Miles. The Promissory Note related thereto includes a Cross-

Default and Cross-Collateralization provision. .

**d) ZeroHolding, LLC, Mark Miles, and Philip Miles**

68.    ZeroHolding, LLC (the "**Zero**") entered a loan dated August 12, 2019, in the amount of $1,000,000 that had an original maturity date of August 12, 2020. Zero is the debtor in Chapter 11 Case No. 22-56502-JWC pending in the United States Bankruptcy Court for the Northern District of Georgia (the "**Zero Bankruptcy Case**"). This Promissory Note related to this loan references guarantees by Mark Miles and Philip Miles.

69.    As noted above, the Receiver is dealing directly with Mr. Miles and his counsel on these loans.

**e) Haven and Lisa Brown**

70.    Lisa Brown is the Manager of Haven Real Estate Holdings of Snellville, LLC ("**Haven-Snellville**"), which entered a loan dated July 31, 2024, in the amount of $1,750,000.00 that had a maturity date of July 31, 2025 and was secured by all assets of borrower, a senior living facility in Snellville, and a guarantees by Lisa Brown and Haven Memory Care of Snellville. There was a payment in the amount of $2,502,247.75 related to this loan (the "**Snellville Payment**").

71.    Lisa Brown is also the Manager of Haven Memory Care of Athens, LLC, which entered a loan dated November 16, 2022, in the amount of $600,000.00

that had a maturity date of on May 16, 2024 and was secured by the Snellville facility, the residence of Lisa Brown, an option, and a guaranty by Lisa Brown. The Snellville Payment paid a portion of this loan.

72.    Haven Memory Care of Athens, LLC, entered into another loan dated May 23, 2023, in the amount of $1,700,000.00 that had a maturity date of May 22, 2024 and is secured by the Athens and Snellville (released) facilities, the residence of Lisa Brown in Greensboro, GA, an assignment of an option to buy the properties, and a guaranty by Lisa Brown.

73.    Further, Lisa Brown is the sole Member of Haven Real Estate Holdings of Athens LLC, which entered a loan dated April 23, 2025 in the amount of $2,000,000.00 that has a maturity date of April 22, 2026 and is secured by all assets of borrower, the residence of Lisa Brown, a mortgage against Haven Real Estate Holdings of Athens, and guarantees by Lisa Brown and Haven Memory Care of Athens. The loan was for the purpose of purchasing 705 Whiteside Road in Athens by paying off an existing secured loan.  Paragraph 6 of Promissory Note related to this loan is Cross-Default and Collateralization provision for all loans to Borrower or its affiliates, which is defined as any entity related to "Borrower by common ownership and /or control." The provision is also included as an exhibit to the Security Agreements. Documents do not appear to modify obligations of the related

entities and paragraph 7 of the Promissory Note reaffirms obligations due to Lender without providing an amount due or modifying any maturity dates. Paragraph 5 of the Promissory Note provides that "Borrower shall provide Lender with quarterly financials and such information as Lender may request from time to time regarding application of loan proceeds and performance under the Loan documents." Paragraph 8(f) of the Promissory Note represents that the Borrower is sophisticated.

74.    The Receiver has sent notices of default to the Haven Athens loans and has scheduled a foreclosure sale for the Haven Athens property for November 4, 2025.

75.    Lisa Brown is also the Manager of Haven Winder, which entered the Construction Loan dated January 24, 2024 in the amount of $2,000,000.00 that had a maturity date of January 23, 2025 and was secured by three separate senior care facilities in Athens, Snellville, and Winder. The loan was guaranteed by Haven Memory Care of Athens, Lisa Brown, and Haven Memory Care of Snellville. The closing statement for the loan allocates funds for construction and does not allocate any proceeds to be used to acquire the Winder Property owned by First Liberty.

76.    To date, Ms. Brown, who has personally guaranteed all of these loans, has been wholly uncooperative. She has refused to provide financial and other information and failed to make loan payments. Although her counsel recently

indicated that she was attempting to seek a refinancing of these loans, no information has been provided and this appears to have been delay tactic on her part. The Receiver intends to enforce the loans, recover available collateral, seek attorneys fees and default interest and seek any shortfall from Ms. Brown personally.

**f)  Product Design Innovations LLC-Chisel Fit**

77.    Product Design Innovations LLC entered a loan dated August 23, 2023 in the principal amount of $1,950,000.00 secured by a second lien on an Ocala FL residence owned by Mr. and Ms. Ellis and adjoining commercial property owned by Margaret Brown and a guaranty by Joseph K. Ellis. The Receiver has sent a default notice on these loans.

**g)  Dr. Jerry Williams, No Free, LLC and RiverDawg LLC**

78.    Entities owned or controlled by Dr. Williams received a significant amount of proceeds from the comingled pool of funds maintained by the Receivership Entities.

79.    An entity owned and controlled by Jerry Williams, No Free, LLC ("**No Free**"), entered into a loan dated December 28, 2023, in the amount of $250,000.00 that was funded by the Receivership Entities, guaranteed by Dr. Williams, and secured by a condominium at 285 Centennial Park Drive, Commercial Unit No. 2. Such loan was renewed with the balance rolled into a loan in the amount of

$500,000.00 dated June 11, 2024 ("**Williams Loan 2**") that was funded by the Receivership Parties and guaranteed by Dr. Williams. In conjunction with Williams Loan 2, Dr. Williams executed a Modification of Promissory Note that contains a cross-default and cross-collateralization provision for obligations of all entities related to the No Free by common ownership and/or control.

80.    Another entity owned and controlled by Jerry Williams, RiverDawg, LLC ("**RiverDawg**"), entered a loan dated September 18, 2024 ("**Williams Loan 3**") in the amount of $760,000.00 that was funded by the Receivership Entities and guaranteed by Jerry Williams and Urgent Care 247, LLC ("**UC**"), an entity owned and controlled by Dr. Williams. The Promissory Note executed by Dr. Williams on behalf of RiverDawg incident to Williams Loan 3: a) has a cross-default and cross-collateralization provision for obligations of all entities related to the RiverDawg by common ownership and/or control; and b) indicates that the loan is secured by certain property at 7934 Hiawassee Wilderness Trial in Hiawassee Georgia. Loan 3 is also secured by a Deed to Secure Debt, Assignment of Rents and Security Agreement dated September 17, 2024, for certain property in the County of Towns, Georga and Title Insurance.

81.    RiverDawg entered into another loan dated December 9, 2024 ("**Williams Loan 4**"), in the amount of $355,000.00 that was funded by the

Receivership Entities and guaranteed by Jerry Williams and UC. The Promissory Note related to Loan 4: a) indicates that it is secured by Unit 32 and Unit 44 of the Overlook at Baxter Condominiums; and b) has a cross-default and cross-collateralization provision for obligations of all entities related to the RiverDawg by common ownership and/or control.

82.     No Free entered into another loan dated December 19, 2024 ("**Willaims Loan 5**" and collectively with Williams Loan 1, Williams Loan 2, Williams Loan 3, and Williams Loan 4, the "**Williams' Loans**") in the amount of $3,500,000.00 for the purpose of constructing a home in Highlands, North Carolina that was funded by the Receivership Entities and guaranteed by Jerry Williams and UC. The Promissory related to Williams Loan 5: a) contains a cross-default and cross-collateralization provision for obligations of all entities related to the No Free by common ownership and/or control; and b) indicates that the obligation is secured by security agreements conveying security interests in property located in South Georgia referred to as Arnolds's Point, (the value of which, the Receiver is advised, far exceeds the amount of the Williams Loans) together with a lot in Highlands Falls Country Club in North Carolina. Security for Williams Loan 5 includes a certified Commercial Deed to Secure Debt and Security Agreement dated December 19, 2024, for two parcels known as Arnold's Point, a North Carolina Deed of Trust on property in Bittersweet

Hills, Highlands, NC (the "**North Carolina Parcel**" or "**Land**"), and Title Insurance.

83.    The Receiver has issued a payoff and notice of default regarding the foregoing loans. Notwithstanding the extensive efforts by the Receiver to obtain an amicable resolution of these loans, Dr. Williams has declined to satisfy the outstanding obligations. Instead, Dr. Williams caused the filing of a *Motion for Leave of Court to Initiate Action Against Receivership Estate* [Doc. No. 29] in which Dr. Williams seeks to strip away collateral from the foregoing loans and has challenged the legitimacy of the security deed for the Highlands Property.

84.    The Receiver has tendered notice of a claim to the title insurance company which insured the secured deed; has notified the lawyers involved in this transaction to notify their malpractice carriers and intends to vigorously enforce the Williams loans.  Default interest in accruing and legal collection fees will be added to the loans

**h)  Tie and Timber Technologies, LLC**

85.    Tie and Timber Technologies, LLC ("**T3**" and also referred to as Precision Timberworks) was formed to engage in the business of manufacturing railroad ties and selling railroad ties and byproducts (including bark and wood chips), through a plant to be established in Mullin, South Carolina.   A building was

purchased and over $1 million was spent on equipment on a plan that was never operated.

86.     T3 entered a loan dated December 19, 2019 for $300,000.00 that had an extended maturity date of May 17, 2021 and was secured by a mortgage on property in Marlon County, South Carolina, a Security Agreement on accounts receivable, and other assets, and a Guaranty from Eugene N. Martini. T3 also entered into a loan dated December 23, 2021 for $600,000.00 that had a maturity date of December 22, 2023 and was secured by a Security Agreement on property at 301 S. Cyprus St., Mullins, SC (the "**T3 Plant**") and a Guaranty from Eugene N. Martini.

87.     T3 also entered into a loan dated January 25, 2022 for $4,000,000.00 that had a maturity date of January 24, 2023 and was secured by a Security Agreement for 2 parcels in South Carolina, Guaranty by Eugene N. Martini, and Mortgage Deed to Secure Debt.

88.     T3 entered into a loan dated April 18, 2022 for $3,000,000.00 that had a maturity date of April 17, 2023 and was secured by a Security Agreement for two parcels in SC, Guaranty by Eugene N. Martini, and Mortgage Deed to Secure Debt.

89.     T3 entered into a loan dated August 24, 2022 for $2,500,000.00 that had a maturity date that was modified to August 24, 2022 and was secured by a Guaranty by Eugene N. Martini and possibly other documents.

90.    T3 entered into a loan dated February 15, 2023 for $2,500,000.00 that included a modification of the foregoing obligations and was secured by a February 15, 2023 Mortgage of Real Estate, Security Agreement, and Equity Option Agreement. There is a February 15, 2023 Agreement Regarding Recourse in which the claims against the guarantor who died in 2002 were waived.

91.    The manager of T3 has offered to cause T3 to transfer its title to its assets to the Receiver (or to a special purpose entity formed by the Receiver) to allow the Receivership Entities to conduct a formal foreclosure. The Receiver is evaluating options to recover and auction the T3 Plant and equipment in Mullin, South Carolina.

92.    The T3 Plant is a sawmill plant in Mullins, South Carolina that has been inspected by the Receiver on two occasions. The Receiver has onsite security personnel that reports to the Receiver's office daily.

93.    The T3 Plant was not insured as of the appointment of the Receiver. The Receiver is actively communicating with insurance carriers to obtain liability and property insurance coverage. The issues surrounding the value of the property and equipment have been a concern for the insurance carriers. The Receiver has provided photographs and detail surrounding the onsite security to the insurance carrier. The carrier is currently in the process of shopping the risk to different carriers.

94.     Upon inspection of the location, Dwaine Butler, of the Receiver's office, met with Teddy Hemmingway, a former employee, at the T3 Plant location. Mr. Butler also met with the City of Mullins Mayor's office, Fire Department, and City of Mullins Police. Due to the T3 Plant being vacant, the Receiver deemed it necessary to obtain security services to monitor the location. The Receiver continues to maintain power, water, and internet services at the location. The internet service is required to support the onsite security camera system.

95.     A representative of the Receiver also met with former Chief Compliance Office of T3 to discuss prior operations, purchase of equipment and inventory, and obtain detail surrounding building documents. The majority of the building documents are located onsite at the business location and the Receiver is in process of reviewing such documents.

96.     The Receiver's office has received calls from parties interested in the purchase of the building and/or equipment. As of the date of this Report, the Receiver has not been presented any formal offers to purchase the T3 Plant or equipment, but is in contact with the City of Mullins Economic Development Department and Mayor's office regarding use of the building. The Receiver continues to monitor and maintain the T3 Plant utilities, exterior landscape, and mitigation of any county code violations.

97.    Although the Receiver will seek to enforce this loan to the fullest extent possible, the value of the collateral securing this loan appears to be significantly lower than amount of the loan.

### i) David Pike and Full Circle LLC aka Normal Recovery

98.    David Pike is the Managing Member of Full Circle LLC aka Normal Recovery ("**Full Circle**"), entered a loan dated February 10, 2023 in the amount of $2,750,000.00 that originally matured on February 9, 2024 and is secured by real property of Timeless Acquisitions LLC and Full Circle in Walton County, Georgia at the intersection of George Pike Sr. Parkway and Bethany Church Road, all property of Full Circle, and guarantees by David Pike, David Pike II and Christie Pike Nelson. The Receiver is currently in negotiations with counsel for Full Circle and has requested documentation from them. Full Circle is proactively seeking a resolution of its loan that is currently in default.

### j) FibRETech LLC and Rendell Schmidt

99.    Rendell Schmidt is the Managing Member of President of FibRETech LLC ("**FibRETech**"), which entered a loan dated August 16, 2021, in an amended amount of $165,000.00 that had a maturity date of August 15, 2022 and is secured by a second priority interest on 6635 Canyon Cove, Cumming GA, an interest reserve, and a guaranty by Rendell Schmidt. FibRETech also entered a loan dated

July 26, 2022 in the amount of $4,000,000.00 in conjunction with an assignment of loan documents from Mobilization Funding II, LLC that had a maturity date of December 20, 2023 and is secured by an interest in lot 238 in Forsyth County, GA, all property of FibRETech, including accounts receivable, and lot 236 in Forsyth County, GA. The only piece of collateral remaining is a horizontal grinder in North Carolina that cost approximately $365,0000. The obligation is guaranteed by both Rendell Schmidt and Sharon Schmidt.

100.    The Receiver is the process of obtaining or selling the horizontal grinder in North Carolina and has included in his pending motion to employ professionals the lawyers who were handling this matter prior to the Receivership.

### k) Christopher Ridgeway and Stone Capital Group LLC

101.    Christopher Ridgeway is the Chairman of Stone Capital Group LLC ("**Stone**"), which entered a loan dated March 31, 2023 in the amount of $3,750,000.00 that matured on March 30, 2024 and is secured by two personal residences of Christopher Ridgeway in Alys Beach, FL and Matarie LA, and all assets of Stone, and a guaranty of Christopher Ridgeway. Stone also entered a loan dated August 14, 2023 in the amount of $1,000,000.00 that is secured by two personal residences of Christopher Ridgeway in Alys Beach, FL and Matarie LA and medical equipment and the guaranty of Christopher Ridgeway. Stone entered a

loan dated November 22, 2023 in the amount of $1,500,000.00 that matured on November 22, 2024 and is secured by two personal residences of Christopher Ridgeway in Alys Beach, FL and Matarie LA, and a guaranty of Christopher Ridgeway. A foreclosure was started on Alys Beach FL home and the matter is now tied up in arbitration.

l) **Specialty Surgery Center Inc., Harvey Cole, Atlanta Oculoplastic Surgery, Scott Honan**

102.  Specialty Surgery Center Inc. ("**Specialty**")  entered a loan dated April 4, 2019 in the amount of $2,600,000.00 that was secured by interest in SCH Forsyth, LLC and guarantees by Harvey Cole, Atlanta Oculoplastic Surgery, Scott C. Honan, individually, Scott C. Honan and John J. Honan as co-trustees of The Scott Honan and Descendants Trust. Specialty also entered a loan dated July 1, 2019 in the amount of $1,500,000.00 that was guaranteed by Harvey Cole and Atlanta Oculoplastic Surgery. Specialty entered a loan dated July 1, 2019 in the amount of $1,050,000.00 that was guaranteed by Harvey Cole, Atlanta Oculoplastic Surgery, Scott Honan.

103.  Harvey Cole has sought bankruptcy protection and the Receiver is currently analyzing his enforcement options with respect to this loan.

m) **Honan Preferred Equity and Scott C. Honan**

104.   Scott C. Honan is the manager of Honan Preferred Equity ("**HPE**"), which entered a loan dated July 1, 2019 in the amount of $1,750,000.00 secured by certain limited liability company member interests and  a  guaranty  by  Scott  C. Honan. HPE also entered into a loan dated September 24, 2019 in the amount of $600,000 secured by certain medical equipment and a guaranty by Scott C. Honan.

105.   L&S Regional One MOB I, LLC – Memphis entered a loan dated October 3, 2022 in the amount of $5,000,000.00 secured by membership interest in 11680 Royal Ridge SH, LLC, a GA LLC, 5009 Manna Petros HPE, LLC, a GA LLC, and 5009 Manna Petros SH, LLC, a GA LLC and a guaranty by Scott C. Honan.

106.   Glenridge Point SPE LLC, a DE LLC (or Glenridge Lifehope SPE, a DE LLC) entered a loan dated May 31, 2022 in the amount of $3,500,000.00 secured by interests in Glenridge Lifehopc SH, LLC, a GA LLC, SHWMRH Investors, LLC, a GA LLC, and contracts and a guaranty by Scott C. Honan.

**n) 11680 Royal Ridge SH, LLC and Scott C. Honan**

107.   11680 Royal Ridge SH, LLC entered loans dated: a) January 22, 2021 in the amount of $4,750,000.00; b) June 29, 2021 in the amount of $4,500,000.00; c) November 22, 2021 in the amount of $2,850,000.00; and d) February 25, 2022 in the amount of $1,500,000.00.

108.   As noted herein, there are a number of loans in which Mr. Honan is involved. The Receiver is currently analyzing his enforcement options with respect to the Honan loans and to determine the extent of recoverable assets.

**o) Global Onboard and Keri Adams**

109.   Global Onboard entered a loan dated December 21, 2020 in the amount of $350,000.00 secured by real property in Cobb County, Georgia that was guaranteed by Krik R. Adams. The Receiver is currently reviewing this loan for further enforcement activity.

**p) Conquest Commercial Funding, LLC**

110.   Conquest Commercial Funding, LLC ("**Conquest**") entered a loan dated March 31, 2021, that was modified pursuant to a certain Loan Modification Agreement dated April 3, 2023, that set the principal amount of the obligation at $1,600,000. The loan was guaranteed by Jorge Martinez. The Receiver recently learned that Mr. Martinez filed bankruptcy without scheduling the obligation due under the guaranty. The Receiver plans to file a claim in the bankruptcy case and has been in contact with the bankruptcy trustee. At present, the Receiver is uncertain about the collectability of this loan.

**q) Ecofusion LLC, Ernest E. Jones, Jr. Joseph MA Coalla, and Ralph Reed**

111.   Ecofusion LLC ("**Ecofusion**") entered a loan dated July 27, 2023 in the

amount of $1,500,000.00 secured by all assets of the borrower and guarantees by Ernest E. Jones, Jr. Joseph Coalla, and possibly others.

112.    The Receiver is currently reviewing this loan for further enforcement activity.

**r)  2304 GP LLC, Brandi Kirkland, and Bret Tomlinson**

113.    2304 GP LLC ("**Grand Prairie**") entered a loan dated December 22, 2021 in the amount of $2,000,000.00 secured by a second priority Deed of Trust and separate Assignment of Rents and Leases on 2304 -2307 Oak Lane, Grand Prairie, Texas 75051, a fourth priority Deed to Secure Debt, Assignment of Rents and Security Agreement on 1800 Water Place, Marietta, Cobb County, Georgia and guarantees by Brandi Kirkland and Bret Tomlinson. Grand Prairie also entered into a loan dated January 3, 2022 in the amount of $100,000.00 that was guaranteed by Brandi Kirkland and Bret Tomlinson.

114.    This loan was tied up in pre-Receivership litigation and the Receiver is evaluating recommendations from counsel as to how to proceed.

**s)  DI Development LLC, Brent E. Myers and Timothy L. Miller**

115.    DI Development LLC entered a loan dated April 20, 2022 in the amount of $375,000.00 secured by real estate in Gainesville GA and Port St. Lucie FL and guarantees by Brent E. Myers and Timothy L. Miller.   The loan is in default and the

Receiver is investigating.

**t)  Dixie Precast and Franklin Lamar Brown**

116.   Dixie Precast entered a loan dated January 30, 2025 in the amount of $363,000.00 that was guaranteed by Franklin Lamar Brown. The Receiver is investigating to determine whether this loan is collectible.

**u)  Emergent Testing Labs, LLC dba Lux Diagnostics, Jonathan Goss, and Kraken Enterprises, LLC**

117.   Jonathan Goss is the President of Emergent Testing Labs, LLC dba Lux Diagnostics, ("**ETL**"), which entered a loan dated March 28, 2024 in the amount of $950,000.00 that had a maturity date of March 27, 2025 and was secured by a purported: a) 1st lien on a residence on Monument Rd. in Jasper, GA; a) 2nd lien position on three additional properties owned by the principal: 2 Corporate Drive, Atlanta; 13 Corporate Drive, Atlanta; and 4153 Roswell Rd., Atlanta; and c) 2nd lien position on a residence at 5265 Peachtree Dunwoody Rd., Sandy Springs, GA. The loan was guaranteed by Jonathan Goss. Paragraph 6 of the Promissory Note of ETL is a Cross-Default and Cross-Collateralization provision for obligations of ETL and any entities related to ETL by common ownership or control. Jonathan Goss is also the Manager of Kraken Enterprises, LLC ("**Kraken**"), which entered a loan dated October 25, 2024 in the amount of $135,000.00 that had a maturity date of April 25, 2025 and was secured by: a) a security interest on the facility at 13

Corporate Square in Atlanta, GA; and b) a guaranty by Jonathan Goss and ETL.

118.    The Receiver sent a default notices on these loans to Mr. Goss but has not received a response.

### v) VIMAEC LLC, Arol Wolford and Charles de Andreade

119.    VIMAEC LLC entered a loan dated August 27, 2020 in the amount of $450,000.00 that was guaranteed by Arol Wolford and Charles de Andreade. The loan is in default and the Receiver is investigating the collectability of this loan.

### w) Randy Bates

120.    Randy Bates entered a loan dated January 17, 2020 in the amount of $150,000.00 that was guaranteed by Randy J. Bates. The Receiver is investigating the collectability of this loan.

### x) Imperial Independent Media, LLC - Zachary Freeman

121.    Imperial Independent Media, LLC entered a loan dated June 15, 2023 in the amount of $90,000.00 secured by a second on a personal residence in Franklin, TN and a guaranty by Zachary Freeman. The Receiver is investigating the collectability of this loan.

### y) YGLI LLC (Positanos Pizza)

122.    A loan for YGLI LLC appears as a current loan in the records of the Receivership Entities, but the loan appears to have been paid off. The estate was still

paying interest to investors after the payoff and the principal was deposited in the general fund and not used to pay investors in YGLI. The Receiver continues to investigate whether additional amounts are owed on this loan.

## z) Shistine Farms

123. While the loan for Shistine Farms loan apparently never closed because of title issues with the property, records indicate that the Receivership Entities paid interest payments to investors even though the loan never funded. At present, the Receiver does not believe that further action is required on this loan.

## aa)    Undocumented

124. The Receiver has seen references to a number of other loans possibly made by First Liberty but has been unable to find any documentation with respect to such loans. The Receiver continues to search for records relating to these loans and will update his next quarterly report with respect to undocumented loans.

## bb)    My Health AI

125. There are four loans involving My Health AI in the total principal amount of $8,725,000. The Receiver has been informed that these loans were made as part of an investment in this entity by the Receivership Entities. This entity was supposedly developing software for use in the healthcare business. At present, there does not appear to be any collateral securing this loan and this appears to be a total

loss, although the Receiver continues to investigate.

### iii.    Vehicles

126.    The Receiver has identified certain vehicles purchased in whole or in part by the Receivership Entities.

127.    The Receivership Assets includes, among other assets, a 2006 Aston Martin DB5 (the "**Aston Martin**") and a 2021 Cadillac Escalade ESV that were surrendered to the Receiver by Defendant Frost (the "**Cadillac**").

128.    In addition, the Receiver has demanded that Defendant Frost turn over the following additional vehicles (the "**Additional Vehicles**") which include, but are not limited to:

      a)  2011 LNDR Range Rover Sport;

      b)  2011 Range Rover Sport;

      c)  2017 LNDR Range Rover; and

      d)  2013 Nissan Rogue.

129.    The Receiver has requested authority to sell the sell the Aston Martin, Cadillac, the Additional Vehicles via public auction(s) [Doc. Nos. 23 and 24]. The Receiver is awaiting an order from the Court to proceed.

### iv.    Other Personal Property

130.    The cash assets of the Receivership Entities held with financial

institutions in the amount of approximately $1.2 million were frozen and subsequently moved to a Qualified Settlement Fund under the administration of the Receiver in accordance with the Receiver Order.

131.   The Receiver continues to seek the return of certain other personal property in the custody of Defendant Frost or his family (the "**Other Personal Property**").   Mr. Frost recently turned over a watch acquired for $20,000 which the Receiver has now secured.

132.   The Receiver has requested authority to sell via auction other Receivership Assets identified by the Receiver as appropriate to be auctioned for the benefit of the Receivership [Doc. Nos. 23 and 24].

### F.  Pending Litigation

133.   The Receiver and the Receiver's Professionals examined ongoing litigation and disputes that may impact the Receivership Assets. In addition to the Winder Action, litigation and disputes that may impact the Receivership Assets include the following:

a)     A foreclosure action to foreclose on a house in *First Liberty Capital Partners, LLC v. Christopher Ridgeway, et al.*, CA No. 2024-CA-192838426 (Walton County, FLA) in which First Liberty has a $1.5 million mortgage against a property secured by a $1.5 million promissory note where the

property in Alys Beach in Florida may be worth at least $7.0 million;

b)    A foreclosure action to foreclose on a house in *First Liberty Capital Partners, LLC v. Stone Capital Group, LLC, et al.*, CA No. 853982 (Jefferson Parish, LA) in which First Liberty has a mortgage that secures the $1.5 promissory note referenced along with another $3.75 million promissory note;

c)    In connection with the above foreclosures, two replevin/foreclosures were brought based on equipment leases that First Liberty also signed with Stone Clinical Laboratories, LLC. The two cases are: (i) *First Liberty Leasing Stone SPE 1, LLC v. Stone Clinical Laboratories, LLC, et al.*, CA No. 2024-CA- 198164441 (Walton Country, FLA), and (ii) *First Liberty Leasing Stone SPE 1, LLC v. Stone Biotechnologies, LLC, et al.*, CA No. 856-304 (Jefferson Parish, LA);

d)    A replevin action to take possession of a large, expensive piece of equipment called a grinder that was security for a First Liberty loan to Fibretech in a case styled *First Liberty Capital Partners, LLC v. Fibretech LLC, et al.*, CA No. 25-CV-001062-340 (Franklin County, NC);

e)    An action in which Tie & Timber Tech, LLC defaulted on its note to First Liberty; and

f)    The Curepoint bankruptcy case.

134.    The Receiver has sought authority to engage Cooper Tierney in the

ordinary course of business [Doc No. 20]. Cooper Tierney as special and limited counsel to advise the Receiver with respect to several of the foregoing matters on which Cooper Tierney advised the Receivership Entities prior to the Appointment Order.

135.    The Receiver also sought to engage Chalmers, Adams, Backer & Kaufman as special and limited counsel to advise the Receiver with respect to: a) real property located in Winder, Georgia; and b) potential litigation against Ellis Commercial Investments LLC and 1800 Limited Partnership and its principal, Brandy Kirkland [Doc No. 20].

### G. Known Investors and Creditors

136.    To protect the identities, and prevent predatory solicitation the investors of the Receivership Entities, the Receiver has not attached a list of the known investors to this Report, but, upon request, the Receiver will provide a list to the Court for in camera review. The Receiver and the Forensic Accountant are still preparing the forensic reconstruction of the accounts of the Receivership Entities and anticipate that the completed reconstruction will reveal additional investors and investor deposits as reflected in the court filings of the SEC. Once the Receiver has finished this work, he will provide a more detailed report regarding the Investors.

137.    The Receiver and his team have expended significant efforts in

communicating with investors of Receivership Entities. The Receiver has: a) issued correspondence to investors who have already been identified by the Receiver; and b) already sent emails to all—over 200—known email addresses for investors. Incident to discharging the duties of the Receiver under the Appointment Order, the Receiver has attempted to respond to all calls and emails regarding this matter and been available to the media in order to communicate with investors.

138.    As explained above, soon after his appointment, the Receiver set up a dedicated telephone line and an email address for investors to communicate with the Receiver's office and obtain information regarding the enforcement action and the Receivership, and created the Website, which contains a summary of this action, important court filings and dates, answers to several frequently asked questions, and other information relevant to investors. The Receiver then sent emails to all known investors notifying them of this enforcement action and his appointment, providing general information regarding the Receivership, providing the telephone number, email address, and website address, and inviting them to contact the Receiver with any questions and visit the Website for further information regarding the Receivership and the enforcement action.

139.    The Receiver and counsel for the Receiver have informed investors that they cannot provide specific advice regarding tax or legal issues, their retirement

accounts, or any other matter and directed them their respective tax, IRA, and other professionals. As investors present common questions to the Receiver, the Receiver may update the Website to reflect frequently asked questions and answers that provide general information regarding common issues to the extent possible and as is appropriate. All investors are referred to their respective professionals to address their particular circumstances.

140.    Since the Receiver was unable to locate a complete schedule of investors with contact information for investors in the files of the Receivership Entities, the Receiver is attempting to compile an accurate list of investors from bank records, computer files, tax filings, paper records and other sources. Such information will be verified with information from investors in a claims process.

141.    With the assistance of Stretto, the Receiver compiled one comprehensive investor email list, deduped and verified the email addresses, and sent out formal emails to all known investors, providing an explanation regarding the commencement of the SEC enforcement action, the appointment of the Receiver, certain mandates of the Appointment Order, general information concerning the role of the Receiver, and again providing the Receivership telephone number, email address, and website to facilitate the dissemination of important information to investors. Because numerous investors have asked when they will receive their

money back, the Receiver also provided a general explanation regarding the procedures and possible timing of a potential claims process and distribution plan that may be formulated, approved, and implemented in this Receivership.

142. As explained above, during the Reporting Period, the Receiver obtained Court approval to employ Stretto as the data collection agent to prepare a secure online portal to collect and process information and documents from investors necessary for the Forensic Accountant to complete the account reconstruction and assist the Receiver to otherwise fulfill his duties under the Appointment Order, and to facilitate the use by the Receiver and the professionals of the Receiver of all the data received from investors. The Receiver is working with Stretto to create the portal through which investors can provide their contact information and upload their documents evidencing their investments in Receivership Entities, including wire transfer confirmations, canceled checks, promissory notes, bank statements, and/or retirement account statements. The collection of this information and documentation will streamline any claims process that may be approved by the Court, given that much of the information and documentation necessary to complete the forensic reconstruction of accounts will be required to confirm investors' claims and losses.

143. Once the claims portal is completed, the Receiver, with the assistance

of Stretto, will send out a mass email to all investors providing a link for a data collection form and a link to the secure portal to upload their documentation.

### H. Identifying and Pursuing Liquidated and Unliquidated Claims

144.    During the Reporting Period, the Receiver began investigating whether the Receivership has liquidated and unliquidated claims against third parties, affiliates, insiders, and investors of the Receivership Entities who received net gains. The Receiver and the professionals of the Receiver have begun compiling avenues of potential recoveries for the benefit of the Receivership; however, the focus of the Receiver has been collection of the outstanding loans.

145.    During the Reporting Period, the Receiver discovered that the Receivership Entities had used investor funds to make charitable donations and gifts as well as campaign contributions to political candidates. In particular, the Receiver and the professionals of the Receiver have identified a number of contributions to political candidates. The Receivership Entities appears to have directly, indirectly or through the Frost family made almost 1,000 political "donations" totaling over $1 million using investor funds. There has been extensive media coverage of these campaign contributions since the appointment of the Receiver. With regard to such contributions, Secretary of State Brad Raffensperger has urged any political entity that accepted contributions from Receivership Entities, the Frost Family, or any of

their affiliates to return those contributions to the Receiver so that victims may be made whole.

146.   Over $300,000 in campaign or charitable contributions have already been returned to the Receiver. Any politician wishing to return campaign contributions or other disbursement received from the Receivership Entities or Frost family should return them directly to the Receiver at Suite 555, 2964 Peachtree Road NW, Atlanta, Georgia 30305. The Receiver has deposited all such funds in a segregated account. When the Receiver has obtained sufficient information to report on these campaign contributions, the Receiver will file a report detailing the campaign contributions and the extent to which such contributions have been voluntarily returned.

147.   The Receiver is scrutinizing the improper use of investor funds used as charitable donations or campaign contributions and will seek the return of all such funds to the fullest extent permitted by applicable law.

148.   The Receiver and the professionals of the Receiver are also examining assets that may be recovered from Frost and other parties, including, but not limited to assets: a) attributable to funds derived from investors or clients of the Receivership Entities or the Defendants; b) held in constructive trust for the Receivership Entities; and/or c) that may otherwise be includable as Recoverable Assets, as that term is

defined in the Appointment Order.

149.   The Receiver and his professionals will continue to analyze potential sources of recovery and gather evidence for purposes of developing and pursuing claims the Receivership Estate may have to recover funds or other assets belonging to or improperly transferred from the Receivership Entities, including without limitation turnover and fraudulent transfer actions, as is appropriate and authorized by the Court. Further, the Receiver will investigate the potential claims of the Receivership Entities against professionals and institutions that may have facilitated the alleged misconduct of Defendants or otherwise contributed to the damages alleged to have been sustained by investors. The Receiver will complete the investigation of those claims, and after consultation with the SEC, pursue those claims that the Receiver believes are meritorious and likely to result in a significant recovery for the Receivership Estate.

## IV.   CASH ON HAND AND ACCRUED EXPENSES OF ESTATE

150.   As of September 30, 2025 (the end of the Reporting Period), the Receiver held a total of $1,460,895.91 in cash-on-hand in the fiduciary accounts for the Receivership Estate at Western Alliance Bank. The Standardized Fund Accounting Report for the Reporting Period, setting forth the receipts and disbursements of the Receivership Estate for the Reporting Period is attached as

**Exhibit A.**

151.    During the Reporting Period, the Receivership Estate has incurred administrative expenses in the form of fees and costs of the Receiver and his Court-approved professionals, including Counsel, the Forensic Accountant, and Stretto, for the work they performed or the costs they incurred in connection with fulfilling the duties of the Receiver under the Appointment Order. Pursuant to the Appointment Order, the Receiver will file an application seeking approval and payment of those fees and costs from the funds the Receiver has marshalled and deposited into the fiduciary accounts of the Receivership. The Receiver also incurred cost for Valid8 and Transfperct and has file motion to pay these expenses.

## V. CONCLUSION

152.    The Receiver and the professionals of the Receiver appreciate the opportunity to assist the Court in this matter. Until further order of the Court, the Receiver and the professionals of the Receiver professionals will continue their efforts, as discussed herein, to fulfill the duties of the Receiver under the Appointment Order in the most cost-effective manner while seeking to maximize

the ultimate recovery by the Receivership Estate.

Respectfully submitted this 30th day of October, 2025.

LAW OFFICES OF HENRY F. SEWELL JR., LLC

*/s/ Henry F. Sewell, Jr.*
Henry F. Sewell, Jr. Georgia Bar No. 636265 Counsel for the Receiver
Law Offices of Henry F. Sewell, Jr. Buckhead Centre
2964 Peachtree Road NW, Suite 555
Atlanta, GA 30305
(404) 926-0053
hsewell@sewellfirm.com

## <u>CERTIFICATE OF SERVICE, FONT AND MARGINS</u>

I hereby certify that I electronically filed the foregoing using the CM/ECF System that will automatically send e-mail notification of such filing to all registered attorneys of record.

I further certify that I prepared this document in 14-point Times New Roman font and complied with the margin and type requirements of this Court.

Dated: October 30, 2025.

LAW OFFICES OF HENRY F. SEWELL JR., LLC

*/s/ Henry F. Sewell, Jr.*
Henry F. Sewell, Jr. Georgia Bar No. 636265
Counsel for the Receiver
Law Offices of Henry F. Sewell, Jr.
Buckhead Centre
2964 Peachtree Road NW, Suite 555
Atlanta, GA 30305
(404) 926-0053
hsewell@sewellfirm.com

EXHIBIT A

SEC v. Edwin Brant Frost IV and First Liberty Building & Loan LLC
Receipts and Disbursements

## Receipts

| | | |
|---|---|---|
| Truist Bank Checking Account | First Liberty Capital Partners LLC | $5,214.35 |
| Truist Bank Checking Account | First Liberty Capital Partners LLC | $570,508.80 |
| Truist Bank Checking Account | First Liberty Building & Loan LLC | $58,930.52 |
| Truist Bank Checking Account | First National Investments LLC | $23,162.44 |
| Truist Bank Checking Account | My HealthAI Capital LLC | $196,495.50 |
| Truist Bank Checking Account | The Legacy Advisory Group Inc | $13,898.94 |
| Truist Bank Checking Account | The Liberty Group LLC | $17,542.86 |
| United Community Bank account | First Liberty Capital LLC | $2,164.10 |
| Rent Collections | 14 Greenville Street, Newnan GA | $4,800.00 |
| 2406 Cancer Care | Loan Interest | $30,000.00 |
| GDTC LAW | Attorney Retainer | $75,000.00 |
| Robbins Alloy Belinfante Littlefield LLC | Attorney Retainer | $80,468.18 |
| Jordan K. Carpenter | Retainer paid to future employee | $10,000.00 |
| Nick Lotito | Return of Gold Coin money retainer | $75,000.00 |
| Charitable donations and Political Contributions | 31 Charities and Political Entities/Candidates | $324,568.57 |
| | **Total Receipts** | **$1,487,754** |

## Disbursements

| | | |
|---|---|---|
| Teddy M. Hemmingway | Security guard at Tie & Timber Technologies | $9,780 |
| Various | Utilities, Insurance and other property expenses | $17,078 |
| | **Total Disbursements** | **$26,858** |

| | | |
|---|---|---|
| **Cash in Bank (9/30/2025)** | | **$1,460,896** |