IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>EDWIN BRANT FROST IV AND FIRST LIBERTY BUILDING & LOAN, LLC,<br><br>Defendants, and<br><br>FIRST LIBERTY CAPITAL PARTNERS LLC, FIRST NATIONAL HEALTH INVESTMENTS LLC, MYHEALTHAI CAPITAL LLC, THE LEGACY ADVISORY GROUP INC., and THE LIBERTY GROUP LLC,<br><br>Relief Defendants. | Civil Action File No.<br><br>1:25-cv-3826-MLB |

**MOTION FOR LEAVE OF COURT TO INITIATE ACTION AGAINST RECEIVERSHIP ESTATE**

Page **1** of 15

Come now Movants Full Circle LLC ("Full Circle,"), Timeless Acquisitions LLC ("Timeless Acquisitions"), David Pike, David Pike II, and Christie Pike, (collectively the "Movants"), through counsel, and file this *Motion for Leave of Court to Initiate Action Against Receivership Estate,* showing the Court as follows:

I. The Receivership Action

1. On July 10, 2025, the Securities and Exchange Commission ("SEC") filed a Complaint against First Liberty and other parties, thereby initiating the above-styled action (the "Receivership Action").

2. On July 11, 2025, this Court entered the *Order Appointing Receiver* (Doc No. 6) (the "Receivership Order") *inter alia* (i) appointing S. Gregory Hays as Receiver for the estate of First Liberty Building & Loan LLC, First Liberty Capital Partners LLC, First National Investments LLC, MyHealth AI Capital LLC, The Legacy Advisory Group Inc., and The Liberty Group LLC (the "Receivership Entities"), and (ii) staying "all civil legal proceedings of any nature… involving: (a) the Receiver, in his capacity as Receiver; (b) any Receivership Property, wherever located; (c) the Receivership Entities…; or (d) the Receivership Entities' past or present officers, directors, managers, agents, or general or limited partners…" Receivership Order at 16.

3. The Receivership Order granted the Receiver "all powers, authorities, rights and privileges heretofore possessed by the officers, directors, managers and general and limited partners of the Receivership Entities… in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959, and 1692, and Federal Rule of Civil Procedure 66." Receivership Order at 3.

4. The Receiver has the sole authority and ability to pursue and preserve the claims of the Receivership Entities. Pursuant to the Receivership Order, "[t]he Receiver shall assume and control the operation of the Receivership Entities and shall pursue and preserve all of their claims." Receivership Order at 4.

5. The Receiver has the power and duty "to pursue, resist, and defend all suits, actions, claims and demands which may now be pending or which may be brought by or asserted against the Receivership Estate." Receivership Order at 5.

9. As a result of the Receivership Order, the Receiver stands in the shoes of First Liberty and the other Receivership Entities.

II. First Liberty's Purported Loans to Movants

10. Movants entered into a transaction with Receivership Entities which was purportedly styled as a loan (the "Purported Loan"). Movants do not concede that

the transaction and its subsequent amendments were actually bona-fide business loans.

11. Movants operated in good faith with respect to all their dealings with Frost and the Receivership Entities. To the extent the Purported Loan was not actually a bona fide business loan, Movants were acting in good faith and had no knowledge of the nefarious activities of Frost and the Receivership Entities.

12. To the extent that the Purported Loan was actually a bona fide business loan, Movants constitute innocent bona fide good faith borrowers. Movants did not know that Frost and the Receivership Entities were operating a Ponzi scheme. At the times that Movants conducted the Purported Loans transactions with First Liberty, the Movants had no reason to believe that First Liberty was anything other than a legitimate lender.

13. On January 26, 2023, Movants David Pike, David Pike II, and Christie Pike each entered into Guaranty Agreements with First Liberty (d/b/a "First Liberty Capital Partners LLC"). Copies of those Guaranty Agreements are attached as **Exhibits A, B, and C.**

14. On February 10, 2023, Movant Full Circle entered into a promissory note with First Liberty for a total purported sum of $2,750,000, to be loaned to

Movant Full Circle at an interest rate of 18% for a twelve-month term (the "Purported Loan"). A copy of this promissory note is attached as **Exhibit D.**

15. On February 10, 2023, Movants Timeless Acquisitions and Full Circle entered into security agreements with First Liberty to secure the promissory note referenced above. Pursuant to the security agreements, Movants granted First Liberty a security interest in certain real property located in Walton County, Georgia (the "Walton Property") to secure the Purported Loan. Copies of these security agreements are attached as **Exhibits E and F.**

16. From the first day of the Purported Loan through the last day of First Liberty's business operations, Movants were victims of Brant Frost's ongoing fraud.

17. Movants understood the loan to be a twelve-month bridge loan which would allow them to begin work on revitalizing the Walton Property while Frost obtained an SBA loan as permanent financing for Movants. None of this turned out to be the case, because of Frost's fraud.

18. The first piece of Frost's ongoing fraud was the lack of actual funding he provided. A ledger provided by Defendants on February 10, 2023 showed a total $2,750,000 loan in which $1,455,730 was immediately disbursed and $1,294,270

was a balance available to the borrower. A copy of the ledger is attached as **Exhibit G.**

19. In truth, of the "immediately disbursed" money, only $1,034,730 was ever actually disbursed to a party other than Frost himself. That sum paid off a previous loan to a previous creditor. The rest of the "immediately disbursed" money was a six-month interest reserve and various self-dealt fees paid to Defendants for the execution of the Purported Loan.

20. Of the "balance available to the borrower," only $78,360 was actually loaned out to Movants. The rest existed in a theoretical balance Frost refused to let Movants access, because the nature of his fraud made him too illiquid to actually loan Movants the money they were entitled to.

21. Frost continually moved the goalposts on Movants to maintain plausible deniability about the existence of available funds. He had them submit multiple business plans for different types of businessees, yet continued to deny their requests to access the money they had contracted for.

22. One of Frost's sales pitches to Movants when Movants were considering doing business with him was his purported ability to obtain a Small Business Administration ("SBA") loan for Movants to retire the bridge loan and obtain

permanent, low-interest financing for their projects. This, too, was fraud. During the course of the business relationship, Frost represented on several occasions that he would obtain an SBA loan for Movants, but he never did. This fraud kept Movants trapped in the Purported Loan for longer than they had wanted or anticipated.

23. On February 5, 2024, Movants and First Liberty agreed to extend the term of the Purported Loan by an additional six months, with a 2.5% exit fee to be paid at closing as consideration (the "First Purported Loan Extension Agreement"). A copy of the First Purported Loan Extension Agreement is attached as **Exhibit H.**

24. On July 8, 2024, Movants and First Liberty agreed to extend the term of the Purported Loan by an additional nine months with an additional 1% extension fee to be paid with the signing of the extension as consideration (the "Second Purported Loan Extension Agreement). A copy of the Second Purported Loan Extension Agreement is attached as **Exhibit I.**

25. The Purported Loan remains in an outstanding state at this time, although Movants dispute the total amount owed, if any.

III. Movants' Debt Spiral Caused By Defendants' Bad Faith; Effect on Receiver's Interests

26. Movants entered into the agreement for the Purported Loan with the expectation that they would be able to access $1,294,270 of the original $2,750,000 to finance capital improvements to the Walton Property. *See* **Exhibit G.**

27. In truth, Defendants only ever released $78,360 to Movants. Defendants presented Movants with constantly shifting rationales as to why the funds that were supposed to be available to them couldn't be released, which Movants now understand to be a function of Defendants' Ponzi scheme.

28. Nonetheless, Defendants continued to charge Movants monthly interest in the amount of $41,250 – an amount that would have been accurate to an 18% annual rate if $2,750,000 had been loaned, which was not the case.

29. Because Defendants refused to release funds to Movants, Movants could not follow through with their intended upgrades and renovations to the Walton Property to make it viable for business.

30. Because the Walton Property, which projected to be income-producing if upgraded and renovated, was not income-producing, Movants had no income stream with which to pay off the Purported Loan.

31. Defendants further perpetuated their Ponzi scheme by subtracting $41,250 from the nominal "available balance" each month in lieu of collecting a

payment from Movants. The effect of this scheme and the misrepresentation of an SBA loan was to attempt to create a situation in which Movants would be liable to pay Defendants back for sums not actually lent, while cutting Movants off from alternative financing arrangements.

32. Movants have been, throughout their entire relationship with Defendants, victims of the fraud and Ponzi scheme perpetuated by Defendants. Movants have, through no fault of their own, left their relationship with Defendants with both their Property and their finances in a worse condition relative to where they started from.

33. On October 3, 2025, counsel for the Receiver indicated to counsel for Movants the Receiver's desire to inspect the Walton Property. Counsel for the Receiver also noted the Pikes' personal guarantees, and asked counsel for Movants for personal financial statements for all three of them.

34. On November 13, 2025, a property inspector for the Reciever came to the Walton Property, inspected it, and talked to David Pike.

35. Court filings in this case indicate that by no later than December 8, 2025, the Receiver shall file a plan for the fair, reasonable, and efficient liquidation of all

remaining, recovered, and recoverable Receivership Property (the "Liquidation Plan.") *See* Docket No. 6, No. 28.

36. Based on the Receiver's communications to Movants and the inspection of the property, Movants reasonably suspect that the Walton Property – which the Receiver's predecessor in interest only obtained an interest in via fraud – may be included as part of the Liquidation Plan.

37. Movants believe that such an outcome would be fundamentally unjust, and seek leave of the Court to petition for protection against such an outcome.

IV. <u>Bay Point Capital's Assertion of Rights</u>

38. Upon information and belief, on February 10, 2023, First Liberty entered into a Loan Participation Agreement with Bay Point Capital, which agreement gave Bay Point Capital a 36.36% interest in the nominal value of the Purported Loan. A copy of what Movants believe to be a true and accurate representation of the Loan Participation Agreement is attached as **Exhibit K.**

39. Under the terms of the Loan Participation Agreement, First Liberty ("Seller" in the agreement) was to function as loan administrator of the Purported Loan unless one of the following qualifying events occurred:

(1) Seller fails to comply with Seller's fiduciary, contractual, or legal obligations as provided under this Agreement or by state or federal law.

(2) Seller petitions for or becomes subject to bankruptcy.

(3) Seller commits any act of insolvency.

(4) Seller is declared insolvent, is taken over, or otherwise closed by a governmental regulatory agency which has jurisdiction over Seller.

40. The Loan Participation Agreement further provides that in the event of multiple participants in the Loan, the participating lender with the then-largest share will have the right to assume administration.

41. On July 1, 2025, counsel for Bay Point Capital sent a letter to First Liberty, to the attention of Frost. In that letter, Bay Point Capital asserted that it had learned that First Liberty was under SEC investigation and that First Liberty had ceased operations.

42. Bay Point Capital – whose share of the loan under the Loan Participation Agreement is not a majority share – asserted itself as the administrator of the Purported Loan from that date forward.

43. It is unclear to Movants who the proper administrator of the Purported Loan is at this point.

## V. Relief Requested

44. Movants request the Court to enter an order authorizing Movants to commence an action against the Receivership Estate before this Court (the "Declaratory Relief Action" for purposes of determining, *inter alia*,: (a) the amounts due, if any, on the Purported Loan; (b) the amounts of any offsets and recoupments available to Movants, (c) the amounts due to Movants based on the actions of the Receivership Entities, and (d) declaratory judgment as to whether or not Bay Point Capital is the current administrator of the Purported Loan.

45. Further, Movants request the Court to enter an order authorizing Movants to commence an action against the Receivership (the "Temporary Restraining Order") restraining the Receiver or any of its agents from executing a foreclosure or otherwise placing an encumberance on the Walton Property.

## VI. Jurisdiction

46. Movants believe this Court has ancillary jurisdiction over the proposed Declaratory Relief Action and the proposed Temporary Restraining Order because the claims relate to the receivership property of First Liberty and claims held by the Receiver in such capacity. With respect to the proposed actions, "[f]ederal jurisdiction is based on the ancillary jurisdiction of the federal courts… part of

their statutory 'supplemental jurisidiction.'". *Scholes v. Lehmann,* 56 F.3d 750 (7th Cir. 1995), citing *Pope v. Louisville, New Albany&Chicago Ry.,* 173 U.S. 573, 577 (1899). 28 U.S.C. §959(a) permits suits against "trustees, receivers, or managers of any property… without leave of the court appointing them, with respect to any of their acts or transactions in carrying on the business connected with such property." 28 U.S.C. §959(a). The Eleventh Circuit noted that this exception "is intended to permit actions redressing torts committed in furtherance of the debtor's business." *Carter v. Rodgers,* 220 F.3d 1249 (11th Cir. 2000).

47. Venue for the proposed Declaratory Relief Action and Temporary Restraining Order is proper in this district pursuant to 28 U.S.C. §1391.

48. Although it is Movants' belief that Movants may file the Declaratory Relief Action and Temporary Restraining Order in this Court against the Receivership Estate, out of an abundance of caution, Movants respectfully request this Court grant leave to initiate such Declaratory Relief Action and Temporary Restraining Order.

49. Movants request the Court for leave with urgency, as the Liquidation Plan is due to be filed by no later than February 6, 2025.

50. With this Court's permission, Movants seek to initiate the proposed Declaratory Relief Action and Temporary Restraining Order immediately to resolve the issues described above and to prevent Movants from suffering further harm as a result of Defendants' fraud and Ponzi scheme.

WHEREFORE, Movants request (a) authorization to file the proposed Declaratory Relief Action, (b) authorization to file the proposed Temporary Restraining Order, and (c) such other relief as the Court deems equitable and just.

Respectfully submitted this 25th day of November, 2025.

> GUILMETTE HENDERSON LLC
>
> */s/ Timothy J. Guilmette*
> Timothy J. Guilmette
> Georgia Bar No. 624309
> 1355 Peachtree Street
> Suite 1125
> Atlanta, GA 30309
> Telephone: (770) 635-5859
> Facsimile: (770) 637-8106
> tim@guilmettehenderson.com
>
> *Attorney for Movants*

## CERTIFICATE OF SERVICE, FONT, AND MARGINS

I certify that on the date below, I electronically filed the foregoing **Motion for Leave of Court to Initiate Action Against Receivership Estate** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all attorneys of record.

I further certify that I prepared this document in 14 point Times New Roman font and complied with the margin and type requirements of this Court.

Respectfully submitted this the 25th day of November, 2025.

                                         GUILMETTE HENDERSON LLC

                                         */s/ Timothy J. Guilmette*
                                         Timothy J. Guilmette
                                         Georgia Bar No. 624309
                                         1355 Peachtree Street
                                         Suite 1125
                                         Atlanta, GA 30309
                                         Telephone: (770) 635-5859
                                         Facsimile: (770) 637-8106
                                         tim@guilmettehenderson.com

                                         *Attorney for Movants*