# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Civil Action File No. 1:25-cv- |
| v. | |
| EDWIN BRANT FROST IV and FIRST LIBERTY BUILDING & LOAN, LLC, | |
| Defendants, and | |
| FIRST LIBERTY CAPITAL PARTNERS LLC, FIRST NATIONAL INVESTMENTS LLC, MYHEALTHAI CAPITAL LLC, THE LEGACY ADVISORY GROUP INC., and THE LIBERTY GROUP LLC, | |
| Relief Defendants. | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

## SUMMARY

1.     Between 2014 and June 2025, Defendants Edwin Brant Frost IV ("Frost"), and First Liberty Building & Loan, LLC ("First Liberty") (together, "Defendants"), raised at least $140 million from approximately 300 investors through

the sale of loan participation agreements and promissory notes which offered annual returns of 8% to 18%.

2.      Defendants represented to investors that their funds would be used to make short-term small business loans at relatively high interest rates ("Bridge Loans").

3.      Defendants represented to investors that these Bridge Loans and interest thereon would be repaid by borrowers via Small Business Administration ("SBA") or other commercial loans, which Defendants claimed they would help broker.

4.      Initially, Defendants solicited and sold these investments to "friends and family" in the form of either loan participation agreements or promissory notes.

5.      These agreements and notes offered investors the opportunity to make an investment that would be pooled with other investor funds and then lent to specific borrowers.

6.      Beginning in 2024, Defendants started a more widespread public solicitation of potential investors, advertising the opportunity to invest in promissory notes via radio advertising, internet podcasts, and the First Liberty website.

7.      All the investments, whether offered as a loan participation agreement or a promissory note, were purportedly to fund Bridge Loans.

8.      Defendants, however, did not use investor funds as represented.

9.     While some investor funds were used to make Bridge Loans, those loans did not perform as represented.

10.     Of the Bridge Loans Defendants actually made, only a few have been paid in full.

11.     Most Bridge Loans have ultimately defaulted and ceased making interest payments.

12.     Defendants, however, have continued to make interest payments to investors on the defaulted loans.

13.     Since at least 2021 Defendants have had to use funds raised from new investors to make these interest payments.

14.     Most, if not all, of the funds raised through the publicly advertised offering were either misappropriated or used to make Ponzi-style payments to existing investors.

15.     For example, Frost used investor funds to make payments to himself and his family members in excess of $5 million.

16.     Frost further used investor funds to pay for the operations of affiliated companies that he controlled, First Liberty Capital Partners LLC ("FLCP"), First National Investments LLC, MyHealthAI Capital LLC, The Legacy Advisory Group Inc., and The Liberty Group LLC ("Relief Defendants").

17.     The Relief Defendants received proceeds from this scheme without providing any value in return and were thus unjustly enriched thereby.

18.     As recently as May 24, 2025, Frost withdrew $100,000 investor funds for his personal use.

19.     In addition to failing to use investor funds as represented, *i.e.*, to make Bridge Loans, Defendants made other misrepresentations when soliciting new investments.

20.     Specifically, Frost knowingly misrepresented the success of the Bridge Loan program to investors.

21.     Frost told some potential investors that First Liberty had only ever had one Bridge Loan default.

22.     Frost told other potential investors that very few loans had defaulted.

23.     In reality, a significant portion of the Bridge Loans issued by First Liberty were in default when Frost made these statements.

## VIOLATIONS

24.     By the conduct described herein, Defendants have engaged and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities

Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

25. The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

26. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)].

27. In connection with the transactions, acts, practices, and courses of business described in this Complaint, Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce, of the mails, and/or of the means and instruments of transportation or communication in interstate commerce.

28. Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] and 28 U.S.C. § 1391 because Defendants reside in this district and offered and sold securities in this district.

## FACTS

### Defendants

29. **Edwin Brant Frost IV**, age 67, lives in Newnan, Georgia. Frost is the owner and president of First Liberty.

30. **First Liberty Building & Loan, LLC** was formed by Frost in 2005 in Georgia with its principal place of business in Newnan, Georgia. First Liberty recently ceased operations, had fewer than ten employees, and claimed to serve "Main Street business needs with Wall Street creativity," by providing loans to customers primarily through the SBA loan program and mortgage brokerage services.

### Relief Defendants

31. **First Liberty Capital Partners LLC** is a Georgia limited liability company that was formed in May 2005 with its principal place of business in Newnan, Georgia. This entity was formed a month after formation of First Liberty with the same post office address for the principal place of business. FLCP was the signatory on most of the loan participation agreements and promissory notes. Additionally, Defendants transferred investor money to FLCP.

32. **First National Investments LLC** is a Georgia limited liability company that was formed in April 2000 with its principal place of business in Newnan, Georgia. This entity was formed with the same post office address for

6

the principal place of business as First Liberty. Defendants transferred investor funds to First National Investments LLC.

33. **MyHealthAI Capital LLC** is a Georgia limited liability company formed in April 2025 with its principal place of business in Newnan, Georgia. This entity was formed to house health artificial intelligence investment transactions from First Liberty investors. This entity was formed with the same post office address as First Liberty. Defendants transferred investor funds to MyHealthAI Capital LLC.

34. **The Legacy Advisory Group Inc**. is a Georgia corporation that was incorporated in November 2024 with its principal place of business in Tucker, Georgia. This corporation filed a notice of intent to dissolve on June 18, 2025. Frost is the CEO, CFO, and secretary of this entity. Defendants transferred investor funds to The Legacy Advisory Group Inc.

35. **The Liberty Group LLC** is a Georgia limited liability company formed in July 2015 with its principal place of business in Newnan, Georgia. This entity was formed with the same post office address as the principal place of business as First Liberty. Defendants transferred investor funds to The Liberty Group LLC.

**First Liberty's Investment Scheme**

36. Starting in 2014, Defendants began raising capital via loan participation agreements offered to "friends and family."

37. "Friends and family" were later offered the opportunity to invest in promissory notes.

38. In 2024, Defendants expanded their capital raise by offering and selling promissory notes to the public via radio, internet program advertisements, and First Liberty's website.

39. Defendants told investors in both investment programs that the invested funds purportedly were to be used to provide Bridge Loans to First Liberty customers who were trying to obtain long-term loans from the SBA.

40. In total, Defendants raised at least $140 million from the sale of loan participation agreements and promissory notes to at least 300 investors.

41. During the "friends and family" phase of Defendants' scheme, Defendants solicited investors to participate in specific Bridge Loans.

42. For example, Frost would provide a potential investor with the total loan amount, the anticipated closing date of the loan, and the date upon which the loan would mature.

43. Additionally, Frost would provide the potential investor with information about the supposed borrower, the use of the funds, the existence of guarantees, and the exit options for the loan.

44. Investor funds were pooled together to reach the total amount purportedly needed to fund a specific Bridge Loan.

45. The terms of the publicly advertised note program differed from the "friends and family" program.

46. While the publicly advertised note program offered potential investors the opportunity to provide funding for Bridge Loans and investor loans were pooled together, investors did not participate in specific loans.

47. First Liberty's website stated that the promissory notes allowed "First Liberty to provide small businesses with short term bridge loans and other commercial capital."

48. As recently as May 2025, First Liberty's website stated that it had been providing commercial bridge lending since 2013 and that First Liberty had "funded over $100 million in bridge loans since 2013."

49. Both the "friends and family" and publicly advertised investments generally had a 12-month term (with rollover capability) and paid interest monthly.

50. The "friends and family" agreements paid a rate of return between 14-18%, with investors receiving the same interest rate regardless of investment size.

9

51.     The publicly offered notes paid between 8-13%, with the interest rate paid increasing based on the size of the investment, and investment tiers starting at $25,000.

52.     Initially, in the "friends and family" program, First Liberty was to be compensated from origination fee and other related fees that borrowers paid to obtain the Bridge Loans.

53.     At that time, First Liberty charged 18% interest on the Bridge Loans and paid 18% interest on the loan participation agreements.

54.      Over time, Defendants began offering loan participation agreements at 16% interest but continued charging Bridge Loan borrowers 18% interest on their loans.

55.     The loan participation agreements specifically state that all the fees paid on the loan belong to First Liberty and that First Liberty would be compensated by the differential between the per annum interest rate paid by the Borrower to First Liberty and the per annum interest rate that First Liberty paid to the investors.

56.     Some promissory notes contain a similar provision, while others are silent on the issue of Defendants' compensation.

57.      Frost, however, orally represented to the publicly advertised note investors that he and First Liberty did not take any fees out of the investor funds.

10

58.     The difference (or spread) between the interest rates paid by the borrowers on the Bridge Loans and the interest rates First Liberty owed investors in the "friends and family" program was typically 2%.

59.     The promissory notes issued in the publicly advertised program do not identify the spread because those notes were not tied to specific borrowers.

60.     Largely due to the numerous defaults in the Bridge Loans, the spread and fees collected from borrowers did not generate enough revenue to pay the interest owed to investors.

**The Ponzi Scheme and Misrepresentations to Investors**

61.     Frost told investors that First Liberty used 100% of the proceeds from the sales of loan participation agreements and promissory notes to fund the Bridge Loans.

62.     Frost also told investors that they would be repaid from the repayment of the Bridge Loans and interest thereon.

63.     These representations were false.

64.     Beginning no later than 2021, First Liberty began operating as a Ponzi scheme.

65.     First Liberty experienced a deficit each year from 2021 thru May 30, 2025.

66.     By the end of 2019, if all outstanding loans were making interest payments, the most that First Liberty could generate in revenue based on the spread between the interest paid by borrowers on the Bridge Loans and the interest paid to investors was approximately $180,000.

67.     In 2019, Defendants incurred $118,000 in credit card expenses, leaving just $65,000 to pay all other operating expenses.

68.     In 2020, Defendants incurred $234,000 in credit card expenses, leaving just under $250,000 to pay all other operating expenses.

69.     By 2021, Defendants' payroll expense exceeded the maximum revenue that Defendants could generate from the interest payments on the Bridge Loans by almost $200,000.

70.     In 2021, Defendants also incurred $313,000 in credit cared expenses, which increased the deficit to over $500,000.

71.     And by 2022, Defendants were not generating the maximum revenue from the Bridge Loans.

72.     In August 2022, a Bridge Loan borrower with $6.2 million in loans filed bankruptcy and stopped making interest payments on its loans.

73.     Nevertheless, in December 2022, Defendants raised $6.5 million purportedly to make another loan to this borrower.

74.     Defendants' potential revenue each year from 2019 to present calculated using the maximum interest generated by the Bridge Loans[1] and deducting only payroll and credit card expenses[2] is set forth below:

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|---|
| Total interest payments First Liberty should have received from Bridge Loan borrowers | 1,201,188 | 3,450,675 | 5,228,188 | 8,164,425 | 12,156,963 | 18,727,147 | 8,695,014 | 57,623,599 |
| Total interest payments First Liberty owed to investors | (1,017,545) | (2,969,323) | (4,627,996) | (7,755,056) | (13,414,459) | (18,934,441) | (8,567,889) | (57,286,709) |
| Subtotal | 183,642 | 481,353 | 600,192 | 409,369 | (1,257,496) | (207,294) | 127,126 | 336,891 |
| Minus operating expenses | | | | | | | | |
| Payroll expenses | 0 | 0 | (795,849) | (963,808) | (1,029,108) | (1,304,216) | (756,983) | (4,849,963) |
| Credit Card expenses | (118,289) | (234,163) | (313,700) | (681,931) | (370,820) | (412,038) | (241,332) | (2,372,272) |
| | (118,289) | (234,163) | (1,109,548) | (1,645,739) | (1,399,928) | (1,716,254) | (998,314) | (7,222,235) |
| Total Deficit | 65,353 | 247,190 | (509,357) | (1,236,371) | (2,657,424) | (1,923,547) | (871,189) | (6,885,344) |

75.     The actual deficit for each year is substantially larger than what is reflected in the chart in paragraph 74 because the Bridge Loans did not generate the maximum revenue.

76.     Instead, most of the Bridge Loans defaulted and ceased making interest payments.

77.     As of 2021, approximately 80% of interest and principal payments to investors were sourced from new investor funds, and not from Bridge Loan interest payments or principal repayments.

---

[1]     The analysis does not include any interest payments from the Bridge Loan borrower who filed bankruptcy in August 2022, but does include the interest payments owed to investors for the Bridge Loans made to that borrower.

[2]     First Liberty incurred other expenses that are not included in this calculation.

13

78. By at least 2021, Frost knew that many Bridge Loans were in default, and that many borrowers were not paying the interest due on their Bridge Loans.

79. Nevertheless, First Liberty continued to make interest payments to investors.

80. When soliciting new investors, Frost misrepresented the default rate of the Bridge Loans to investors.

81. Specifically, in connection with selling both the "friends and family" investments and the publicly advertised notes, Frost told some investors, including one as recently as May 2025, that First Liberty had only ever had one Bridge Loan default.

82. As recently as May 2025, when selling an investment, Frost told an investor that when the one Bridge Loan defaulted, First Liberty paid investors back with its own funds.

83. When selling to other investors, Frost represented that only a few Bridge Loans had defaulted.

84. In reality, the default rates were significantly higher. Indeed, potentially 90% of the Bridge Loans are currently in default.

85. Frost's representations regarding the success of First Liberty's Bridge Loan program were material to investors when deciding to invest with First Liberty.

14

86.    Frost also misled investors about the security of the Bridge Loans.

87.    When selling investments, Frost told investors that the borrowers to whom First Liberty made Bridge Loans had already received approval for SBA loans and that the Bridge Loan was only needed to provide funds while the SBA loan process was completed.

88.    In fact, few, if any, Bridge Loan borrowers had received preapproval for an SBA loan at the time the Bridge Loan was funded, and Frost knew that few Bridge Loans were ever converted to SBA loans.

89.    Frost also misled investors about the security of their existing investments to obtain additional investments from those investors.

90.    For example, in 2019, an individual invested $500,000 in connection with a $3.4 million Bridge Loan to the Bridge Loan borrower who filed bankruptcy in August 2022.

91.    The $3.4 million Bridge Loan closed in October 2019 and was to mature in May 2021 ("First Loan").

92.    Subsequently, First Liberty made a second Bridge Loan to the same borrower in November 2019 for $900,000 that was to mature in June 2021 ("Second Loan").

93. In May 2021, after the First Loan matured but the investor was not repaid, First Liberty made a third loan to the same borrower for $1.5 million ("Third Loan").

94. In September 2021, First Liberty made a fourth loan to the same borrower for $400,000 ("Fourth Loan").

95. In August 2022, the borrower filed for bankruptcy and ceased making interest payments on the Bridge Loans issued by First Liberty.

96. In December 2022, after the bankruptcy filing, First Liberty purportedly made a fifth loan to the same borrower for $6.5 million.

97. In May 2024, Frost solicited the investor in the First Loan for a new investment.

98. Frost offered the investor the opportunity to participate with other investors in a loan that would be used to help fund a company that was developing a healthcare app.

99. In response, the investor inquired about the status of repayment of his $500,000 investment in the First Loan.

100. Frost told the investor that the First Loan was scheduled to pay off in June and that he was "very confident that it will."

16

101. Frost also told the investor that the borrower was "up 20% YoY [year over year] in NOI [net operating income], and our lending partner who is refinancing this for us is very eager to get it done."

102. Relying on Frost's representations about the status of his $500,000 investment, the investor made an investment of $200,000 in a loan to First Liberty.

103. Frost knew his statements to the investor about the First Loan were false when he made them.

104. Frost knew by October 2022 that the Bridge Loan borrower was in bankruptcy.

105. On October 28, 2022, First Liberty filed a claim against the borrower in bankruptcy.

106. The bankruptcy claim filed by First Liberty identified only the Second and Third Loan.

107. First Liberty did not make a claim for the $3.4 million First Loan.

108. The bankruptcy court ultimately approved an unsecured claim for First Liberty of $375,000. No payment has been made on First Liberty's claim.

109. Until First Liberty shuttered operations in June 2025, the investor received monthly interest payments on his $500,000 investment in the First Loan.

**Defendants Fail to Disclose the Significant Default Rates**

110. Each loan participation agreement contained a provision stating that First Liberty would provide notice to the investor if First Liberty obtained "actual notice or knowledge or any loss of Property or change in financial condition or any Obligor under the Loan which will have a material adverse effect upon continuation of payments under the Loan or its repayment on default."

111. Defendants failed to provide investors with notice of changes in borrowers' financial conditions despite knowing that many Bridge Loan borrowers had defaulted and that the default would have a material adverse effect on the continuation of interest payments and the repayment of the principal amount.

112. By at least 2021, Defendants issued loan participation agreements containing this notice provision, knowing that they did not intend to comply with it.

113. The loan participation agreements also contained a provision requiring the investor's consent before First Liberty could make additional loans to the borrower.

114. Defendant failed to seek investor consent before making additional loans to existing Bridge Loan borrowers.

18

115. By at least 2021, Defendants issued loan participation agreements containing the consent provision knowing that they did not intend to comply with it.

116. As recently as June 2025, Frost was soliciting investments in a $3.5 million loan and telling investors that First Liberty's cashflow and resources were sufficient to repay the loan if necessary.

117. This statement was false.

118. As of May 30, 2025, the balance in First Liberty's accounts was only $2,668,045.06.

## Defendants Misappropriate Substantial Investor Funds

119. During Defendants' scheme, Frost misappropriated a significant amount of investor assets.

120. Between 2019 and 2024, Frost spent over $230,000 in investor funds to rent a vacation home for his family in Kennebunkport, Maine.

121. Between 2019 and 2025, Frost used over $140,000 in investor funds to purchase jewelry.

122. Additionally, Frost used investor funds to purchase a $20,800 Patek Philippe watch.

123. Between 2022 and 2024, Frost paid over $335,000 in investor funds to a rare coin dealer.

19

124. Frost also used investor funds to make over $2.4 million in payments to credit cards issued to him and his business entities.

125. Frost has used investor funds to make more than $570,000 in political donations.

126. Frost has transferred more than $5 million of investor funds to himself and members of his family.

127. Given that First Liberty was operating at a loss, Frost was not entitled to these funds according to what he told investors as to how he would be compensated.

128. Defendants also directed investor funds to various entities related to First Liberty.

129. Specifically, Defendants directed over $630,000 to relief defendant FLCP.

130. Defendants directed over $1.1 million to relief defendant First National Investments LLC.

131. Defendants directed over $460,000 to relief defendant MyHealthAI Capital LLC.

132. Defendants directed over $198,000 to relief defendant The Legacy Advisory Group Inc.

20

133.   Defendants directed $8.3 million to relief defendant The Liberty Group LLC.

134.   In the last eight months, Frost has been dissipating assets at a rapid pace.

135.   From October 2024 through April 2025, Frost wrote checks from company accounts to himself totaling $1,324,000.

136.   Significantly, nine days after being interviewed by Commission staff, Frost withdrew $100,000 from company accounts containing investor funds.

137.   Very recently, Frost also has been making large purchases at companies that sell high value and easily concealable assets.

138.   Between December 2024 and May 2025, Frost wrote checks to a local jeweler totaling $40,570.

139.   In November and December 2024, Frost wrote checks from company accounts totaling $210,875 to a business that specializes in selling gold coins.

## COUNT I

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]

140.   The Commission realleges paragraphs 1 through 139 above.

141.   Between 2014 and June 2025, Defendants, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and

21

communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

142. Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

143. By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II

**Violations of Sections 17(a)(2) and (a)(3) of the Securities Act
[15 U.S.C. §§ 77q(a)(2) and (a)(3)]**

144. Paragraphs 1 through 139 are hereby realleged and are incorporated by reference.

145. Between 2014 and June 2025, Defendants, in the offer and sale of securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

    a.    obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order

to make the statements made, in light of the circumstances under which they were made, not misleading; and

b.      engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

146.   Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III

### Violations of Section 10(b) and Rule 10b-5 of the Exchange Act
### [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]

147.   The Commission realleges paragraphs 1 through 139 above.

148.   Between 2014 and June 2025, Defendants, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

a.      employed devices, schemes, and artifices to defraud;

b.      made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

23

c.      engaged in acts, practices, and courses of business which would

and did operate as a fraud and deceit upon the purchasers of such

securities,

all as more particularly described above.

149.   Defendants knowingly, intentionally, and/or recklessly engaged in the

aforementioned devices, schemes and artifices to defraud, made untrue statements of

material facts and omitted to state material facts, and engaged in fraudulent acts,

practices and courses of business.

150.   By reason of the foregoing, Defendants, directly and indirectly, have

violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange

Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully prays for:

## I.

Permanent injunctions enjoining Defendants and their officers, agents,

servants, employees, and attorneys from violating, directly or indirectly, Section

17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange

Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**II.**

A permanent injunction enjoining Defendant Frost from directly or indirectly participating in the issuance, purchase, offer, or sale of any security, provided that such injunction shall not prevent Defendant Frost from purchasing or selling securities listed on a national securities exchange for his own personal accounts.

**III.**

An order requiring an accounting by Defendants and Relief Defendants of the use of proceeds of the fraudulent conduct described in this Complaint and the disgorgement by Defendants and Relief Defendants of all ill-gotten gains or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws.

**IV.**

An order pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] imposing civil penalties against Defendants.

**V.**

An order freezing the assets of Defendants and Relief Defendants pending further order of the Court.

## VI.

An order appointing a Receiver over Defendant First Liberty and Relief Defendants.

## VII.

An order preventing Defendants and Relief Defendants from destroying or concealing documents or other evidence until further order of this Court and expediting discovery.

## VIII.

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

Respectfully submitted this 10th day of July, 2025,

*/s/ Kristin W. Murnahan*
M. Graham Loomis
Regional Trial Counsel
United States Securities & Exchange Commission
950 E. Paces Ferry Road NE, Suite 900
Atlanta, GA 30326
404-842-7622
Georgia Bar No. 457868
loomism@sec.gov

Kristin W. Murnahan
Senior Trial Counsel
United States Securities & Exchange Commission

950 E. Paces Ferry Road NE, Suite 900
Atlanta, GA 30326
404-842-7655
Georgia Bar No. 759054
murnahank@sec.gov

COUNSEL FOR PLAINTIFF