UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>Plaintiff,<br>v.<br>EDWIN BRANT FROST IV and FIRST LIBERTY BUILDING & LOAN, LLC,<br>Defendants, and<br>FIRST LIBERTY CAPITAL PARTNERS LLC, et. al.,<br>Relief Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Civil Action File No.<br>1:25-cv-3826-MLB |

**STATUS REPORT REGARDING SALE OF WINDER PROPERTY AND REQUEST FOR HEARING ON SALE MOTION**

S. Gregory Hays, as Court-Appointed Receiver ("**Receiver**") pursuant to the *Order Appointing Receiver* dated July 11, 2025 [Doc. No. 6] ("**Appointment Order**") that was entered in the above-captioned case (the "**Case**" or "**Receivership**"), by and through counsel, hereby files this *Status Report Regarding Sale of Winder Property and Request for Hearing on Sale Motion* and shows as follows:

1. On July 22, 2026, the Court held a hearing (the "**Hearing**") on: a) a motion [Doc. No. 95] (the "**Winder Sale Motion**") filed by the Receiver to employ an auctioneer to sell certain real property located at 169 W. Athens St., Winder, Georgia (the "**Winder Property**") free and clear of all liens, claims, interests, and encumbrances; and b) a motion [Doc. No. 92] (the "**Haven Motion**") by Lisa Brown

("**Ms. Brown**") and Haven Real Estate Holdings of Winder, LLC ("**HREHW**") seeking certain relief with respect to the Winder Property (Brown and HREW shall be referred to herein as the "**Haven Parties**").

2. At the Hearing, the Haven Parties offered to purchase the Winder Property for $2,750,000 (the "**Winder Resolution**") with such amount comprised of: a) the estimated value of the Winder Property; and b) satisfaction of a prior obligation due by Four Seasons to First Liberty incident to which First Liberty acquired the Winder Property. The Court granted the parties until Friday, August 21, 2026, to move forward with the Winder Resolution or to report back that the matter was a live matter requiring resolution by the Court.. It was clear at the Hearing that the Winder Resolution did not include obligations due by entities owned or controlled by Ms. Brown other than HREW, including Haven Memory Care of Athens, LLC ("**HMCA**") and Haven Real Estate Holdings of Athens LLC ("**HREHA**"), or any guarantees or obligations related thereto. Counsel for the Receiver indicated at the Hearing that such obligations exceeded an additional $1.6 million (collectively, the "**Athens Obligations**"). A copy of the portion of the transcript from the hearing at which counsel for Ms. Brown made his offer is and the Court provided instructions (Pages 33 – 39) is attached as Exhibit "A".

3. After the Hearing, Ms. Brown did not provide the Receiver with

evidence of financing to close the Winder Resolution for $2,750,000, identify the name of a potential lender, provide a sale contract or show any ability to close this transaction. Instead, counsel for the Haven Parties made a revised, significantly lower proposal that would encompass the Athens Obligations and all other issues. The Receiver requested financial information from the Haven Parties (recent financials and proof of financing) to support this significantly lower offer which the Haven Parties refused to provide. No explanation has been provided by the Haven Parties as to why they are unwilling or unable to close the Winder Resolution. Despite this, the Receiver did provide a revised payoff to the Haven Parties for all issues as a counteroffer. At present, the Receiver's counteroffer remains pending. The Receiver also offered to move forward with the Winder Resolution in the event that the parties could not procure a settlement regarding all obligations. At present, the Receiver's counteroffer remains pending.

4. Based on a recent development at the Winder Property and the increasing expense to the Receivership related to property, however, the Receiver has concluded that a sale of the Winder Property must move forward as quickly as possible whether such sale is pursuant to the Haven Resolution or an auction pursuant to the Sale Motion.

5. As discussed at the hearing, the Receiver and Haven Parties did agree

to permit mutual inspections of the Haven Athens facility and the Winder Property. These inspections took place on August 19, 2022. The Haven Parties fully cooperated in permitting an inspection of the Haven Athens facility.

6. At the inspection of the Winder Property, however, the Receiver discovered that a door was unlocked, a side door plywood board had been removed, and a vagrant had broken into the building. After contacting the City of Winder Police Department, a police officer toured the Winder Property to make sure it was safe, confiscated drug paraphernalia and discovered an ID in the unit that belonged to someone who was already jailed on other charges. Ms. Brown attended this inspection and was given fully access to the Winder Property and spoke to the police department. Since a representative of the Receiver visits the Wider Property periodically to check on the property, the landscaper checks all doors every time services are performed, and neighbors routinely check on the property, it appears that the vagrant entered the property sometime in the past week as the last confirmation that all doors were locked was on August 17, 2026. The Receiver has instructed a contractor to re-attach the side door plywood board and is increasing surveillance of the Winder Property.

7. In an effort to further increase surveillance, the Receiver has requested and a police officer indicated that patrols near the Winder Property would be

increased. The Receiver has also offered to allow the City of Winder to use the Winder Property for weekly canine training so that a routine police presence exists. A representative of the Receiver will continue to follow up with the City of Winder Police Department.

8. Further, the Receivership continues to incur cost related to the Winder Property, including for insurance ($1,700), monthly landscaping ($750), and now maintenance to address vandalism issues (approximately $500), and likely increasing surveillance costs.

9. The urgency of this matter is exacerbated by the fact that, as the Receiver has experienced in other engagements, vagrant activity can occur when a property sits vacant. Barring the presence of 24-hour surveillance, it is difficult to control what happens when the property is vacant. While the Receiver's maintenance and management of the Winder Property has been frequent and consistent, the Receiver fears, despite his best efforts, that issues will continue at the Winder Property until the property is sold and occupied. Moreover, the need for additional monitoring will result in additional fees being incurred by the Receiver.

10. While the Receiver will continue to monitor, maintain and insure the Winder Property and will remain in contact with the authorities in Winder[1], the

[1] The Receiver first made contact with the Winder Police shortly after his

Receiver believes that the Winder Property should be sold as soon as possible and that time is of the essence.

11. Under the circumstances, the Receiver has concluded: a) there is no evidence that the Haven Entities can complete the transaction announced at the hearing; and b) that a hearing schedule as outlined by the Court at the July 22 hearing should be established. Establishing such a schedule will not prevent the Parties from seeking a negotiated solution and the establishment of firm deadlines may, in fact, further such discussions.

12. Accordingly, the Receiver requests a scheduling conference with the Court at which a hearing schedule can be put into place and such other and further relief as may be just and proper.

Respectfully submitted this 21st day of August, 2026.

LAW OFFICES OF HENRY F. SEWELL JR., LLC

*/s/ Henry F. Sewell, Jr.*
Henry F. Sewell, Jr.
Georgia Bar No. 636265
Law Offices of Henry F. Sewell, Jr.
2964 Peachtree Road NW, Suite 555
Atlanta, GA 30305
(404) 926-0053; hsewell@sewellfirm.com
Counsel for the Receiver

---

appointment to make them aware of the Receivership.

## CERTIFICATE OF SERVICE, FONT AND MARGINS

I hereby certify that I electronically filed the foregoing using the CM/ECF System that will automatically send e-mail notification of such filing to all registered attorneys of record.

I further certify that I prepared this document in 14-point Times New Roman font and complied with the margin and type requirements of this Court.

Dated: August 21, 2026.

LAW OFFICES OF HENRY F. SEWELL JR., LLC

*/s/ Henry F. Sewell, Jr.*

Henry F. Sewell, Jr.
Georgia Bar No. 636265
Law Offices of Henry F. Sewell, Jr.
Buckhead Centre
2964 Peachtree Road NW, Suite 555
Atlanta, GA 30305
(404) 926-0053
hsewell@sewellfirm.com
Counsel for the Receiver

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ET AL., Plaintiffs, v. BAY POINT CAPITAL PARTNERS II, LP, Intervenor Plaintiff, v. EDWIN BRANT FROST, IV, ET AL., Defendants. | CIVIL ACTION FILE NO. 1:25-CV-03826-MLB |

---

BEFORE THE HONORABLE MICHAEL L. BROWN
TRANSCRIPT OF PROCEEDINGS
JULY 22, 2026

---

Proceedings recorded by mechanical stenography and computer-aided transcript produced by

JANA B. COLTER, FAPR, RDR, CRR, CRC
Realtime Systems Administrator
Official Court Reporter
1949 U.S. Courthouse
75 Ted Turner Drive, SW
Atlanta, Georgia 30303
(404) 215-1456

He then goes in, uses these investor's funds, goes into the Bank of OCK, takes that traditional lending, says I'm just going to cross-collateralize all of your companies. I'm going to do it all. Because I'm going to go package it and sell it 22 times. And when you say you don't have any investors, I do, I have a bunch of them waiting.

And we filed in state court. But I agreed with the SEC, I've worked very well with the SEC in this process. I have stayed everything in the state court. And I have turned over every bit that I can to help the SEC in prosecuting this case.

But I do have investors and they're coming, some of those investors invested into this.

And so it's not right. And what I would ask, Judge, is this, it looks like we're now closer because we stood before a Federal Judge in the Northern District.

I've been asking this, and he says he wants the offer. We'll pay the $2 million, we'll pay the 750, and we'll go about our happy way as it relates to Winder.

We'll go get traditional lending if we can come to a number of what she actually owes. We have a bank prepared to do that traditional lending. And we can pay these back to the investors and we can go back to a bank and be gone, and you don't have to hear this anymore from us.

MR. SEWELL: And, Your Honor, I -- if they're going

to pay $2.7 million to resolve the Winder situation, I'll recommend that to the receiver.

But that still leaves the Athens property, which is -- which has -- and that loan is 1.9 on its own, and that has to be resolved.

MR. EPPS: So I don't want to throw another -- I just want to deal with Winder right now. We'll do that. I have a bank prepared, we'll get -- we'll -- we'll offer the contract, we'll get that taken care of. Well, I'll get it papered up and then Winder is done and we can move on.

THE COURT: I'm going to let you-all see what you can work out in the next 30 days.

MR. EPPS: Yes, sir.

THE COURT: If you can't, then my plan is this. My plan is to proceed as to the ability of the receiver to sell the property or alternatively Haven and Brown's right to an equitable claim to the property in the main action pursuant to the receiver's motion to sell.

In which case, what we will do is you tell me that this is still a live action. I don't think the most efficient way to address it is either in a motion to intervene and file a separate complaint or as a counterclaim in the separate action. I think the most efficient way is to do it in the receivership through the motion to sell.

All that is necessary is that the receiver have their

to pay $2.7 million to resolve the Winder situation, I'll recommend that to the receiver.

But that still leaves the Athens property, which is -- which has -- and that loan is 1.9 on its own, and that has to be resolved.

MR. EPPS: So I don't want to throw another -- I just want to deal with Winder right now. We'll do that. I have a bank prepared, we'll get -- we'll -- we'll offer the contract, we'll get that taken care of. Well, I'll get it papered up and then Winder is done and we can move on.

THE COURT: I'm going to let you-all see what you can work out in the next 30 days.

MR. EPPS: Yes, sir.

THE COURT: If you can't, then my plan is this. My plan is to proceed as to the ability of the receiver to sell the property or alternatively Haven and Brown's right to an equitable claim to the property in the main action pursuant to the receiver's motion to sell.

In which case, what we will do is you tell me that this is still a live action. I don't think the most efficient way to address it is either in a motion to intervene and file a separate complaint or as a counterclaim in the separate action. I think the most efficient way is to do it in the receivership through the motion to sell.

All that is necessary is that the receiver have their

right to liquidate and take whatever actions Frost could have taken. And at the very same time to make sure that the borrower has her opportunity to present evidence in support of her claim.

So if you tell me it's still a live action, we'll set a schedule for discovery and a date for an evidentiary hearing.

And I would think discovery would be something like 60 days. I think it would be something like three depositions each, five interrogatories each and five requests for productions or something like that, something that can be streamlined to get to this issue efficiently.

And then we will have an evidentiary hearing. And I'll determine whether or not Haven and Brown have some equitable claim that would preclude the sale of the property.

Does everybody understand that?

MR. EPPS: Yes, sir.

MR. SEWELL: Yes, Your Honor.

THE COURT: I've read Eleventh Circuit cases. I have read *SEC v. Terry*, that's a case in which the Eleventh Circuit reversed one of my colleagues because she didn't go through that process. That's at 833 F. App'x 229.

And I've read another case, *SEC v. Torchia*, which essentially says the same thing, that that's the process that should be followed.

It protects her right to a process to establish her claim, but allows the equitable decision to be made efficiently. Okay?

MR. EPPS: Yes, sir.

THE COURT: In the interim, I would recommend that you-all figure out whether this is a real offer or whether it's a figment of an offer.

If it's going to go on, I'm going to order you, since I'm not going to address the two other claims, as soon as you tell me this is a live action, you're going to have to comply with the procedures order.

MR. EPPS: Yes, sir.

THE COURT: All right?

If for no other reason than I think that information should be given so that it can be worked out. If it really is, as both of you say, if you show your work, then this case ought to be resolved.

The receiver is entitled to no better situation than Frost would have been in. And there's something that hits me wrong about the receiver saying today the value of the property might be worth more and we might be able to go find some investors or some speculators who want to buy this property.

And that Ms. Brown ought to compete with them if, in fact, Frost said, hey, help me out with this and if you do

these things, then you will get the property.

My thought would be that if he was making that offer, it is as he thought and he said to her, there was a lot of upside in it. She should get that upside. She shouldn't have to compete with some private equity fund from Omaha who wants to take that upside. Okay?

And I don't know if that's what happens in an auction. But it appears to me as though that the receiver is entitled to the things that Frost was entitled to, but not the benefit of the fact that all of this is unwound in a bad way and Ms. Brown can't be disadvantaged by that. She's entitled to be in the position she was supposed to be in, but no worse and no better.

I don't think anybody can make -- I am concerned in this case about borrowers trying to get an unfair advantage because Frost was committing fraud against other people.

But I'm also concerned about the receiver trying to maximize, for good reasons, there are investors that have lost money, and so there is a good reason to try to maximize the receivership assets. But you can't do that at the expense of an innocent borrower.

And so I'm trying to make sure that that's the world pool and the sea monster that we're trying to get between. Okay?

MR. EPPS: Yes, sir.

THE COURT: All right.

MR. SEWELL: Yes, sir.

THE COURT: Anything else? Everybody understand what's going to happen?

MR. SEWELL: That's all I have, Your Honor.

The one thing I think I would like to present to the Court, is just as -- and I can share this more as a consent order, sort of freezing that ancillary proceeding while we're -- because I think there's some deadlines coming up, so we ought to freeze that ancillary proceeding until we report back to the Court.

THE COURT: I'll do that by a docket entry.

MR. SEWELL: Okay. Thank you.

MR. EPPS: Yes, sir. And the only other thing, Judge Brown, that we would ask is -- and I hope we can just say this to you openly -- is just access to the Winder property so we can see where it is since we've last seen it, just to make sure that there is nothing in there that we're unaware of.

THE COURT: Do you have a problem with that?

MR. SEWELL: No. No problem with that. And I would ask the request we've made before, is just that we have access to the Athens property to inspect it and see what's there.

MR. EPPS: The only thing I say to that, Judge Brown, is that I totally agree, but this is a functioning memory ward

facility in Athens, it's got patients, it's --

THE COURT: Well, just do it in a nice way.

MR. EPPS: Yes, sir.

THE COURT: Do it in a respectful way.

MR. SEWELL: We know how to do that, Your Honor.

MR. EPPS: We can do that.

MR. SEWELL: We can do that. We can do that.

THE COURT: Have somebody walk through and have somebody with them to walk through it. That shouldn't be something that lawyers can't figure out.

MR. SEWELL: Yes, sir. we'll do it.

THE COURT: Okay?

MR. SEWELL: Thank you.

MR. EPPS: Thank you, Judge Brown.

(Whereupon, the proceedings were adjourned at 10:51 a.m.)