EHD&H

Epps, Holloway, DeLoach & Hoipkemier, LLC

Kevin E. Epps
Kelly C. Holloway
Jeffrey W. DeLoach
Tyler M. Gaines

Adam L. Hoipkemier, of counsel
David Quilliams, of counsel
Morris H. Wiltshire, Jr., of counsel

August 21, 2026

*Via Electronic Mail and Certified Mail*
Henry F. Sewell, Jr., Esq.
Law Offices of Henry F. Sewell, Jr., LLC
Buckhead Centre
2964 Peachtree Road NW, Suite 555
Atlanta, Georgia 30305
hsewell@sewellfirm.com
*Counsel for S. Gregory Hays as Court-Appointed Receiver*

**Re:** *SEC v. Edwin Brant Frost IV and First Liberty Building & Loan, LLC, et al.*, No. 1:25-cv-3826-MLB (N.D. Ga.); *Hays v. Brown, et al.*, No. 1:26-cv-03283-MLB (N.D. Ga.)

The August 20, 2026 Inspection of the Winder Property; Demand for Immediate Action to Secure, Insure, and Preserve Receivership Property; Notice of Intent to Seek Emergency Relief; Response to Your August 21, 2026 Email

Dear Mr. Sewell:

Yesterday, pursuant to the parties' agreement and the Court's direction at the July 22 hearing, the Receiver's representative inspected Haven Athens and then met Ms. Brown and her brother at the Winder Property, 169 W. Athens Street, Winder, Georgia. The Athens inspection proceeded exactly as promised. What the participants found at Winder is the subject of this letter.

## 1. What the Inspection Found

The buildings were occupied. Persons were living inside the facility, and individuals were found using drugs there. Hypodermic needles and other drug paraphernalia were present. Bedding had been set up in the cottages. The Winder Police Department had to be dispatched to clear the buildings before the inspection could proceed safely, and arrests were made. Officers directed those present, including Ms. Brown's brother and the Receiver's representative, to stand back while the buildings were searched because of the quantity of drug materials inside.

The physical condition of the Property matches the way it has been kept. The HVAC systems have been stripped of their copper and destroyed. The commercial kitchen equipment turned over with the Property, including the commercial range, has been broken apart and ruined; Photographs 11 and 12 of Exhibit A show that equipment as it was maintained and as it was found

yesterday. A water pipe burst inside the facility at some point during the Receiver's custody and was never properly remediated. Mold followed, and the lower portions of drywall, baseboard, and molding have been cut away through substantial portions of the interior, which remains open, exposed, and unrestored. The grounds are abandoned, with grass and weeds standing shoulder high against buildings that are barely visible from the drive.

The cause and the timeline were supplied on site by the Receiver's own representative. He told Ms. Brown during the inspection that the pipe burst in March, and that the Receiver learned of it only when the owner of the neighboring hotel called early one morning to report water running through the building. He attributed the flood cuts, which took out brand new drywall and finished trim, to mold that had already taken hold by the time anyone responded. In short: the estate's principal construction asset flooded five months ago; the Receiver's inspections did not catch it; a neighbor did; and after the demolition, the building was left open, unrestored, unsecured, and, by yesterday, occupied. At no point in those five months, including in your August 18 letter pricing this Property at $2,750,000, was any of this disclosed to the Brown Parties.

Twelve photographs from the inspection are enclosed as Exhibit A. Video from the inspection documents the same conditions, including the occupancy and the police response, and will be submitted to the Court.

## 2. **The Receiver Has Had Exclusive Possession and Control**

None of this occurred on the Brown Parties' watch. The Receiver was appointed on July 11, 2025 [Doc. 6]. On August 6, 2025, your office demanded keys or access codes to the Winder buildings because, in your words, when you drove through the Property the night before, it "was unsecured." Our office provided the lockbox code to the Receiver's real estate manager that same day. From that day forward, the estate held exclusive possession and control of a project that stood at approximately 85% completion, and it locked the Brown Parties out. (Tr. 32.) The estate took the keys because it insisted that an unsecured Winder Property was unacceptable. Yesterday showed what the estate did with them. The Property was turned over secure, sound, and nearly complete. Ms. Brown had prospective purchasers prepared to pay more than $3,900,000 for it, and the Receiver's own August 18 proposal priced it at $2,750,000.

The Receiver's team represented to Ms. Brown that the Property was being physically inspected once each week. Yesterday's conditions cannot be reconciled with that representation. A building inspected weekly does not flood undetected until a neighbor calls to report it, is not taken over by squatters, does not lose the copper out of its mechanical systems, and does not grow mold undisturbed long enough to require the demolition of its lower walls. Either the inspections did not occur, or they occurred and these conditions were known and permitted to continue. The Brown Parties are entitled to know which. So are the Court, the Commission, and the investors for whose benefit this estate exists.

The Brown Parties' preliminary assessment is that restoring the Property to the condition in which the Receiver received it will approach $1,000,000. That value was not lost by the borrower. It was lost in the custody of the estate.

### 3. Your August 21 Email

Against that backdrop, your email of this morning asks whether Ms. Brown intends "to proceed with the $2.75 Million offer" and states that "[i]n light of the discovery yesterday at Winder, the Receiver needs to move forward with a sale, either to your client or at auction." Respectfully, what was "discovered" yesterday is the condition of an asset that has been in the Receiver's exclusive care for more than a year, and the central casualty was no discovery at all: by your own representative's account, the estate has known of the March water loss for months. The estate's failure to protect its most valuable hard asset is not a reason to force an immediate sale at a price fixed before the damage was known; it is the reason there cannot be one.

The Court's framing at the July 22 hearing controls: the Receiver "is entitled to no better situation than Frost would have been in," and Ms. Brown is "entitled to be in the position she was supposed to be in, but no worse and no better." (Tr. 36-37.) A rushed sale of a stripped, unsecured, mold-damaged building, with the waste priced into every bid, puts the estate ahead of its own conduct and Ms. Brown far behind it. The Court held the sale motion [Doc. 95] in abeyance on July 22 [Doc. 106], and it remains in abeyance.

As for your question: the $2,750,000 you reference was addressed to the Property as the Receiver's representations described it. The Brown Parties had a comprehensive written response to your August 18 proposal, including a revised offer supported by a complete line-item schedule, finalized for delivery yesterday, August 20. What the inspection revealed intervened. The Brown Parties remain ready to resolve this matter, and their third-party financing, which is underwritten against the Winder Property itself, remains in place. But no responsible offer can be made for the Property in its present condition until the Receiver discloses the full extent of the casualty and his custody records, and until the lender's appraiser completes the appraisal first requested on August 3, an appraisal that must now begin from a materially different and previously undisclosed baseline. The Brown Parties will not absorb the cost of the estate's failure to protect the asset, and they reserve every right with respect to the diminution in value and the damage to the collateral underlying their financing. The Receiver has demanded evidence of the Brown Parties' ability to close while the collateral on which that ability depends deteriorated, undisclosed, in his custody. That, too, will be presented to the Court.

### 4. Demands

The Brown Parties require the following. Items (a) through (c) should not require a motion; they are the baseline obligations of any custodian of estate property.

a. **Secure the Property immediately.** Lawful removal of all occupants in coordination with the Winder Police Department; new locks; secured points of entry; and monitored security. Please confirm in writing by noon on Monday, August 24, 2026 that this has been done.

b. **Remediate and insure.** Engage a licensed water and mold remediation contractor immediately; give notice of the March 2026 water loss and of the theft and vandalism losses to the estate's insurance carrier; and confirm in writing that the Property has been continuously insured since July 11, 2025, providing the policies and any claim correspondence.

c. **Preserve all records.** The Receiver and his professionals should implement an immediate litigation hold covering: all inspection logs, reports, photographs, and calendars; the identity of every person who inspected the Property and each date of inspection; all representations to Ms. Brown, written or oral, regarding inspections of the Property; all records concerning the March 2026 water loss, including the neighboring hotel owner's report and all communications with him; all property management, security, access, and key records; all utility records; all contractor, demolition, and remediation communications and invoices; all insurance communications; and all communications with prospective purchasers, brokers, or auctioneers concerning the Property.

d. **Produce by Friday, August 28, 2026:** the inspection records described above; all records of the March 2026 water loss and the demolition that followed, including any moisture, mold, or air quality assessments; the insurance policies and claim notices; an itemized accounting of every dollar the estate has spent to maintain, secure, insure, or repair the Property since July 11, 2025; and the loan-level accounting of the Haven Winder loan requested in our August 3 letter.

e. **Stand down on the auction.** Withdraw the demand that the Brown Parties buy immediately or see the Property auctioned. No sale process should move while the Property sits unsecured and unremediated, while the Brown Parties' lender has been denied appraisal access, and while the Receiver's custody of the asset is itself the subject of the emergency relief described below.

5. **<u>Emergency Relief</u>**

The thirty-day window the Court set at the July 22 hearing closed today. This afternoon, the Receiver filed a status report with the Court [Doc. 121] describing yesterday's findings as the discovery that “a vagrant had broken into the building,” estimating that he “entered the property sometime in the past week,” reporting approximately $500 in maintenance “to address vandalism issues,” and requesting a scheduling conference. The report does not mention the March water loss, the mold, or the demolition. The Court should have the complete picture, from the parties. The Brown Parties are preparing an emergency motion asking the Court to set a status conference at its earliest availability and to enter interim orders directing the Receiver to secure, insure, remediate, and account for the Winder Property, directing preservation of the records identified above, and confirming that no sale or auction proceeds in the interim. This letter and Exhibit A will be exhibits to that motion. If the Receiver will commit in writing by noon on Monday, August 24, 2026 to items (a) through (c) above, we will advise the Court of that commitment. The Brown Parties' status report and the emergency motion described above will give the Court that picture, will join the request for a conference, and will ask that it be held promptly, with interim protections in place.

Because the Winder Property is an asset of the receivership estate created at the Commission's request for the benefit of defrauded investors, we are providing this letter and its enclosures to the Commission's counsel of record. Every dollar of value lost at Winder is a dollar lost to the same investors the receivership exists to protect.

**6. <u>Reservation of Rights</u>**

The Brown Parties reserve all rights, claims, and defenses, including their claims arising from the waste, loss, and diminution in value of the Winder Property and the impairment of the collateral underlying their financing; their claims arising from the nondisclosure of the March 2026 casualty during the parties' negotiations; their right to seek appropriate relief against the estate, including surcharge; their positions stated in the August 3, 2026 letter and all prior correspondence; their defenses and counterclaims in the ancillary action; and their objections to any sale of the Property. Nothing in this letter waives any of them.

We are available today, over the weekend, and Monday.

Sincerely,

**EPPS, HOLLOWAY, DELOACH & HOIPKEMIER, LLC**

*/s/ Kevin E. Epps*

Kevin E. Epps

KEE/sr

Enclosure: Exhibit A (Photographs 1 through 12)

Cc: Madison Graham Loomis, Esq., U.S. Securities and Exchange Commission
Kristin Wilhelm Murnahan, Esq., U.S. Securities and Exchange Commission

# **EXHIBIT A**

*Photographs of the Winder Property, 169 W. Athens Street, Winder, Georgia*

*Photographs 1 through 10 and 12 were taken during the August 20, 2026 inspection. Photograph 11 shows the same commercial kitchen equipment as previously maintained.*



**Photograph 1.** Main building and drive; grounds overgrown against the structure.



**Photograph 2.** Cottage entrance engulfed by overgrowth.



**Photograph 3.** Cottage nearly obscured from the drive.



**Photograph 4.** Corridor wall with lower drywall, baseboard, and molding cut away; studs and slab exposed.



**Photograph 5.** Flood cut along corridor wall; drywall debris left on the floor.



**Photograph 6.** Entry vestibule; lower wall sections removed; framing lumber left on the floor.



**Photograph 7.** Wall opened around doorway; insulation exposed.



**Photograph 8.** Header above doorway cut open; insulation exposed.



**Photograph 9.** Insulation pulled from wall cavities; unfinished plumbing wall.



**Photograph 10.** Interior room left with debris, buckets, and staging.



**Photograph 11.** The commercial kitchen range in serviceable condition, as previously maintained.



**Photograph 12.** The same commercial range as found on August 20, 2026.