UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, Plaintiff, | : | Civil Action File No. 1:25-cv-3826-MLB |
| v. | : | |
| EDWIN BRANT FROST IV and FIRST LIBERTY BUILDING & LOAN, LLC, Defendants, and | : | |
| FIRST LIBERTY CAPITAL PARTNERS LLC, et. al., Relief Defendants. | : | |

**RESPONSE AND OBJECTION TO EMERGENCY MOTION OF LISA BROWN AND HAVEN REAL ESTATE HOLDINGS OF WINDER, LLC FOR A STATUS CONFERENCE AND FOR INTERIM ORDERS TO SECURE AND PRESERVE THE WINDER PROPERTY**

S. Gregory Hays, as Court-Appointed Receiver ("**Receiver**") pursuant to the *Order Appointing Receiver* dated July 11, 2025 [Doc. No. 6] ("**Appointment Order**") that was entered in the above-captioned case (the **"Case**" or "**Receivership**"), by and through counsel, hereby files this *Response and Objection to Emergency Motion of Lisa Brown and Haven Real Estate Holdings of Winder, LLC for Status Conference and for Interim Orders to Secure and Preserve the Winder Property* (the "**Emergency Motion**") , respectfully stating as follows:

1. The Emergency Motion requests (i) a status conference and (ii) interim orders regarding 169 W. Athens Street, Winder, Georgia, the ("Winder Property").

2. The Receiver shows that the relief sought by Movants is based upon false and exaggerated claims regarding the current condition of the Winder Property and an incident which took place on August 20, 2026. Further, the Receiver shows that the Movants are not in compliance with the *Order Establishing Procedures to Enter Action to Resolve Claims Arising from Loan Obligations Due to the Receivership* [Doc. No. 70] (the "**Procedures Order**"), particularly the requirement that they provide a verified statement of all uses of monies received from the Receivership Entities and that no relief should be afforded to the Movants unless and until they are in compliance with the Procedures Order.

# I. BACKGROUND

## A. Hearing and Winder Resolution

3. On July 22, 2026, the Court held a hearing (the "**Hearing**") on: a) a motion [Doc. No. 95] (the "**Winder Sale Motion**") filed by the Receiver to employ an auctioneer to sell the Winder Property; and b) a motion [Doc. No. 92] (the "**Haven Motion**") by Movants seeking certain relief with respect to the Winder Property.

4. At the Hearing, the Movants offered to purchase the Winder Property for $2,750,000 (the "**Winder Resolution**"). Such amount represented a compromised amount due to take into account the value of the Winder Property and the satisfaction of a prior loan which had defaulted resulting in First Liberty Capital

taking the Winder Property back through a deed in lieu of foreclosure. The Winder Resolution would leave unresolved the amounts owed by a related entity owned by Ms. Brown, Haven Athens. The offer of $2,7500,000 was made without condition and with a representation that financing was available.

5. After the Hearing, and before the August 20 inspection described below, counsel for Movants made a revised, significantly lower proposal that would encompass all of his clients' obligations as further discussed in the status report at Doc. No. 121 (the "**Sale Status Report**"). This proposal demonstrated to the Receiver that Movants did not intend to honor the commitment made in open court on July 22 and that the Movants did not have the funds to complete the sale. Indeed, despite repeated demands, the Movants failed and refused to produce any evidence of documents that they could even pay this lower amount. Despite this, the Receiver responded to this revised offer with a proposal leaving intact the $2.75 Million proposal for Winder and providing a discounted pay off for the Haven Athens loan. The Receiver reiterated his demands for proof of financing which the Movants have still not provided.

6. Pursuant to an agreement between the parties, mutual inspections took place on August 20, one by the Receiver of the Haven Athens facility and one by the Movants at the Winder Property. As the result of an incident which took place at

the Winder Property inspection, the Movants are now apparently seeking to delay a sale and dramatically lower the price for the Winder Property to the detriment of the investors in this case and, indeed, are relying on sensationalized and false account of that incident to hurl unsubstantiated allegations against the Receiver and drive down the value of the Winder Property for their own benefit.

7. As a preliminary matter, as detailed in the Affidavit of Dwaine Butler, filed herewith, the Receiver has incurred significant time and expense maintaining and securing the Winder Property. Mr. Butler details and provides pictures of the Winder Property at the time the Receiver took possession which show that it was a partially renovated, vacant property which clearly required substantial work to be completed. Mr. Butler also details his efforts to work with neighbors, contractors and local authorities to ensure that any issues at the Winder Property are promptly addressed and to maintain the Property.

8. Since the appointment of the Receiver, Ms. Brown, who represented to First Liberty that she was a person of substantial wealth worth several millions of dollars, has not made a single payment on any loan obligations and has refused to allow the Receiver to sell the Winder Property. Further, she has rejected a proposal from the Receiver to forgive the construction loan (to the extent she can document that the funds were actually used in the construction of the building) in exchange for

a release of a lis pendens to enable a sale of the Property. Essentially, Movants seek a free ride, demanding more and more relief and delay, while forcing the investors in this case, who already provided Ms. Brown with millions of dollars, to preserve and maintain property for her.

9. As detailed in Mr. Butler's Affidavit, on August 20, Mr. Butler accompanied Ms. Brown and a colleague of hers to the Winder Property. He immediately noticed that one of the doors was open. For safety reasons, Mr. Butler contacted the Winder Police and asked that they enter the building first. Three officers arrived within a few minutes and conducted a walk through of the building. Although no one was in the building, the police officer did find a mattress had been set up in one of the rooms and that drug paraphernalia as well as a bag that looked to contain a controlled substance was located in one of the rooms. The mattress was on a bed frame in the building at the time the Receiver was appointed. The officers took possession of and removed the drug paraphernalia. The officers further reported that they found an id and confirmed that it belonged to an individual who had recently been taken into custody on other charges.

10. Since no one was in the building and the building was deemed safe, the police officers left and the inspection of the premises by Ms. Brown proceeded and she was able to inspect, and take pictures of the entire premises.

11. Since that date, the Receiver has had the mattress, bed frame and other items all removed from the room in which they were located and all of the lock keys and codes have been changed. In addition, plywood has been added to the door which had been left open to further secure it. Discussions have been held with the Winder police who agreed to provide extra patrols and keep Mr. Butler advised of any issues.

12. In the Emergency Motion, the Movants make a number of false claims about what happened at the August 20 inspection as follows:

a) "The Winder Property was found occupied by trespassers" (Page 3) No one was in the building at the time of the inspection

b) "individuals were found using drugs inside" (Page 3) Again, no one was in the building and no one was found in the building using drugs.

c) "Arrests Were Made" (Page 4) No one was placed under arrest at the inspection;

d) "Bedding had been set up in the cottages" (Page 4) There are no "cottages" on the Property and the only bedding was in one unit.

e) Officers "directed those present .. to stand back" (Page 4) Mr. Butler asked the officers to inspect the building and while the officers did

so remained outside with Ms. Brown and her brother.

13. Without citing any evidence of trespassers prior to August 17, 2026, the Motion attempts to sensationalize this event by: a) referencing the number of vehicles that responded after a representative of the Receiver called the police after discovering the unauthorized entry; and b) alluding that the intrusion was a longstanding situation without any actual evidence. While the Receiver acknowledges that intrusions are serious matters, the Motion fails to identify any actual damage from this incident or how it would impact the value of the Property.

14. Movants go on to make a number of other allegations against the Receiver.

15. During the course of the August 20 inspection, Mr. Butler freely discussed a water leak which had occurred in March with Ms. Brown and her brother. Without conducting any investigation as to what actually happened, Movants make a number of allegations with respect to the water leak. In fact, as detailed in Mr. Butler's affidavit, the water leak was minor, was covered by insurance, was cleaned for approximately $5,000 and the Receiver has received $97,000 from the insurance company to conduct any additional repairs he determines should be made. As noted in Mr. Butler's Affidavit, even Ms. Brown's contractors did not think the damage significant

16. Movants further allege that copper wiring has been stolen. Mr. Butler addresses that in his affidavit and states there is no evidence of such theft and if there had been theft, he would have reported it to police and filed an insurance claim.

17. Mr. Butler also addresses the claim that the "commercial kitchen equipment has been broken apart and ruined. Mr. Butler confirms that this old equipment is in the same state it was when the Recover took over. There is no evidence that the equipment is not working and certainly no evidence that it was working at the time of the Receiver's appointment. It should be noted that the Four Seasons facility closed in 2024 and this equipment has likely not been used for several years.

18. Finally, the Movants assert that the grounds are overgrown. Mr. Butler details the landscaping done by the Receiver, the contract with the Landscaping Company, amounts paid to the Landscaper. Further, his picture of the front of the main building on August 17, just prior to the August 20 inspection, shows a trimmed yard. The Receiver has properly maintained the landscaping.

19. The condition of which Movants now complain is in material respects the condition in which they left the Property. On July 22, 2025, eleven days after the Receiver's appointment, Movants' counsel described the Winder Property to counsel for the Receiver as "not occupied," "in the middle of a rezoning process,"

and in need of "approximately $200k before it will be operational." That description matches the estimate Movants' own contractor prepared on May 21, 2025, two days before the purchase agreement was signed, which priced the work remaining to finish the building at $230,325.93 — of which flooring and paint alone accounted for two-thirds, and the only electrical scope was light fixtures. It also matches the state of the life-safety systems: on January 29, 2024, before First Liberty took title, the sprinkler system at the Property was reported to be "recalled" and "not serviceable," and as late as June 10, 2025 Ms. Brown requested a draw of $11,600 for "shop drawings for fire safety alarm systems," meaning the fire alarm system was then still at the design stage. The Winder Property was a vacant, unfinished building when the Receiver took possession, exactly as Mr. Butler's affidavit and photographs show.

20. The Movants now request several forms of relief:

a) An order that the locks be changed: This has already been done and was arranged without any demand from the Movants.

b) Notice to the insurance company: The notice was given several months ago and the Receiver has collected the allowed claim. The documents evidencing this are attached to the Butler Affidavit.

c) A report as to the work done with respect to the Water Leak: Mr.

Butler's affidavit contains a full report.

d) Direct the Receiver provide access to Haven's appraiser: The Receiver has agreed and conducted three separate inspections of the Property by Haven, not one of them involved an appraiser. As far as the Receiver is aware, the Movants have never conducted an appraisal of the Property. However, should the Movants now seek to have an appraiser visit the Property, the Receiver will certainly agree to coordinate an inspection.

21. A further review of the Emergency Motion reveals the real purpose of the Emergency Motion which is the Movants demand that the Court continue to hold the Receiver's Motion to Sell in abeyance. Obviously, the Receiver will not proceed with any sale without Court permission; however, a sale of the Winder Property has already been delayed too long and must move forward. This not only due to the increasing expense to the Receivership and fact that the Movants have failed to pay amounts due to the Receivership and/or related to the Winder Property, but due to the failure of the Movants to present a viable option despite causing significant delays in the sale of the property. The Receivership has already expanded significant time and effort to try to get the Movants to honor their obligations and it is time for the delays to stop. The Movants either need to come forward with a viable offer

with proof of funds or the Receiver must be permitted to auction the Property per the Sale Motion

22. The sensationalized events referenced in the Motion reinforce the need for a sale. As an initial matter, the Motion appears to be an effort to drive down the value of the Winder Property rather than a good faith effort to address matters related to the Winder Property. Events that occurred prior August 20, 2026, make clear that Movants have been searching for any way to pay less than the amount due. The Motion; however, does not actually benefit the Movants and only harms the Receivership as the amount due by the Movants are based on the amount due under the Four Seasons Loan and the Construction Loan. Movants owe a significant amount to the Receivership based on the outstanding amount of the Construction Loan and, in event Movants seek to acquire the Winder Property, the Four Seasons Loan.[1] Since the amount due is based on such obligations, the efforts by Movants to lower the value of the Winder Property are unavailing. Moreover, to the extent there was any actual damage stemming from the water leak and trespasser, these issues have been addressed and the Receiver has approximately $90,000 to make such repairs as may be necessary to prepare the Property for auction. The Movants are

[1] Ms. Brown and the other entities owned by Ms. Brown owe even more in light of the Athens Obligation.

also not creditors of the Receivership and do not have a claim for mismanagement.

**B. Expenses**

23. The Receiver believes that any right of the Movants to the Winder Property, to the extent it ever existed, has expired. To the extent that the Court will continue to consider such right, the Receiver requests that Movants be required to post a bond or start paying the expenses of preserving the Winder Property.

**C. Compliance with the Procedures Order.**

24. The Movants continue to attempt to seek relief from this Court without complying with the Procedures Order.

25. In particular, the Movants have not provided the verified report, supported by documents, for their uses of investor funds received from First Liberty. No information is provided about this issue in the Emergency Motion.

26. Of particular note, the Movants have consistently contended that they were prepared to close the proposed sale of the Winder Property just prior to the appointment of the Receiver. This agreement required the Movants to provide the following information to the buyer as a condition of closing.

> 5.1.5 Construction Deliverables. Seller shall have delivered the following items no later than fifteen (15) business days prior to Closing, or as soon as reasonably available, to Purchaser and Purchaser's lender (collectively, the "Construction Deliverables"): Complete copies of the approved building plans and specifications, including any and all approved changes or modifications (as-built plans if available); All building permits,

> governmental approvals, inspection sign-offs, and final certificates of occupancy (if applicable); Itemized budget and cost summary, including allowances and any change orders issued during construction; Product schedules, including finishes, fixtures, equipment, and systems installed; Contractor warranties and subcontractor/supplier lien waivers, evidencing all parties have been paid in full through Closing; Final renderings and marketing materials, if available, for appraiser and lender valuation purposes.

27. To the extent that the Movants were truly prepared to close the transaction which was cancelled after the appointment of the Trustee, they should already have collected and be prepared to produce the information required under the Procedures Order.

28. Further, the Movants have made other commitments regarding the production of information to the Receiver. The following statement is contained in Paragraph 2 of the Movants Status Report filed August 21, 2026:

> The Haven Parties finalized a comprehensive written response to the Receiver's August 18 counteroffer, including a revised offer supported by a complete line-item schedule and a commitment to deliver the requested financial information, including 2025 financial statements, 2026 year-to-date financial statements, the 2026 general ledger, the current rent roll, current lender correspondence, and Ms. Brown's updated personal financial statement, by August 26, 2026. That response was finalized for delivery on August 20, 2026. What the parties found at the Winder Property that afternoon intervened. The production commitment stands, and the materials will be delivered as stated.

29. The counter offer was never made and the information and documents

have never been provided.

30. Unless and until the Movants comply with the Procedures Order and produce the information they have agreed to produce, this Court should not grant them any relief.

**Conclusion**

31. Simply stated, the Movants have all of the information they sought and there is no valid reason to further delay a sale. Either the Movants must come forward with a viable, provable offer or the Receiver must be permitted to proceed with an auction. Recent events weigh in favor of a sale, not in favor of further delay If the Movants are simply unable to purchase the Property, the Receiver has two interested buyers and should be allowed to proceed with the sale of the Winder Property.

WHEREFORE, the Receiver requests that the Emergency Motion be denied, that the Receiver be awarded his attorneys fees in being forced to respond

to the Emergency Motion and for such other and further relief as may be just and proper.

Respectfully submitted this 4th day of September, 2026.

LAW OFFICES OF HENRY F. SEWELL JR., LLC

*/s/ Henry F. Sewell, Jr.*
Henry F. Sewell, Jr.
Georgia Bar No. 636265
Law Offices of Henry F. Sewell, Jr.
2964 Peachtree Road NW, Suite 555
Atlanta, GA 30305
(404) 926-0053; hsewell@sewellfirm.com
Counsel for the Receiver

**CERTIFICATE OF SERVICE, FONT AND MARGINS**

I hereby certify that I electronically filed the foregoing using the CM/ECF System that will automatically send e-mail notification of such filing to all registered attorneys of record.

I further certify that I prepared this document in 14-point Times New Roman font and complied with the margin and type requirements of this Court.

Dated: September 4, 2026.

LAW OFFICES OF HENRY F. SEWELL JR., LLC

*/s/ Henry F. Sewell, Jr.*

Henry F. Sewell, Jr.
Georgia Bar No. 636265
Law Offices of Henry F. Sewell, Jr.
Buckhead Centre
2964 Peachtree Road NW, Suite 555
Atlanta, GA 30305
(404) 926-0053
hsewell@sewellfirm.com
Counsel for the Receiver